IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Reagor-Dykes Motors, LP, et al. | ) | Case No. 18-50214-rlj-11 |
| | ) | Jointly Administered |
| Debtors, | ) | |
| | ) | |
| | ) | |
| Reagor-Dykes Motors, LP, | ) | |
| Reagor-Dykes Imports, LP, | ) | |
| Reagor-Dykes Amarillo, LP, | ) | Adversary Proceeding |
| Reagor-Dykes Auto Company, LP, | ) | No.: 20-05005-rlj |
| Reagor-Dykes Plainview, LP, and | ) | |
| Reagor-Dykes Floydada, LP, | ) | |
| Reagor Auto Mall, Ltd., | ) | |
| Reagor-Dykes Snyder, L.P., | ) | |
| Reagor-Dykes Auto Mall I LLC, | ) | |
| Reagor-Dykes II LLC, | ) | |
| Reagor-Dykes III LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| Ford Motor Credit Company LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FORD MOTOR CREDIT COMPANY LLC'S
BRIEF IN SUPPORT OF MOTION TO DISMISS DEBTORS' COMPLAINT**

Respectfully submitted,

**BAKER BOTTS LLP**

Kevin M. Sadler
State Bar No. 17512450
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
650-739-7518
650-739-7618 (Fax)
kevin.sadler@bakerbotts.com

Michael S. Goldberg
State Bar No. 08075800
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
713-229-1234
713-229-1522 (Fax)
michael.goldberg@bakerbotts.com

and

**PHILLIPS LYTLE LLP**

Craig A. Leslie
Jacob S. Sonner
One Canalside
125 Main Street
Buffalo, New York 14203
716-847-8400
716-852-6100 (Fax)
cleslie@phillipslytle.com
jsonner@phillipslytle.com

**ATTORNEYS FOR DEFENDANT**

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ........................................................................................... i

I.       INTRODUCTION ............................................................................1

II.     STATEMENT OF FACTS ..............................................................2

      A.     The Debtors' Floorplan Financing Fraud ...............................2

      B.     The FBI's Investigation and Criminal Charges .......................3

III.    ARGUMENT AND AUTHORITIES...............................................5

POINT I       DEBTORS' ADVERSARY COMPLAINT FAILS
TO STATE A CLAIM.....................................................................5

POINT II     DEBTORS' FRAUDULENT TRANSFER CLAIM
IS BARRED AS A MATTER OF BOTH LAW AND EQUITY...........7

      A.     The Alleged Transfers to Ford Credit Cannot, as a
Matter of Law, Support a Fraudulent Conveyance Claim ...........8

      B.     Debtors' Fraudulent Conveyance Claim is Inequitable,
Contravenes the Purpose of Fraudulent Transfer Law, and
Fails to Satisfy the Benefit of the Estate Requirement ..............11

           1.     Debtors cannot satisfy § 550's benefit of the estate requirement ..11

           2.     Avoidance claims that contradict the goals and
purposes of the Bankruptcy Code are impermissible. ...................12

      C.     Ford Credit has an Absolute Defense to Debtors'
Fraudulent Conveyance Claim...............................................13

      D.     Debtors' Fraudulent Conveyance Claim is also Inadequately Pled...........14

POINT III    DEBTORS' LACK STANDING TO ASSERT AN EQUITABLE
SUBORDINATION CLAIM, AND CANNOT STATE SUCH
A CLAIM AS A MATTER OF LAW ...............................................15

POINT IV    DEBTORS CANNOT STATE A SURCHARGE CLAIM,
AS A MATTER OF LAW...............................................................17

POINT V     DEBTORS CANNOT STATE A PLAUSIBLE TURNOVER CLAIM...............19

POINT VI        DEBTORS CANNOT STATE A PREFERENTIAL
TRANSFER CLAIM, AS A MATTER OF LAW ................................................20

POINT VII       DEBTORS' "DETERMINATION OF LIEN" CLAIM
FAILS TO STATE A CLAIM ..............................................................................23

POINT VIII      DEBTORS CANNOT STATE A DISALLOWANCE CLAIM,
AS A MATTER OF LAW......................................................................................25

IV.      CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

Page

Cases

*In re 1701 Commerce, LLC,*
   511 B.R. 812 (Bankr. N.D. Tex. 2014) .................................................................6, 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...............................................................................................5, 6

*Begier v. IRS,*
   496 U.S. 53 (1990) .................................................................................................8, 21

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...............................................................................................5, 6

*In re the Bennett Funding Grp., Inc.,*
   439 F.3d 155 (2d Cir. 2006) ....................................................................................14

*Campbell v. City of San Antonio,*
   43 F.3d 973 (5th Cir. 1995) .....................................................................................5

*Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.,*
   783 F.2d 480 (5th Cir. 1986) ...................................................................................10

*In re Consol. Cotton Gin Co.,*
   347 B.R. 572 (Bankr. N.D. Tex. 2006) ..............................................................18, 19

*Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.,*
   500 B.R. 464 (W.D. Tex. 2013) ...............................................................................11

*Cuvillier v. Taylor,*
   503 F.3d 397 (5th Cir. 2007) ...................................................................................6

*In re CyberCo Holdings, Inc.,*
   382 B.R. 118 (Bankr. W.D. Mich. 2008) ...................................................8, 9, 10, 11

*In re Davis,*
   889 F.2d 658 (5th Cir. 1989) ...................................................................................25

*In re Delta Towers, Ltd.,*
   924 F.2d 74 (5th Cir. 1991) .....................................................................................17

*In re Domistyle, Inc.,*
   811 F.3d 691 (5th Cir. 2015) ...................................................................................18

*Dunes Hotel Assocs. v. Hyatt Corp.,*
   245 B.R. 492 (D. S.C. 2000) ..............................................................................12, 13

*E. Poultry Distribs., Inc. v. Yarto Puez*,
  2001 WL 34664163 (N.D. Tex. 2001) ............................................................14

*Ehrlich for Hoffmans Trade Grp. LLC v. Comm. Factors of Atlanta*,
  567 B.R. 684 (N.D.N.Y. 2017) .......................................................... 8, 9, 15

*In re El Paso Refinery, L.P.*,
  171 F.3d 249 (5th Cir. 1999) ............................................................. 21, 23

*Epie v. Neiman Marcus Direct*,
  2001 WL 585766 (N.D. Tex. May 29, 2001) .......................................... 6

*Matter of Fairchild Aircraft Corp.*,
  6 F.3d 1119 (5th Cir. 1993) *abrogated on other grounds*,
  *In re Dunh*am, 110 F.3d 286 (9th Cir. 1997) ....................................13

*In re Feiler*,
  230 B.R. 164 (B.A.P. 9th Cir. 1999) ....................................................11

*Ferrer v. Chevron Corp.*,
  484 F.3d 776 (5th Cir. 2007) .............................................................. 6

*Finn v. All. Bank*,
  860 N.W.2d 638 (Minn. 2015) ............................................................15

*In re First All Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ........................................................ 8, 9, 11

*In re Great Lakes Dredge & Dock Co., LLC*,
  624 F.3d 201 (5th Cir. 2010) .............................................................. 6

*In re Grimland, Inc.*,
  243 F.3d 228 (5th Cir. 2001) ......................................................... 18, 19

*In re Holcomb*,
  2005 WL 6443634 (Bankr. N.D. Tex. Sept. 1, 2005) ............................ 6

*In re IFS Fin. Corp.*,
  2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008) ..............................25

*In re Integra Healthcare Holdings, Ltd.*,
  2012 WL 4434680 (Bankr. E.D. Tex. Sept. 24, 2012) ..........................23

*In re Jacobson*,
  2006 WL 2796672 (W.D. Tex. Sept. 26, 2006),
  *aff'd* 2007 WL 2141961 (5th Cir. July 26, 2007) ...........................6, 10

*Janvey v. Golf Channel, Inc.*,
   487 S.W.3d 560 (Tex. 2016) .......................................................................................15

*In re JKJ Chevrolet, Inc.*,
   26 F.3d 481 (4th Cir. 1994) ................................................................................. 17, 18

*In re Lancelot Inv'rs Fund L.P.*,
   2012 WL 718631 (Bankr. N.D. Ill. Mar. 2, 2012) ......................................................25

*In re Lehman Bros. Holdings, Inc.*,
   541 B.R. 551 (S.D.N.Y. 2015) ............................................................................. 14, 15

*In re Life Partners Holdings, Inc.*,
   926 F.3d 103 (5th Cir. 2019) ............................................................ 14, 16, 17, 21, 22

*In re Lockwood*,
   14 B.R. 374 (Bankr. E.D.N.Y. 1981) ...........................................................................15

*In re Lyondell Chem. Co.*,
   554 B.R. 635 (S.D.N.Y. 2016) ....................................................................................14

*Matter of Maple Mortg., Inc.*,
   81 F.3d 592 (5th Cir. 1996) .......................................................................8, 11, 21, 23

*MCorp. v. Clarke*,
   755 F. Supp. 1402 (N.D. Tex. 1991) ...........................................................................16

*Melamed v. Lake County Nat'l Bank*,
   727 F.2d 1399 (6th Cir. 1984) .......................................................................... 8, 9, 11

*In re Murphy*,
   331 B.R. 107 (Bankr. S.D.N.Y. 2005) .........................................................................12

*In re Pearlman*,
   440 B.R. 900 (Bankr. M.D. Fla. 2010) ........................................................................15

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*,
   57 F.3d 321 (3d Cir. 1995) ..........................................................................................18

*R2 Invs., LDC v. Phillips*,
   401 F.3d 638 (5th Cir.2005) .......................................................................................... 6

*In re Rand Energy Co.*,
   256 B.R. 712 (Bankr. N.D. Tex. 2000) ........................................................................25

*Reagor Auto Mall, Ltd. v. FirstCapital Bank of Texas, N.A.*,
   No. 20-05002-rlj, Dkt. 35 (Bankr. N.D. Tex. August 24, 2020) ........................ 14, 16, 22

*In re ReoStar Energy Corp.*,
   2012 WL 3184726 (N.D. Tex. Aug. 3, 2012)..............................................................21

*In re Rollings*,
   456 Fed. App'x 340 (5th Cir. 2011)......................................................................6, 10

*Search Int'l., Inc. v. Snelling & Snelling, Inc.*,
   31 F. App'x 151 (5th Cir. 2001).................................................................................6

*In re Sharp Intern. Corp.*,
   403 F.3d 43 (2d Cir. 2005).......................................................................................13

*In re SI Restructuring, Inc.*,
   532 F.3d 355 (5th Cir. 2008)....................................................................................16

*In re Soporex, Inc.*,
   446 B.R. 750 (Bankr. N.D. Tex. 2011).......................................................................6

*In re Stangel*,
   222 B.R. 289 (Bankr. N.D. Tex. 1998).......................................................................6

*In re Sullivan*,
   161 B.R. 776 (Bankr. N.D. Tex. 1993).....................................................................14

*Matter of Tex. Gen. Petroleum Corp.*,
   52 F.3d 1330 (5th Cir. 1995)....................................................................................11

*In re Tusa-Expo Holdings, Inc.*,
   496 B.R. 388 (Bankr. N.D. Tex. 2013),
   *aff'd* 2015 WL 935141 (N.D. Tex. Mar. 4, 2015),
   *aff'd* 811 F.3d 786 (5th Cir. 2016)...............................................................21, 23, 24

*In re U.S. Abatement Corp.*,
   39 F.3d 556 (5th Cir. 1994)......................................................................................16

*In re UDI Corp.*,
   301 B.R. 104 (Bankr. D. Mass. 2003).......................................................................21

*United States ex rel. King v. Alcon Labs.*,
   232 F.R.D. 568 (N.D. Tex. 2005).............................................................................14

*USA v. Cabral*,
   No. 2:19-cr-149-Z, Dkt. 5...........................................................................................4

*USA v. Canady*,
   No. 2:19-cr-187-Z, Dkt. 7...........................................................................................4

*USA v. Dunn*,
    No. 2:19-cr-170-Z, Dkt. 5 ................................................................................ 4

*USA v. Fansler*,
    No. 2:19-cr-159-Z, Dkt. 6 ................................................................................ 4

*USA v. Johnston*,
    No. 2:19-cr-126-Z, Dkt. 4 ................................................................................ 4

*USA v. Maldonedo*,
    No. 2:19-cr-175-Z, Dkt. 6 ................................................................................ 4

*USA v. Miller*,
    No. 2:19-cr-116-Z, Dkt. 6 ................................................................................ 4

*USA v. Neel*,
    No. 2:20-cr-00012-BR, Dkt.7 .......................................................................... 4

*USA v. Rickman*,
    No. 2:19-cr-150-Z, Dkt. 4 ................................................................................ 4

*USA v. Smith*,
    Case No. 2:19-cr-079-D-BR, Dkt. 11 ................................................... 3, 4, 16

*USA v. Urias*,
    No. 2:19-cr-115-Z, Dkt. 8 ................................................................................ 4

*USA v. Williams*,
    No. 2:19-cr-118-Z, Dkt. 7 ................................................................................ 4

*USA v. Wood*,
    No. 2:19-cr-130-Z, Dkt. 8 ................................................................................ 4

*In re Waggoner Cattle, LLC*,
    2019 WL 469367 (Bankr. N.D. Tex. Feb. 6, 2019) ...................................... 16

*In re Weeks*,
    28 B.R. 958 (Bankr. W.D. Okla. 1983) ......................................................... 15

*Wellman v. Wellman*,
    933 F.2d 215 (4th Cir. 1991) ................................................................. 11, 12

**Statutes**

11 U.S.C. § 502 ................................................................................................. 5, 25

11 U.S.C. § 506 ................................................................................................. 5, 17

11 U.S.C. § 510 ............................................................................................................. 5

11 U.S.C. § 542 ............................................................................................... 5, 19, 20

11 U.S.C. § 547 ................................................................................................... 5, 21

11 U.S.C. § 548 ...........................................................................................5, 8, 13, 14

11 U.S.C. §550 ..................................................................................................... 5, 11

11 U.S.C. § 1106 ......................................................................................................14

11 U.S.C. § 1107 ......................................................................................................14

Bankruptcy Code § 547 ............................................................................................1, 7

Bankruptcy Code § 548 ......................................................................................... 11, 13

Bankruptcy Code § 550 ......................................................................................... 11, 12

Texas Bus. & Comm. Code § 9.310 ............................................................................10

Texas Bus. & Comm. Code § 9.312 ............................................................................10

Texas Bus. & Comm. Code § 9.315 ............................................................................10

Texas Bus. & Comm. Code § 9.322 ............................................................................10

Texas Bus. & Comm. Code § 9.324 ............................................................................10

Texas Fin. Code § 348.408 .........................................................................................10

Texas Fin. Code § 348.409 .........................................................................................10

Texas Penal Code § 32.34 ...........................................................................................10

Texas Transp. Code § 501.111 ....................................................................................10

**Other Authorities**

Bankruptcy Rule 7012(b) ............................................................................................ 1

Bankruptcy Rule 9011 .............................................................................................2, 7

Federal Rules of Civil Procedure Rule 11 .................................................................... 2

Federal Rules of Civil Procedure Rule 12(b)(6) ........................................................... 1

## I.   INTRODUCTION

Defendant Ford Motor Credit Company LLC ("Ford Credit") moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Bankruptcy Rule 7012(b), for an Order dismissing, with prejudice, each and every cause of action alleged in Debtors' Adversary Complaint.[1]  Each alleged cause of action fails to state a plausible claim, and Debtors cannot cure that failure because their claims are barred as a matter of both law and equity.

In late June 2018, Ford Credit discovered a massive floorplan financing fraud ***committed by the Debtors against Ford Credit***, involving the operations of six automobile dealerships that Debtors collectively owned and controlled (the "Dealerships").[2]  Ford Credit immediately suspended the Dealerships' floorplan financing to prevent further losses and Debtors filed for bankruptcy.  At that time, they owed Ford Credit in excess of $116 million.

The publicly-reported results of an FBI investigation have since confirmed that Ford Credit was the primary victim of the massive fraud ***perpetrated by Debtors themselves***.  Ford Credit has suffered proven losses in excess of $45 million as a result of Debtors' fraud, which is the worst loss suffered by any one of Debtors' creditors – by a wide margin.  Now, however, Debtors attempt to shift blame for their own fraud ***against*** Ford Credit ***to*** Ford Credit.  Their baseless claims seek to require Ford Credit to return to Debtors' bankruptcy estate over $315 million in proceeds Debtors paid to Ford Credit, both as a result of the Dealerships' sales of Ford Credit's secured collateral and as lien payoffs on vehicles that Debtors' customers traded in to the Dealerships.  And, as a part of their effort to victimize Ford Credit yet again, Debtors also seek to subrogate or

---

[1]      "Debtors" refers collectively to Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP,  Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Floydada, LP, Reagor Auto Mall, Ltd., Reagor-Dykes Snyder, L.P., Reagor-Dykes Auto Mall I LLC, Reagor-Dykes II LLC, and Reagor-Dykes III LLC.

[2]      The "Dealerships" were Reagor-Dykes Motors, Reagor-Dykes Imports, Reagor-Dykes Amarillo, Reagor-Dykes Auto Company, Reagor-Dykes Floydada, and Reagor-Dykes Plainview.

deny Ford Credit's claims in Debtors' bankruptcy proceedings, effectively making Debtors themselves the primary beneficiaries of any amounts paid back into their estates.

Neither the law nor equity permits that absurd result. As a matter of law, Debtors' payments to Ford Credit, as a secured creditor (which held a first-priority, properly perfected security interest in its collateral and the proceeds of that collateral), cannot support any of Debtors' claims. Instead, all of Debtors' claims are barred as a matter of law, inadequately pled, or otherwise baseless and frivolous – and all of them must be dismissed, with prejudice.[3]

## II.   STATEMENT OF FACTS

### A.   The Debtors' Floorplan Financing Fraud

The essential facts demonstrating that Debtors themselves perpetrated a massive fraud are undisputed. In fact, Debtors admit them in their Adversary Complaint. *See* Dkt. 1.[4]

Before August 1, 2018, Ford Credit provided wholesale floorplan financing to the Dealerships. *See* Dkt. 1 at ¶ 22. Ford Credit secured that financing with security interests in all of the Dealerships' assets, including, *inter alia*, their vehicle inventory, proceeds from sales of that inventory, furniture, trade fixtures, and equipment, accounts, general intangibles, and contract rights. *See* Case No. 18-50214-rlj-11, Claim 83-1, Part 2, Exhibits B, C, E, F, H, I, K, L. N, O, Q, R, S, T (entered into evidence in Case No. 18-50214-rlj-11, Dkt. 854 at 10-11).

In June 2018, as a result of vehicle inventory audits, and an analysis of sales and registration data, Ford Credit discovered that Debtors were committing floorplan financing fraud. *See Ford Motor Credit Co. LLC v. Reagor,* Case No. 5:18-cv-00186-c, Dkt. 1 at ¶¶ 185-96. That analysis revealed that Debtors falsely reported sales data and, by doing so, delayed making required

---

[3]      Ford Credit reserves its right to bring a motion pursuant to the Federal Rules of Civil Procedure Rule 11 and Bankruptcy Rule 9011.

[4]      Unless otherwise stated, docket citations are to the Adversary Proceeding, Case No. 20-05005-rlj.

payments to Ford Credit.  *Id.* at ¶¶ 186-87, 190.  Ford Credit also learned that Debtors had engaged in "double-flooring," by submitting false information to get financing from Ford Credit on vehicles they had floorplanned with another lender.  *Id.* at ¶¶ 191-92.  In other instances, Debtors submitted false information to Ford Credit to obtain financing on already-sold vehicles.  *Id.* at ¶ 193.

Further inventory audits revealed each Dealership was out of trust, having sold vehicles subject to Ford Credit's security interests without remitting proceeds to Ford Credit.  *Id.* at ¶ 195. After that discovery, Debtors authorized electronic funds transfers ("EFTs") to Ford Credit totaling over $41 million dollars, which were subsequently returned for insufficient funds or because Debtors stopped payment.  *Id.* at ¶ 198.

As of July 31, 2018, Debtors owed Ford Credit approximately $116,168,000.00.  *Id.* at ¶¶ 199-200.  On July 31, 2018, Ford Credit sued Debtors, seeking to sequester (and then liquidate) collateral held by Debtors, and to recover any deficiency from Debtors and their guarantors.  *See id.*  Debtors immediately filed for bankruptcy, temporarily staying those claims against them.

Ford Credit has since pursued Debtors and their guarantors in both:  (a) this Court; and (b) the District Court, to recover amounts owed to it, and related damages, arising from Debtors' fraud. *See Ford Motor Credit Co. v. Reagor*, Case No. 5:18-cv-00186-C.  Ford Credit remains the Debtors' largest secured and unsecured creditor, and the primary victim of Debtors' fraud.  *See, e.g.*, Case No. 18-50214-rlj-11, Dkt. 11 and Dkt. 421 at 22-23; *USA v. Smith*, Case No. 2:19-cr-079-D-BR, Dkt. 11.  Having previously obtained lift-stay relief, and having liquidated its collateral, Ford Credit is still owed over $45 million.  *See Ford Motor Credit Co. v. Reagor*, Case No. 5:18-cv-00186-C, Dkt. 49.

## B.      The FBI's Investigation and Criminal Charges

In February 2018, after receiving an anonymous tip, the FBI began investigating Debtors' fraud.  *See USA v. Smith*, Case No. 2:19-cr-079-D-BR, Dkt. 11, at ¶ 7.  The FBI investigation has

resulted in multiple federal fraud and fraud-related charges against Debtors' Chief Financial

Officer, Shane Smith, and at least thirteen (13) other employees of Debtors – all of whom have

already pled guilty.  *See id.*[5]  Debtors' employees have stipulated that they knowingly, and with

intent to defraud, obtained financing from Ford Credit by means of materially false representations

or pretenses, used wire communications in interstate commerce to do so, and engaged in an

extensive check-kiting scheme.  The FBI's investigation confirmed that Debtors' fraud included:

> fraudulent requests for floorplan advances, including flooring
> vehicles they had already sold;
>
> selling vehicles out of trust and falsifying sales dates, and creating
> "false paperwork, sometimes referred to as 'dummy shucks,' on
> vehicles that were sold out of trust, to make it appear as though the
> vehicles had just recently sold and were not out of trust"; and
>
> double-flooring vehicles with Ford Credit and other lenders, to
> fraudulently obtain financing from more than one lender.

*Id.* at ¶¶ 11, 13-16, 18-20.  As a result, Debtors were able to "give the appearance" that they were

not selling vehicles out of trust, and that they were "passing [their] audits."  *Id.* at ¶ 14.  And, by

kiting checks, Debtors were able to make payoffs due after those audits.  *Id.* at ¶ 24.

At no time were any criminal charges brought against Ford Credit or any of its employees.[6]

---

[5]    *See, e.g., USA v. Smith*, No. 2:19-cr-079-D-BR, Dkt. 11 at ¶¶ 2, 7, 9, 11, 13-16; *USA v. Williams*,
No. 2:19-cr-118-Z, Dkt. 7; *USA v. Woo*d, No. 2:19-cr-130-Z, Dkt. 8; *USA v. Rickman*, No. 2:19-cr-150-Z,
Dkt. 4; *USA v. Fansler*, No. 2:19-cr-159-Z, Dkt. 6; *USA v. Dunn*, No. 2:19-cr-170-Z, Dkt. 5; *USA v.
Maldonedo*, No. 2:19-cr-175-Z, Dkt. 6; *USA v. Cabral*, No. 2:19-cr-149-Z, Dkt. 5; *USA v. Canady*, No.
2:19-cr-187-Z, Dkt. 7; *USA v. Urias*, No. 2:19-cr-115-Z, Dkt. 8; *USA v. Miller*, No. 2:19-cr-116-Z, Dkt.
6; *USA v. Johnston*, No. 2:19-cr-126-Z, Dkt. 4; *USA v. Neel*, No. 2:20-cr-00012-BR, Dkt.7; *see also Sara
Self-Warbrick, 14th Reagor Dykes Employee Pleads Guilty in Amarillo Federal Court*, Amarillo Globe-
News, Mar. 24, 2020, https://www.amarillo.com/news /20200324/14th-reagor-dykes-employee-pleads-
guilty-in-amarillo-federal-court.

[6]    Debtors' unsupported accusation that Ford Credit was a willing participant in Debtors' fraud has
already been refuted by Ford Credit, and rejected by the District Court.  *See Ford Motor Credit Co. LLC
v. Reagor, et al.*, Case No.: 5:18-cv-00186-C, Dkt. 36, 39, 42, 48 (refuting the same spurious allegation,
there alleged by Debtors' principals, resulting in the Court rejecting attempts to use that allegation to
delay or oppose summary judgment).  The admissions and guilty pleas ***by fourteen of Debtors'
employees*** – and absence of any charges against Ford Credit or its employees – confirm that Ford Credit
was a victim of Debtors' fraud, not a willing participant in it.

### III.    ARGUMENT AND AUTHORITIES

### POINT I

### DEBTORS' ADVERSARY COMPLAINT FAILS TO STATE A CLAIM

Debtors allege seven causes of action: (1) avoidance of fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550; (2) equitable subordination of claims and transfer of subordinated lien pursuant to 11 U.S.C. § 510(c); (3) surcharge pursuant to 11 U.S.C. § 506(c); (4) turnover pursuant to 11 U.S.C. § 542(b); (5) avoidance of preferential transfers pursuant to 11 U.S.C. §§ 547 and 550; (6) to determine extent and priority of Ford Credit's lien on cash held by Debtors on the petition date and paid to Ford Credit during the preference period; and (7) objection to claim pursuant to 11 U.S.C. § 502(d).  None of these causes of action states a claim upon which relief can be granted, and they all should be dismissed, with prejudice.

To satisfy the requirements of Rule 8, and survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must contain more than a "formulaic recitation of the elements of a cause of action" or  conclusory allegations or legal conclusions masquerading as factual conclusions.  *Twombly,* 550 U.S. at 555; *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (complaint must contain direct factual allegations "on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.").

On a motion to dismiss, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 566 U.S. at 678-79.  And, "'when the allegations in a complaint, however true, could not raise a claim or entitlement to relief, this basic deficiency should . . . be

exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558).

A Bankruptcy Court considering a motion to dismiss an adversary proceeding "may consider materials submitted as part of the complaint, items in the record, and [the] public record." *In re Stangel*, 222 B.R. 289, 291-92 (Bankr. N.D. Tex. 1998). The public record includes documents filed in the bankruptcy case. *In re Soporex, Inc.*, 446 B.R. 750, 764 n.12 (Bankr. N.D. Tex. 2011) (citing *R2 Invs., LDC v. Phillips*, 401 F.3d 638 (5th Cir.2005)); *see In re Holcomb*, 2005 WL 6443634, at *1 n.3 (Bankr. N.D. Tex. Sept. 1, 2005). And "[s]tatements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions." *In re Rollings*, 456 Fed. App'x 340, 348 (5th Cir. 2011) (internal quotations omitted); *In re Jacobson*, 2006 WL 2796672 (W.D. Tex. Sept. 26, 2006), *aff'd* 2007 WL 2141961 (5th Cir. July 26, 2007); *In re 1701 Commerce, LLC*, 511 B.R. 812, 829 (Bankr. N.D. Tex. 2014).

Here, all of Debtors' claim are either barred as a matter of law or alleged in conclusory and speculative fashion, lack factual support, and otherwise fail "'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570); *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 210 (5th Cir. 2010); *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). And, because Debtors' claims are barred as a matter of law, there is "no set of facts" they can plead to overcome these fatal defects. *Search Int'l., Inc. v. Snelling & Snelling, Inc.*, 31 F. App'x 151 (5th Cir. 2001) (per curiam); *Epie v. Neiman Marcus Direct*, 2001 WL 585766, at *1 (N.D. Tex. May 29, 2001).[7]

---

[7]    Having had unfettered access to their own records and nearly two full years to bring their claims, Debtors also cannot argue that discovery is necessary to sufficiently state their claims. *Iqbal*, 566 U.S. at 678-79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than

## POINT II

## DEBTORS' FRAUDULENT TRANSFER CLAIM IS BARRED
## AS A MATTER OF BOTH LAW AND EQUITY

Debtors are self-admitted fraudsters who engaged in a "scheme by which they artificially propped up their failing businesses with funds from fraudulent loans and check kiting." *See* Dkt. 1 at ¶ 3. Debtors admit this "created a vicious cycle" in which they required new funds "acquired through fraudulent practices" to pay off "previous loans and replenish overdrawn accounts." *Id.*

Yet Debtors now seek to recover over $315 million in allegedly fraudulent transfers made to Ford Credit – the creditor that, based upon Debtors' own schedules, holds the largest total unsecured claim against them. *See* Case No. 58-2014-rlj-11, Dkt. 421, 423, 425, 427, 429, 431.[8,9] Debtors' own "Liquidation Analysis" estimates the value of all unsecured claims (apparently excluding Ford Credit's claim) as only $45,787,423 – less than 15% of the recovery they seek from Ford Credit. *See id.*, Dkt. 1390-3. Based upon Debtors' analysis, the recovery sought by Debtors would result in a windfall of almost $270 million for Debtors themselves. *See id.*

Debtors' fraudulent conveyance claim must be dismissed, in the first instance, because transfers of collateral or proceeds of collateral to a secured creditor do not, as a matter of law, constitute transfers of an interest of the debtor in property – and cannot support a fraudulent conveyance claim. And, even assuming, arguendo, any portion of the transfers identified by Debtors were to fall outside that bar, Debtors have still failed to allege a plausible fraudulent

---

conclusions."). This is particularly true given the due diligence requirements of amended Bankruptcy Code § 547(b) (which took effect on February 19, 2020) and Bankruptcy Rule 9011.

[8]     The underlying merits of Ford Credit's unsecured claim have already been litigated in the District Court for the Northern District of Texas, where Ford Credit obtained a judgment of $49,280,709.59 against Debtors' principal, Bart Reagor, after a contested jury trial. *See Ford Motor Credit Co. LLC v. Reagor, et al.*, Case No. 5:18-cv-00186-C, Dkt. 104.

[9]     Ford Credit is also the single largest secured creditor of Debtors. *See* Case No. 18-50214-rlj-11, Dkt. 1390 at 47-48.

conveyance claim against Ford Credit and are otherwise equitably estopped from doing so.

**A.    The Alleged Transfers to Ford Credit Cannot, as a Matter of Law, Support a Fraudulent Conveyance Claim**

Section 548(a)(1)(A) of the Code provides that, a trustee or debtor-in-possession "may avoid any transfer . . . *of an interest of the debtor in property* . . . if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)-(a)(1)(A) (emphasis added). However, this "avoidance power" is limited to transfers of "property of the debtor." *Begier v. IRS*, 496 U.S. 53, 58 (1990); *Matter of Maple Mortg., Inc.*, 81 F.3d 592, 595 (5th Cir. 1996).

Because a debtor "does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Begier*, 496 U.S. at 58-59; *Matter of Maple Mortg., Inc.*, 81 F.3d at 595. Property subject to a creditor's security interest is similarly excluded. *See Melamed v. Lake County Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984); *In re First All Mortg. Co.*, 471 F.3d 977, 1008 (9th Cir. 2006); *In re CyberCo Holdings, Inc.*, 382 B.R. 118, 139 (Bankr. W.D. Mich. 2008). Thus, "a debtor cannot fraudulently transfer to a creditor property that has already been pledged to that creditor as collateral." *In re CyberCo*, 382 B.R. at 139.

The rationale behind these rules is simple: property transferred to a secured creditor would not have been available to unsecured creditors absent the transfer and, consequently, the transfer cannot – as a matter of law – harm other creditors or diminish the debtor's assets. *See In re CyberCo*, 382 B.R. at 134-142; *see also In re First All. Mortg.*, 471 F.3d at 1008; *Melamed*, 727 F.2d at 1402; *Ehrlich for Hoffmans Trade Grp. LLC v. Comm. Factors of Atlanta*, 567 B.R. 684, 695 (N.D.N.Y. 2017). Therefore, when a debtor transfers property to a creditor that is subject to the creditor's security interest, there is no fraudulent transfer – as a matter of law – and "the intent

with which the transfer was made is immaterial." *Melamed*, 727 F.2d at 1402; *see also In re First All. Mortg.*, 471 F.3d at 1008-09; *CyberCo*, 382 B.R. at 134-42; *Ehrlich*, 567 B.R. at 695.

*CyberCo* illustrates the application of these rules in a case involving allegations similar to those made by Debtors.  In *CyberCo*, the Trustee alleged that a bank ("Huntington") received preferential and fraudulent transfers from CyberCo, which were made with actual intent to hinder, delay, or defraud its creditors.  382 B.R. at 123.  The Trustee also alleged that CyberCo defrauded lenders, and engaged in "a Ponzi scheme, using new loans to pay off old loans in an ever increasing cycle of debt, all to the detriment of CyberCo's creditors and ultimate financial ruin of CyberCo." *Id.* at 126.  Huntington allegedly perpetuated that scheme "by intentionally overlooking numerous warning signs," and "cast a blind eye" because it was owed over $17 million. *Id.* at 127.  CyberCo also allegedly made "huge transfers to Huntington within the year preceding its bankruptcy with the intention of hindering and delaying its other creditors." *Id.* at 132-33.

Huntington moved to dismiss, arguing that whatever it received "had to have been proceeds from its collateral" because it had a security interest in all assets of CyberCo. *Id.* at 133.  Huntington also argued it was "irrelevant whether it was undersecured or not, for it in any event received from CyberCo only what in effect already belonged to it because of its secured position," and no depletion of the estate occurred, "from the perspective of its other creditors . . .." *Id.*

The Court held that Huntington had a security interest in funds swept from CyberCo's accounts and transferred to Huntington. *See id.* at 134.  As a result, those transfers did not diminish CyberCo's estate *vis-à-vis* other creditors because Huntington's security interest had priority over other creditors' claims. *See id.* at 134-35.  The Court also held that no transfer of an interest of the debtor in property occurred because "Huntington was taking nothing more from CyberCo than its own collateral." *See id.* at 137.  The Court dismissed the Trustee's fraudulent conveyance claim,

as a matter of law, because "a debtor cannot fraudulently transfer to a creditor property that has already been pledged to that creditor as collateral." *Id.* at 139.

Here, Debtors judicially admitted that Ford Credit held first-priority security interests in their assets by filing Schedules with this Court, under penalty of perjury, identifying Ford Credit as a secured creditor with claims against each Dealership that were not listed as contingent, disputed, or contested. *See* Case No. 18-50214-rlj-11, Dkt. 421 at 22, 423 at 23, 425 at 22, 427 at 23, 429 at 22, and 431 at 23; *In re Rollings*, 451 F. App'x at 348; *see also In re Jacobson*, 2006 WL 2796672; *In re 1701 Commerce*, 511 B.R. at 829.

Moreover, this Court has already determined – after a contested, full-day evidentiary hearing – that Ford Credit held properly-perfected, first-priority security interests in essentially all of the Dealerships' assets, including vehicles in their inventory. *See* Dkt. 865, 890.[10] The Court further affirmed those security interests in connection with the interim orders approving Debtors' use of Ford Credit's cash collateral. *See* Dkt. 30, 134, 192, 476, 567 and 764. Ford Credit's blanket security interests extended to, *inter alia*, proceeds of the sale of such vehicles as well as all of the Dealerships' accounts. There is also no dispute that Debtors were required by both law and contract to hold proceeds from sales of vehicles in trust for Ford Credit. *See, e.g., Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 484 (5th Cir. 1986).[11]

---

[10]    There is no dispute that Ford Credit properly perfected its first-priority security interest in Debtors' inventory, and the proceeds of the same, by filing its financing statements with the Texas Secretary of State. *See* Texas Bus. & Comm. Code §§ 9.310, 9.312, 9.315, 9.322 and 9.324; *see also* Case No. 18-50214-rlj-11, Dkt. 854 at 34-35.

[11]    To the extent Debtors also seek to avoid payments to Ford Credit for amounts due to it on vehicles traded-in by customers, those payments were made because Ford Credit held properly perfected, purchase-money security interests in the traded-in vehicles. *See* Dkt. 854 at 34-35, 117; Dkt. 865, 890; Texas Fin. Code §§ 348.408-409; Texas Penal Code § 32.34. There is no dispute that Ford Credit perfected those security interests by recording its lien on their titles. *See* Texas Bus. & Comm. Code § 9.324; Texas Transp. Code § 501.111. Those security interests also are not (and cannot be) disputed – and Debtors cannot state a plausible fraudulent conveyance claim based upon payments made to Ford Credit to satisfy those liens.

For all of these reasons, Debtors cannot state a fraudulent conveyance claim against Ford

Credit based on the challenged transfers.  *See Matter of Maple Mortg.*, 81 F.3d at 595; *Melamed*,

727 F.2d at 1402; *In re First All. Mortg.*, 471 F.3d at 1008; *In re CyberCo*, 382 B.R. at 139.

**B.    Debtors' Fraudulent Conveyance Claim is Inequitable, Contravenes the Purpose of Fraudulent Transfer Law, and Fails to Satisfy the Benefit the Estate Requirement**

**1.    Debtors cannot satisfy § 550's benefit of the estate requirement**

The purpose of Section 548 of the Bankruptcy Code "is to preserve assets of the bankruptcy

estate" for the benefit of its unsecured creditors.  *In re Feiler*, 230 B.R. 164, 169 (B.A.P. 9th Cir.

1999); *Matter of Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1336 (5th Cir. 1995) ("The proceeds

recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds

should benefit the unsecured creditors.").   But the reach of Section 548 is not unlimited.

Under Section 550 of the Bankruptcy Code, there can be no recovery on a Section 548

fraudulent transfer claim unless the recovery is "for the benefit of the estate."  11 U.S.C. § 550(a).

Where appropriate, "courts have denied or limited recovery based on the equitable principles

underlying the Bankruptcy Code and Section 550(a) in particular."  *Crescent Res. Litig. Tr. ex rel.

Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 481 (W.D. Tex. 2013).

For example, the Fourth Circuit has explained that "a trustee or a debtor-in-possession of

a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be

benefitted by the recovery of the transferred property."  *Wellman v. Wellman*, 933 F.2d 215, 218

(4th Cir. 1991) (noting that courts addressing this issue have reached this conclusion "with

unanimity").   The court in *Wellman* held that the debtor-in-possession lacked standing to pursue a

Section 548 fraudulent transfer action because the action was not for the benefit of the estate but

rather "so that he could obtain a 'massive surplus recovery' for himself in addition to the surplus

distributed to him."  *Id*. at 219; *see also Crescent Res. Litig. Tr.*, 500 B.R. at 482-83 (concluding

that recovery on fraudulent transfer claims should be limited under Section 550, after considering "the equitable impact of the Trust's potential recovery," where recovery would result in a "massive windfall" in favor of creditors who were involved in the fraudulent transfers.)

A massive windfall is exactly what Debtors seek here. This Court should reject Debtors' attempt to benefit themselves at the expense, and to the significant detriment, of Ford Credit – their primary victim, largest unsecured creditor, and the intended beneficiary of the Code's avoidance provisions. *See Wellman*, 933 F.2d at 218-19; *see also In re Murphy*, 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005); *Dunes Hotel Assocs. v. Hyatt Corp.*, 245 B.R. 492, 506 (D. S.C. 2000).

### 2. Avoidance claims that contradict the goals and purposes of the Bankruptcy Code are impermissible.

An avoidance action under the Bankruptcy Code is also not permitted if it would be contrary to the underlying purposes of the Code. *Dunes Hotel Assocs.*, 245 B.R. at 497. In *Dunes Hotel,* for example, the debtor-in-possession sued to avoid a leasehold interest and for turnover of property, but the court held that avoidance would be improper because it would 1) conflict with the fiduciary responsibilities of a debtor-in-possession, who "should act in the interests of the creditors, not in its own interests," 2) allow the debtor-in-possession – who was only remaining in bankruptcy to avoid the lease – to "strike down a bilateral contract to the detriment of its only remaining non-insider creditor," and 3) provide the debtor-in-possession a windfall "in derogation of the interests of" the creditor, which "is contrary to the purpose of the avoidance powers as enunciated by numerous courts and commentators." *Id.* at 506-08. An inequitable windfall is, again, precisely what Debtors impermissibly seek here and this Court should again reject Debtors' attempt to primarily benefit themselves. *See Dunes*, 245 B.R. at 497.

C.      **Ford Credit has an Absolute Defense to Debtors' Fraudulent Conveyance Claim**

It is beyond dispute that the challenged transfers were in exchange for reasonably equivalent value, as a matter of law. Debtors' Adversary Complaint admits that Ford Credit provided floorplan financing to the Dealerships, which was used to purchase new and used vehicle inventory. Dkt. 1 at 6, ¶ 22. The payments Debtors seek to reclaim were made to satisfy resulting obligations under their financing agreements with Ford Credit. *Id*. Because these payments were made to satisfy an antecedent debt, they are reasonably equivalent value – as a matter of law. 11 U.S.C. § 548(d) ("'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor"); *see In re Sharp Intern. Corp*., 403 F.3d 43, 54 (2d Cir. 2005) (citation omitted) ("[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.").

Debtors make no attempt to argue that Ford Credit did not provide value, and instead implicitly acknowledge it was received. *See* Dkt. 1 at 2 (effectively admitting value was received; challenging only Ford Credit's "good faith"). Because Debtors admit they received value in exchange for the challenged transfers, it would be inequitable, and an abuse of the bankruptcy system, to permit their Section 548 claim against Ford Credit. *See*, *e.g.*, *Matter of Fairchild Aircraft Corp*., 6 F.3d 1119, 1127 (5th Cir. 1993) ("the recognized test is whether the investment conferred an economic benefit on the debtor") *abrogated on other grounds, In re Dunh*am, 110 F.3d 286 (9th Cir. 1997). It would also be inequitable to allow Debtors to retain the value and benefit of two-year's worth of vehicles acquired using Ford Credit's financing, but force Ford Credit to return payments made to satisfy Debtors' resulting debt to Ford Credit.[12]

There is no basis for such a manifestly inequitable result, and Debtors – who admittedly

---

[12]     It is undisputed that the floorplan advances by Ford Credit to the Dealerships were for acquiring vehicles that went into the Dealerships' inventory. *See* Case No. 18-50214-rlj-11, Dkt. 854 at 35-36.

orchestrated and perpetuated the very fraud that necessitated this bankruptcy – should not be

permitted to use a court of equity to profit from their own wrongdoing.[13]

### D.      Debtors' Fraudulent Conveyance Claim is also Inadequately Pled

To the extent Debtors allege, in purely conclusory fashion, that Ford Credit received

payments of proceeds from sales of its collateral, and "tens of millions of interest payments,"

Debtors have also failed to plead a plausible fraudulent conveyance claim.  As this Court recently

recognized, a plaintiff alleging a fraudulent transfer claim under Section 548(a)(1)(A) must state

with particularity the "'who, what, when, and where and why [of] the fraudulent conduct.'"  *See*

*Reagor Auto Mall, Ltd. v. FirstCapital Bank of Texas, N.A.*, No. 20-05002-rlj, Dkt. 35 at 19, 20-

24 (Bankr. N.D. Tex. August 24, 2020) (*quoting In re Life Partners Holdings, Inc.*, 926 F.3d 103,

117 (5th Cir. 2019)); *see also United States ex rel. King v. Alcon Labs*., 232 F.R.D. 568, 570, 572

(N.D. Tex. 2005); *E. Poultry Distribs., Inc. v. Yarto Puez*, 2001 WL 34664163, at *1-2 (N.D. Tex.

2001).  Consequently, the required element of actual intent under Section 548(a)(1)(A), may not

be presumed, and a plaintiff must allege "something more than just an intent to prefer one creditor

over another."  *In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 575 (S.D.N.Y. 2015); *see also*

*In re Lyondell Chem. Co.*, 554 B.R. 635, 650 (S.D.N.Y. 2016); *see generally In re Sullivan*, 161

B.R. 776, 781 (Bankr. N.D. Tex. 1993).[14]  The plaintiff must, instead, sufficiently allege – in good-

---

[13]      The Court also has authority under § 1107(a) to limit the power of a debtor-in-possession to assert
avoidance claims.  *See* 11 U.S.C. § 1107 (a) ("Subject to any limitations on a trustee serving in a case
under this chapter, ***and to such limitations or conditions as the court prescribes***, a debtor in possession
shall have all the rights, other than the right to compensation under section 330 of this title, and powers,
and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and
(4) of this title, of a trustee serving in a case under this chapter.") (emphasis added).

[14]      Debtors may attempt to argue they are entitled to a presumption of fraudulent intent based on a
characterization of their operations  as a "Ponzi scheme."  (Dkt. 1 at ¶ 4).  However, a Ponzi scheme is "a
fraudulent investment scheme in which money contributed by later investors is used to pay artificially
high dividends to the original investors, creating an illusion of profitability, thus attracting new
investors."  *In re the Bennett Funding Grp., Inc.*, 439 F.3d 155, 157 n.2 (2d Cir. 2006).  This Court has
already recognized that Debtors' scheme, even to the extent it involved check-kiting, was not actually a
Ponzi scheme.  *See Reagor Auto Mall, Ltd. v. FirstCapital Bank of Texas, N.A.*, No. 20-05002-rlj, Dkt. 35

faith and after appropriate diligence – that "the debtor . . . had an intent to interfere with creditors'

normal collection processes or with other affiliated creditor rights for personal or malign ends."

*In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 575 (internal quotation marks and citation omitted).

Here, Debtors make no effort to differentiate between payments of proceeds, customer lien

payoffs, and alleged "interest."  Instead, they simply allege that *all* net transfers to Ford Credit

during the two years prior to Debtors' bankruptcy filing "should be avoided and recovered . . .."

*See* Dkt. 1, at ¶ 6 and Ex. 1.  And Debtors make no effort to plausibly allege how each type of

payment was, allegedly, fraudulent or intended to interfere with rights of other creditors.  Instead,

they merely allege – in conclusory fashion – that Ford Credit turned a "blind eye" to Debtors' own

"fraudulent practices" that "allowed Ford Credit" to be paid while other creditors "would never be

repaid . . .." *id.* at ¶¶ 2, 26, 43.  These conclusory allegations fail to provide the "who, what, when,

where, and why" required to state a plausible fraudulent conveyance claim.

**POINT III**

**DEBTORS' LACK STANDING TO ASSERT AN EQUITABLE SUBORDINATION
CLAIM, AND CANNOT STATE SUCH A CLAIM AS A MATTER OF LAW**

Initially, Ford Credit submits Debtors' equitable subordination claim fails because they are

not creditors or a trustee acting as a representative of creditors, and therefore lack standing to bring

such a claim.  *In re Weeks*, 28 B.R. 958, 960 (Bankr. W.D. Okla. 1983) (Chapter 11 debtor lacks

standing to assert equitable subordination claim); *see also In re Lockwood*, 14 B.R. 374, 381

---

at 19 (Bankr. N.D. Tex. August 24, 2020).  Debtors' allegations against Ford Credit are even further
afield from what is required to plausibly allege a Ponzi scheme or qualify for a Ponzi scheme
presumption.  *See In re Pearlman*, 440 B.R. 900, 904–05 (Bankr. M.D. Fla. 2010); *see also Ehrlich*, 567
B.R. at 693.  And, even were the Court inclined to consider such an argument, the existence of a
presumption of fraudulent intent is not supported by the text of the Bankruptcy Code and has been
rejected in recent state court opinions in the analogous context of state law fraudulent transfer
claims.  *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 567 n.27 (Tex. 2016); *Finn v. All. Bank*, 860
N.W.2d 638, 647 (Minn. 2015).

(Bankr. E.D.N.Y. 1981) (trustee is proper party to bring equitable subrogation claim); *In re Waggoner Cattle, LLC*, 2019 WL 469367, at *8 (Bankr. N.D. Tex. Feb. 6, 2019) (creditor lacks standing to bring equitable subordination claim absent "some particularized injury").[15]

Debtors' equitable subordination claim must also be dismissed because equitable subordination is an "extraordinary remedy," and, in the Fifth Circuit, is available only in three "narrowly" drawn instances: (a) where the defendant is a fiduciary of the debtor and, as such, was capable of disadvantaging other creditors; (b) where the defendant exercised control over the debtor to the detriment of other creditors; and (c) where the defendant has itself defrauded other creditors. *See MCorp. v. Clarke*, 755 F. Supp. 1402, 1416 (N.D. Tex. 1991). It is particularly appropriate to dismiss an equitable subordination claim where the plaintiff fails to allege specific conduct, in more than conclusory fashion, establishing that one of these instances applies. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 122-23 (5th Cir. 2019); *see also In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008).

It is undisputed that Ford Credit was never Debtors' fiduciary and did not control them. *See In re U.S. Abatement Corp.*, 39 F.3d 556, 561 n.5 (5th Cir. 1994). All of the record evidence in the bankruptcy case and Debtors' own allegations are to the contrary – Debtors' finances were controlled by Mr. Smith, Debtors perpetrated a massive floorplan financing fraud on Ford Credit, and, upon discovery of that fraud, Debtors filed for bankruptcy and came under the administration of a chief restructuring officer ("CRO"). *See* Dkt. 1, at ¶ 30; *USA v. Smith*, Case No. 2:19-cr-079-D-BR, Dkt. 11, at ¶¶ 8-10; *In re Reagor-Dykes Motors, LP*, Case No. 18-50214-rj11.

---

[15]     Ford Credit acknowledges this Court held to the contrary in its recent decision in *Reagor Auto Mall, Ltd. v. FirstCapital Bank of Texas, N.A.*, No. 20-05002-rlj, Dkt. 35 at 19 (Bankr. N.D. Tex. August 24, 2020), but respectfully submits that the Court should revisit that holding because the decision in *Weeks*, cited above, specifically holds that a Chapter 11 debtor does not have standing to bring an equitable subordination claim. Ford Credit is otherwise preserving its appellate rights as to this issue.

Debtors make only conclusory allegations that Ford Credit engaged in "inequitable conduct" that "resulted in injury to creditors" or conferred "an unfair advantage" on Ford Credit. *See* Dkt. 1 at ¶ 65. Other than vague and conclusory allegations that "[t]he Debtors' estates were harmed by the diminution of the estates from the continuation of the Debtors' scheme," allegedly "facilitated through payments to FMCC" (*see id.* at ¶ 57), the Adversary Complaint is also devoid of factual allegations regarding the extent of harm allegedly suffered by any individual creditor.

Such allegations are patently insufficient to state a plausible claim for equitable subordination. *See In re Life Partners Holdings*, 926 F.3d at 122-23 (dismissing equitable subordination claim where supporting allegations were "largely conclusory," did not "allege facts" regarding extent of harm "that any individual investor suffered" and stated only that defendants' conduct resulted in "transfer of substantial value" to defendants "to the direct detriment" of other investors). Debtors' equitable subordination claim must, therefore, be dismissed.

## POINT IV

### DEBTORS CANNOT STATE A SURCHARGE CLAIM, AS A MATTER OF LAW

Debtors' surcharge claim, brought pursuant to 11 U.S.C. § 506(c), fails as a matter of law because the estate has significant unencumbered assets, and multiple pending claims that may be expected to generate still further unencumbered assets, sufficient to pay administrative expenses.

A debtor's administrative expenses must be satisfied, in the first instance, not from the collateral of secured creditors, but from unencumbered assets of the estate. *See In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991); *see also In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 483 (4th Cir. 1994). Here, the estate has unencumbered assets, including a $7.5 million settlement payment from Vista Bank. *See* Dkt. 1723, 1761. The estate also has twenty-nine (29) other adversary proceedings pending, seeking to recover over $12 million in additional unencumbered funds. *See* Associated Cases, *In re Reagor-Dykes Motors, LP*, Case No. 18-50214-rj11. Accordingly,

Debtors have not, and cannot, plausibly allege a claim to surcharge Ford Credit for administrative expenses.  *See In re JKJ Chevrolet, Inc.*, 26 F.3d at 483.

Debtors' surcharge claim must also be dismissed because a debtor-in-possession can only recover administrative expenses out of a creditor's collateral if they are: (1) necessary; 2) reasonable; and 3) benefit that creditor.  *In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015).  To state a plausible claim for surcharge, Debtors must meet the high burden of establishing the administrative expenses were "necessary," were directly related to preserving or enhancing the value of Ford Credit's collateral, and provided a "direct" benefit to Ford Credit.  *Id.* at 698; *In re Grimland, Inc.,* 243 F.3d 228, 232-33 (5th Cir. 2001).  Where the only benefit is maintenance of the debtor as a "going-concern," administrative expenses are not entitled to surcharge.  *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 326 (3d Cir. 1995); *see also In re Consol. Cotton Gin Co.,* 347 B.R. 572, 580 (Bankr. N.D. Tex. 2006) (taxes paid by debtor for property needed to maintain its operations did not support a surcharge claim).

Here, the claimed expenses did not provide a direct benefit to Ford Credit, and Debtors' have not alleged any facts to the contrary.  Instead, they merely allege, in conclusory fashion, that they "expended at least $1,957,674 in reasonable necessary costs and expenses" of preserving "the asserted collateral of Ford Credit."  Dkt. 1 at ¶ 68.  Debtors' list of expenses confirms that those expenses consisted entirely of rent (paid to entities related to Debtors, who did not have written leases) and property taxes.  *See* Dkt. 1, Ex. 2; Case No. 18-50214-rlj-11, Dkt. 288 at 25-29, 59-66.

Ford Credit sought stay relief on August 9, 2018.  Dkt. 46.  Debtors opposed that relief and, over the next 8 months – the months for which they seek to surcharge Ford Credit – repeatedly sought and obtained orders permitting them to use Ford Credit's cash collateral to fund "normal day-to-day expenses of Debtors' operations such as payroll, office supplies, utilities, taxes, rents,

and repairs and maintenance . . ..” *id.*, Dkt. 8; *see also id.*, Dkt. 30, 134, 192, 476, 567, 764; Dkt.

1, Ex. 2.  This conclusively establishes both that Debtors were already allowed to use Ford Credit's

cash collateral for the same expenses that they now seek to surcharge and that those expenses were

not for Ford Credit's benefit.  Instead, they served to maintain Debtors as a going concern while

Debtors tried to sell the Dealerships.  Accordingly, Debtors have not stated, and cannot state, a

plausible surcharge claim – and that claim must be dismissed.  See *In re Grimland,* 243 F.3d at

232-33; *In re Consol. Cotton Gin,* 347 B.R. at 580.[16]

**POINT V**

**DEBTORS CANNOT STATE A PLAUSIBLE TURNOVER CLAIM**

Debtors' turnover claim, pursuant to 11 U.S.C. § 542(b), must also be dismissed for failure

to state a claim.  That claim is premised entirely upon a carve out in the cash collateral orders

entered on November 19, 2018 and December 31, 2018 for Trustee's fees and Debtors'

"professional fees and expenses."  *See* Case No. 18-50214-rlj-11, Dkt. 567 at 19-20, 764 at 18-19.

The carve out was expressly limited to Trustee's fees set forth in the interim budget and, "to the

extent allowed by the Bankruptcy Court", the professional fees and expenses incurred by counsel

for Debtor and Debtor's CRO from the Petition Date through the period covered by the Interim

Budget (as those terms are defined therein).  *See id.*, Dkt. 567 at 19.  The carve out also provided,

however, that "nothing in this Interim Order shall be construed to impair the right of any party to

object to any fees, expenses, reimbursement or compensation sought by any such professionals or

---

[16]    Debtors' surcharge claim also fails, as a matter of law, because Ford Credit has a priority
administrative claim to the extent its collateral was diminished in the course of the Debtors' bankruptcy
proceedings.  *See* Case No. 18-50214-rlj-11, Dkt. 30 at 9-10, 134 at 10, 192 at 11, 476 at 10, 567 at 10-
11, and 764 at 10.  Specifically, Ford Credit's priority administrative claim, in the amount of at least $3.1
million, exists because Debtors were allowed to use Ford Credit's cash collateral, were allowed to sell
other vehicles that were subject to Ford Credit's security interests, and Ford Credit paid sales and use
taxes that would otherwise have been paid by the estate.  *See id.*, Dkt. 854 at 55-59; 1564 at ¶ 4.  Ford
Credit is entitled to payment of its administrative priority claim first, before other administrative claims.

any other person or entity." *See id.*  Thus, the carve out is neither automatic nor self-executing.

Debtors were allowed to use Ford Credit's cash collateral from August 8, 2018 through January 5, 2019.  *See id.,* Dkt. 30, 764.  During that time, Debtors submitted interim budgets providing for payment of Trustee's fees, and both counsel and CRO fees and expenses – funded out of Ford Credit's cash collateral.  *See, e.g., id.*, Dkt. 476, Ex. B.  Absent Ford Credit's consent, the cash collateral orders permitted payment of those fees and expenses only as  set forth in the budgets (*see*, *e.g.*, *id.*, Dkt. 476 at 6), and sufficient cash collateral was provided to pay those budgeted amounts.  *See*, *e.g.*, *id.*, Dkt. 567, Ex B (showing budgeted amounts for Trustee Fees and Professional Fees, and projecting positive ending cash balance).  Now, having instead spent those funds on operating expenses, Debtors allege, in conclusory fashion. that $1,604,443.83 of the carve out "remains unfunded" by Ford Credit – without specifying the period over which that alleged liability was supposedly incurred or providing any other factual support (*see* Dkt. 1 at ¶ 72).[17]

Under these circumstances, Debtors have not and cannot state a plausible turnover claim against Ford Credit because they have not alleged, and cannot allege, that Ford Credit "owes a debt" that is property of the estate.  *See* 11 U.S.C. § 542(b).

### POINT VI

### DEBTORS CANNOT STATE A PREFERENTIAL TRANSFER CLAIM, AS A MATTER OF LAW

Debtors have not alleged, and cannot allege, the elements of a preferential transfer claim. Specifically, Debtors have not alleged, and cannot allege, that: (1) the alleged transfers affected the Debtors' interest in property; and (2) Ford Credit received more than it would have in a hypothetical chapter 7 case.  Debtors' preferential transfer claim should therefore be dismissed.

---

[17]    As discussed above, any amounts incurred for Trustee's fees, and fees for Debtors' counsel or CRO, were not spent for Ford Credit's benefit, depleted Ford Credit's cash collateral by at least $3.1 million, allowed Debtors to continue day-to-day operations, and prolonged their death spiral.

The required elements of a preferential transfer claim are: (1) a transfer of the debtor's interest in property; (2) for a creditor's benefit; (3) for or on account of an antecedent debt owed by the debtor; (4) while the debtor was insolvent; (5) within 90 days of the debtor's bankruptcy filing; and (6) which enables the creditor to receive more than it would have (i) as a chapter 7 creditor, (ii) if the transfer had not been made, and (iii) if it had received payment under another bankruptcy code provision.  11 U.S.C. § 547(b); *see In re Life Partners Holdings, Inc.*, 926 F.3d at 121-22; *In re ReoStar Energy Corp.*, 2012 WL 3184726, at *4 n.6 (N.D. Tex. Aug. 3, 2012); *In re Tusa-Expo Holdings, Inc.*, 496 B.R. 388, 398 (Bankr. N.D. Tex. 2013), *aff'd* 2015 WL 935141 (N.D. Tex. Mar. 4, 2015), *aff'd* 811 F.3d 786 (5th Cir. 2016).

Fully encumbered property, including funds held in trust by a debtor for the benefit of a creditor, is not part of the debtor's bankruptcy estate and is not generally available for distribution to unsecured creditors.  *See In re Maple Mortg., Inc.*, 81 F.3d 592, 596-97 (5th Cir. 1996).  Therefore, a prepetition transfer of such funds is not a "transfer of the debtor's interest in property" or a preferential transfer.  *See id.* (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)).[18]

Secured creditors are also broadly insulated from preferential transfer claims. *See generally In re El Paso Refinery, L.P.*, 171 F.3d 249, 253-54 (5th Cir. 1999) ("a creditor who recovers his own collateral is not deemed to have recovered a greater percentage than he would have in bankruptcy").  And a debtor's prepetition transfers to secured creditors are not preferences if they are: (1) applied by the creditor to reduce its secured claim against the debtor; or (2) are received by the creditor from its own collateral.  *See In re Tusa-Expo Holdings, Inc.*, 811 F.3d at 792-94; *In re El Paso Refinery, LP*, 171 F.3d at 254-55.

---

[18]    The mere fact that a debtor may have, at one time, exercised a measure of control over trust funds does not render those funds property of the bankruptcy estate.  *See id.*  Nor does the debtor's "ability to steal the [property] or use it for personal purposes in breach of duty."  *In re UDI Corp.*, 301 B.R. 104, 114-15 (Bankr. D. Mass. 2003) (collecting cases, including *Matter of Maple Mortg., Inc.*).

In the first instance, Debtors' claim must be dismissed, with prejudice, because Ford Credit is insulated – as a matter of law – against a preferential transfer claim.[19]  *See* Dkt. 1 at ¶¶ 33-35 (describing Debtors' out-of-trust sales); *see also* Case No. 18-50214-rlj-11, Claim No. 83-1, Ex. A, Ex. B.  Debtors admit the challenged transfers include amounts subject to Ford Credit's security interests and held in trust for Ford Credit, including "wholesale floorplan payoffs" and "payoffs of consumer accounts related to customer vehicles traded-in and financed by [Ford Credit]."  *See* Dkt. 1, Ex. 3, footnote 1.  Dkt. 1, ¶¶ 74-76, Ex. 3 (describing "wholesale floorplan payoffs" and "payoffs of consumer accounts related to customer vehicles traded-in and financed by [Ford Credit].") *see also* Case No. 18-50214-rlj-11, Claim No. 83-1, Ex. B (describing security interests in, *inter alia*, proceeds of vehicles and other inventory).

Debtors' claim must also be dismissed because they merely allege in conclusory fashion, that *all* transfers of cash to Ford Credit (or paid into Ford Credit's "cash management accounts") between May 3, 2018 and August 1, 2018 were preferential transfers.  *See* Dkt. 1, ¶ 74.  Debtors' fail to allege, however, that they had any interest in those funds – other than a conclusory and unsupported claim that they "would have been otherwise unencumbered and available for distribution to general unsecured creditors had the Debtors each filed chapter 7."  *Id.*  Debtors also fail to allege what Ford Credit, as an unsecured creditor, would have recovered in a Chapter 7 bankruptcy or that its recovery would have been less than the total amount of the challenged transfers – and make no effort to match up the transfers with antecedent debt or identify the particular transferors.  *See id.* ¶¶ 75-76.  These omissions also warrant dismissal of Debtors' claim. *See, e.g.*, *In re Life Partners Holdings, Inc.*, 926 F.3d at 121-22; *Reagor Auto Mall, Ltd. v.*

---

[19]      As already discussed above, this Court affirmed Ford Credit's status as a secured creditor in granting Ford Credit's motion for stay relief, after a full-day, contested evidentiary hearing.  *See* Point II, *supra*.  And, for the reasons set forth in Point III, *supra*, Debtors' claims that Ford Credit's claim should be subordinated to Debtors' general unsecured creditors must be dismissed.

*FirstCapital Bank of Texas, N.A.*, No. 20-05002-rlj, Dkt. 35 at 17-18 (Bankr. N.D. Tex. August 24, 2020).

In sum, the challenged transfers were not transfers of an interest in property of the debtor, as a matter of law, and cannot support a preferential transfer claim. *See In re Maple Mortg., Inc.*, 81 F.3d at 596-97; *In re Tusa-Expo Holdings, Inc.*, 811 F.3d at 792-94; *In re El Paso Refinery LP*, 171 F.3d at 254-55. Additionally, because Debtors have not alleged facts distinguishing transfers of funds held in trust for Ford Credit from other amounts (*see* Dkt. 1, Ex. 3), their preferential transfer claim must, again, be dismissed in its entirety. *See generally In re Integra Healthcare Holdings, Ltd.*, 2012 WL 4434680, at \*5 (Bankr. E.D. Tex. Sept. 24, 2012) (allowing portions of preferential transfer claims to survive motion to dismiss, but only where allegations distinguished unrecoverable transfers).

## POINT VII

## DEBTORS' "DETERMINATION OF LIEN" CLAIM FAILS TO STATE A CLAIM

Debtors' sixth claim seeks a declaration that Ford Credit had no lien "on any cash that was paid to Ford Credit after May 3, 2018, including any cash held by the Debtors on the Petition Date." Dkt. 1 at ¶ 83. Debtors again fail to state a plausible claim.

Again, this Court has already determined that Ford Credit had valid security interests in essentially all of the Dealerships' assets. *See* Case No. 18-50214-rlj-11, Dkt. 865, 890. The Court did so after a full day, contested evidentiary hearing that included: (a) uncontroverted testimony concerning Ford Credit's security interests; and (b) admission into evidence of the Security Agreements executed by each Dealership and Ford Credit's UCC filings perfecting its security interests. *See id.*, Claim 83-1, Part 2, Exhibits B, C, E, F, H, I, K, L. N, O, Q, R, S, T (entered into evidence in Case No. 18-50214-rlj-11, Dkt. 854 at 10-11). The Security Agreements gave Ford Credit blanket security interests in the "Collateral," which was defined to include, *inter alia*: "(a)

All equipment, fixtures, furniture, demonstrators and service vehicles, supplies and machinery and other goods of every kind; (b) All motor vehicles, tractors, trailers, service parts and accessories and other inventory of every kind and any accessions thereto; (c) All accounts, instruments, chattel paper, general intangibles, contract rights, documents and supporting obligations thereto" and all products and proceeds therefrom. *See, e.g.,* Claim 83-1, Part 2, Exhibit B.  Ford Credit's UCC filings perfected its blanket security interests, which extended to cash proceeds as a matter of law. *In re Tusa-Expo Holdings*, *Inc.*, 811 F.3d at 794. Again, Debtors do not – and cannot – dispute that Ford Credit held these security interests and properly perfected them.[20]

Debtors instead assert, in essence, that Ford Credit lost its security interest in proceeds from the sale of its Collateral during the preference period because "Debtors do not believe it will be possible for FMCC to trace and identify any cash proceeds." *See* Dkt. 1 at ¶ 81.  This conclusory and speculative allegation is patently insufficient to state a plausible claim that Ford Credit had no lien "on any cash that was paid to Ford Credit after May 3, 2018, including any cash held by the Debtors on the Petition Date."  *See id.* at ¶ 83; *In re Tusa-Expo Holdings*, *Inc.*, 811 F.3d at 794. Besides being based on Debtors alleged "belief," as opposed to facts, these allegations ignore that it is the Debtors' burden to show "that the source of any transfers from a debtor to a creditor was not the proceeds of the creditor's collateral." *Id.* at 798.  Debtors' Adversary Complaint is completely devoid of any factual allegations that payments made to Ford Credit during the preference period came from ***anything other than the proceeds of Ford Credit's Collateral***.  And the record in Debtors' bankruptcy proceedings demonstrates that any such payments necessarily came from Ford Credit's Collateral – because Debtors were not able to pay Ford Credit for $41

---

[20]    Debtors effectively admitted that Ford Credit held such security interests by filing Schedules with this Court, under penalty of perjury, identifying Ford Credit as a secured creditor with a claim against each Dealership that was not listed as contingent, disputed, or contested.  *See* Case No. 18-50214-rlj-11, Dkt. 421 at 22, 423 at 23, 425 at 22, 427 at 23, 429 at 22, and 431 at 23.

million dollars in vehicles discovered to have been sold out of trust during that period.

Accordingly, Debtors have failed to state a plausible claim for the relief sought in Count VI of their Adversary Complaint, and that claim must be dismissed.

## POINT VIII

### DEBTORS CANNOT STATE A DISALLOWANCE CLAIM, AS A MATTER OF LAW

To state a viable "disallowance" claim pursuant to 11 U.S.C. § 502(d), Debtors must have first established an adjudicated right to a turnover of assets. *See In re Davis*, 889 F.2d 658, 662 (5th Cir. 1989) ("This section is designed to be triggered *after* a creditor has been afforded a reasonable time in which to turn over amounts ***adjudicated to belong to the bankruptcy estate***" (emphasis added)); *In re IFS Fin. Corp.*, 2008 WL 4533713, at *3 (Bankr. S.D. Tex. Oct. 2, 2008) (Section 502(d) applies only to creditors adjudicated to be "liable" and a claim pursuant to that section cannot be maintained where allegedly fraudulent transfer is not "recoverable or avoidable."). Because Debtors have not established an adjudicated right to turnover (and cannot do so), their "disallowance" claim should be dismissed. *See, e.g.*, *In re Lancelot Inv'rs Fund L.P.*, 2012 WL 718631 at *9 (Bankr. N.D. Ill. Mar. 2, 2012) (dismissing "disallowance" claim where trustee did not sufficiently plead a claim for fraudulent conveyance or turnover).[21]

## IV.   CONCLUSION

Based on the above, Ford Credit respectfully requests that the Court dismiss Debtors' Adversary Complaint in its entirety, with prejudice, and grant such other and further relief to which Ford Credit may show itself justly entitled.

---

[21]   Debtors also cannot rely on Section 502(d) to seek "disallowance" of Ford Credit's right to recover administrative expenses. Section 502(d) applies only to "claims" that exist at the time of the filing of the bankruptcy petition, and cannot deny a creditor recovery of post-petition administrative expenses. *See In re Rand Energy Co.*, 256 B.R. 712, 718-19 (Bankr. N.D. Tex. 2000).

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: _/s/ Kevin M. Sadler_____
    Kevin M. Sadler
    State Bar No. 17512450
    1001 Page Mill Road
    Building One, Suite 2
    Palo Alto, California 94304-1007
    650-739-7518
    650-739-7618 (Fax)
    kevin.sadler@bakerbotts.com

    Michael S. Goldberg
    State Bar No. 08075800
    One Shell Plaza
    910 Louisiana Street
    Houston, Texas 77002
    713-229-1234
    713-229-1522 (Fax)
    michael.goldberg@bakerbotts.com

**COUNSEL FOR DEFENDANT**

_And_

**PHILLIPS LYTLE LLP**

Craig A. Leslie, Esq. *(Pro Hac Vice)*
Jacob S. Sonner, Esq. *(Pro Hac Vice Forthcoming)*
One Canalside
125 Main Street
Buffalo, New York  14203
716-847-8400
716-852-6100 (Fax)
cleslie@phillipslytle.com
jsonner@phillipslytle.com

**COUNSEL FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was served on

August 26, 2020 upon all parties entitled to such notice as provided by the ECF filing system.


*/s/ Kevin M. Sadler*
Kevin M. Sadler