IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| IN RE: | |
| Reagor-Dykes Motors, LP, et al. | Case No. 18-50214-rlj-11 |
| | Jointly Administered |
| Debtors, | |
| Reagor-Dykes Motors, LP, | |
| Reagor-Dykes Imports, LP, | |
| Reagor-Dykes Amarillo, LP, | Adversary No. 20-05005-rlj |
| Reagor-Dykes Auto Company, LP, | |
| Reagor-Dykes Plainview, LP, and | |
| Reagor-Dykes Floydada, LP, | |
| Reagor Auto Mall, Ltd., | |
| Reagor-Dykes Snyder, L.P., | |
| Reagor-Dykes Auto Mall I LLC, | |
| Reagor-Dykes II LLC, | |
| Reagor-Dykes III LLC, | |
| *Plaintiffs* | |
| vs. | |
| Ford Motor Credit Company, LLC, | |
| *Defendant* | |

**CREDITORS' TRUSTEE DENNIS FAULKNER'S (AS SUCCESSOR TO DEBTOR PLAINTIFFS) BRIEF IN SUPPORT OF RESPONSE TO DEFENDANT FORD MOTOR CREDIT COMPANY LLC'S MOTION TO DISMISS COMPLAINT**

Respectfully submitted,

**BRACEWELL LLP**

By:*/s/ Bryan S. Dumesnil*
    Bryan S. Dumesnil
    State Bar No. 00793650
    bryan.dumesnil@bracewell.com
    Bradley J. Benoit
    State Bar No. 24012275

brad.benoit@bracewell.com
Diane M. Crabtree
State Bar No. 24046966
diane.crabtree@bracewell.com
711 Louisiana, Suite 2300
Houston, Texas  77002
(713) 223-2300 - Telephone
(800) 404-3970 – Facsimile

**STRICKLIN LAW FIRM, P.C.**

By:*/s/ Samuel M. Stricklin*
Samuel M. Stricklin
State Bar No. 19397050
sam.stricklin@stricklaw.pro
2435 N. Central Expy
Suite 1200, Palisade, Bldg. II
Richardson, TX 75080
(972) 238-8687 - Telephone

**COUNSEL TO CREDITORS' TRUSTEE DENNIS FAULKNER, AS SUCCESSOR TO DEBTORS**

# TABLE OF CONTENTS

*Page*

Table of Contents ....................................................................................................... iii

I.      Introduction .....................................................................................................1

II.     Factual Background........................................................................................2

III.    Argument and Authorities..............................................................................4

        A.      Pleading Standard ...............................................................................4

        B.      The Trustee Has Adequately Pled Fraudulent Transfer Claims ............5

                1.      Commingled Funds In Debtors' Deposit Account Are
                        Presumptively Debtors' Property.................................................5

                2.      Recovery Of The Fraudulent Transfers Would Benefit The Estate............8

                3.      The Trustee's Fraudulent Transfer Claims Meet Rule 9(b)'s
                        Pleading Standard .......................................................................9

                4.      FMCC Has Not Proven Its Affirmative Defense Under 11 U.S.C.
                        § 548(c) ......................................................................................15

        C.      The Complaint Alleges An Equitable Subordination Claim.................20

        D.      The Trustee Has Adequately Pled A Surcharge Claim........................20

        E.      The Trustee Has Adequately Pled A Turnover Claim .........................21

        F.      The Trustee's Preference Claim Is Adequately Pled ...........................22

        G.      The Trustee's Determination Of A Lien Claim Is Adequately Pled.....................24

        H.      The Court Should Disallow FMCC's Claim........................................24

IV.     Conclusion .....................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

**Cases**

*In re Acequia, Inc.*,
   34 F.3d 800 (9th Cir. 1994) ......................................................................8

*In re Am. Hous. Found.*,
   2011 WL 4625349 (Bankr. N.D. Tex. Sept. 30, 2011)...............................15, 17, 18

*In re Am. Hous. Found.*,
   785 F.3d 143 (5th Cir. 2015) ..................................................5, 6, 16, 17

*In re ASARCO LLC*,
   513 B.R. 499 (S.D. Tex. 2012) ..................................................................8

*ASARCO LLC v. Ams. Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) ................................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................4

*Begier v. IRS*,
   496 U.S. 53 (1990)....................................................................................5

*Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*,
   500 B.R. 464 (W.D. Tex. 2013)..............................................................8, 9

*In re BH S & B Holdings LLC*,
   420 B.R. 112 (S.D.N.Y. 2009).................................................................20

*In re Bullion Reserve of N. Am.*,
   836 F.2d 1214 (9th Cir. 1988) .................................................................5

*In re Cajun Elec. Power Co-op., Inc.*,
   119 F.3d 349 (5th Cir. 1997) ..................................................................20

*Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*,
   783 F.2d 480 (5th Cir. 1986) ....................................................................7

*In re Consol. Cotton Gin Co.*,
   347 B.R. 572 (Bankr. N.D. Tex. 2006).....................................................21

*Coral Petroleum, Inc. v. Banque Paribas–London*,
   797 F.2d 1351 (5th Cir. 1986) ..................................................................6

*In re Davis*,
    889 F.2d 658 (5th Cir. 1989) ........................................................................................25

*In re Domistyle, Inc.*,
    811 F.3d 691 (5th Cir. 2015) ...................................................................................20, 21

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)..................................................................15, 16, 17

*Dunes Hotel Assoc. v. Hyatt Corp.*,
    245 B.R. 492 (D. S.C. 2000)...........................................................................................9

*Ehlich for Hoffmans Trade Grp. LLC v. Comm. Factors of Atlanta*,
    567 B.R. 684 (N.D.N.Y. 2017).........................................................................................7

*In re El Paso Refinery LP*,
    171 F.3d 249 (5th Cir. 1999) ........................................................................................23

*In re Fabricators, Inc.*,
    926 F.2d 1458 (5th Cir. 1991) ......................................................................................20

*In re Fairchild Aircraft Corp.*,
    6 F.3d 1119 (5th Cir. 1993) ..........................................................................................16

*In re Falcons Inc.*,
    2008 WL 363045 (E.D. Mo. Feb. 8, 2008)........................................................................9

*Foisie v. Worcester Polytechnic Inst.*,
    967 F.3d 27 (1st Cir. 2020)......................................................................................10, 11

*In re Furr's Supermarkets, Inc.*,
    2007 WL 2827459 (B.A.P. 10th Cir. 2007).....................................................................23

*Georgia Pac. Corp. v. Sigma Serv. Corp.*,
    712 F.2d 962 (5th Cir. 1983) .....................................................................................6, 22

*Grede v. Bank of New York Mellon Corp.*,
    809 F.3d 958 (7th Cir. 2016) ........................................................................................17

*In re Grimland, Inc.*,
    243 F.3d 228 (5th Cir. 2001) ........................................................................................21

*In re Hedged-Inv. Assoc., Inc.*,
    48 F.3d 470 (10th Cir. 1995) ..........................................................................................6

*In re IFS Fin. Corp.*,
    2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008)..........................................................25

*In re IFS Fin. Corp.*,
 417 B.R. 419 (Bankr. S.D. Tex. 2009) ............................................................14, 15

*In re IFS Fin. Corp.*,
 669 F.3d 255 (5th Cir. 2012) ..........................................................................5, 6, 25

*In re Indep. Clearing House Co.*,
 77 B.R. 843 (D. Utah 1987)......................................................................................12

*In re Integra Healthcare Holdings, Ltd.*,
 2012 WL 4434680 (Bankr. E.D. Tex. Sept. 24, 2012) ...........................................23

*Janvey v. Alguire*,
 647 F.3d 585 (5th Cir. 2011) ...................................................................................12

*Janvey v. Brown*,
 767 F.3d 430 (5th Cir. 2014) ...................................................................................11

*Janvey v. GMAG, L.L.C.*,
 592 S.W.3d 125 (Tex. 2019)....................................................................................17

*Janvey v. Golf Channel, Inc.*,
 487 S.W.3d 560 (Tex. 2016)....................................................................................11

*In re Juliet Homes, LP*,
 2011 WL 6817928 (Bankr. S.D. Tex. Dec. 28, 2011) ..............................................9

*In re KZK Livestock, Inc.*,
 190 B.R. 626 (Bankr. C.D. Ill. 1996).......................................................................12

*In re Life Partners Holdings, Inc.*,
 926 F.3d 103 (5th Cir. 2019) ............................................................................5, 9, 12

*In re LLS Am. LLC*,
 2013 WL 3305393 (Bank. E.D. Wash. July 1, 2013) ..............................................12

*In re M & L Bus. Mach. Co.*,
 198 B.R. 800 (D. Colo. 1996)..................................................................................16

*In re Manhattan Inv. Fund Ltd.*,
 310 B.R. 500 (Bankr. S.D.N.Y. 2002)...............................................................12, 16

*In re Margaux Tex. Ventures, Inc.*,
 545 B.R. 506 (Bankr. N.D. Tex. 2014)................................................................24, 25

*Melamed v. Lake Cty. Nat'l Bank*,
 727 F.2d 1399 (6th Cir. 1984) ...................................................................................7

*In re Mirant Corp.*,
    675 F.3d 530 (5th Cir. 2012) .................................................................8, 9

*In re Philip Servs. Corp.*,
    359 B.R. 616 (Bankr. S.D. Tex. 2006) ........................................................6

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)..........................................................12, 16

*In re Provident Royalties, LLC*,
    517 B.R. 687 (Bankr. N.D. Tex. 2014)......................................................11

*In re Ramirez Rodriguez*,
    209 B.R. 424 (Bankr. S.D. Tex. 1997) .....................................................12

*In re Reagor-Dykes Motors, LP*,
    2020 WL 4939180 (Bankr. N.D. Tex. Aug. 24, 2020) ..........5, 10, 11, 13, 14, 20, 22

*Richardson v. Huntington National Bank*,
    382 B.R. 118 (Bankr. W.D. Mich. 2008)....................................................7

*In re Rocco Co., Inc.*,
    2014 WL 7404566 (D.N.J. Dec. 29, 2014)..................................................7

*SEC v. Helms*,
    2015 WL 1040443 (W.D. Tex. Mar. 10, 2015) ...........................................12

*Sender v. Simon*,
    84 F.3d 1299 (10th Cir. 1996) .................................................................12

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005)......................................................................16

*In re Southmark Corp.*,
    49 F.3d 1111 (5th Cir. 1995) .................................................................5, 6

*Stalnaker v. DLC, Ltd.*,
    376 F.3d 819 (8th Cir. 2004) ....................................................................8

*In re Strategic Techs., Inc.*,
    142 F. App'x 562 (3d Cir. 2005) ...............................................................6

*In re Tex. Rangers Baseball Partners*,
    498 B.R. 679 (N.D. Tex. 2013)..................................................................9

*In re Tronox Inc.*,
    464 B.R. 606 (S.D.N.Y. 2012).............................................................8, 9

*Turner v. Pleasant*,
    663 F.3d 770 (5th Cir. 2011) ................................................................................4

*In re Tusa-Expo Holdings, Inc.*,
    496 B.R. 388 (Bankr. N.D. Tex. 2013) ..............................................................23

*In re Tusa-Expo Holdings, Inc.*,
    811 F.3d 786 (5th Cir. 2016) ..............................................................................23

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) ..............................................................................17

*Wellman v. Wellman*,
    933 F.2d 215 (4th Cir. 1991) ................................................................................9

*Wing v. Layton*,
    957 F. Supp. 2d 1307 (D. Utah 2013) ................................................................12

**Statutes**

11 U.S.C. § 502(d) ................................................................................................24, 25

11 U.S.C. § 502(h) ........................................................................................................9

11 U.S.C. § 506(c) ......................................................................................................21

11 U.S.C. § 547 ......................................................................................................24, 25

11 U.S.C. § 548 ................................................................................................11, 24, 25

11 U.S.C. § 548(a)(1) ............................................................................................1, 2, 17

11 U.S.C. § 548(a)(1)(A) ....................................................................................10, 11, 16

11 U.S.C. § 548(a)(1)(B) ............................................................................................16

11 U.S.C. § 548(c) ..............................................................................1, 15, 16, 18, 19

11 U.S.C. § 550 ........................................................................................8, 24, 25

11 U.S.C. § 1104(a) ......................................................................................................3

11 U.S.C. § 1104(b) ......................................................................................................3

11 U.S.C. § 1107(a) ....................................................................................................16

TEX. BUS. & COM. CODE ANN. § 9.104(a)(2) ..............................................................6

TEX. BUS. & COM. CODE ANN. § 9.312(b)(1) ..............................................................6

TEX. BUS. & COM. CODE ANN. § 9.314(a) ........................................................................6

**Rules**

FED. R. CIV. P. 8(a).......................................................................................................9, 22

FED. R. CIV. P. 9 ...............................................................................................................11

FED. R. CIV. P. 9(b) ...................................................................................................5, 9, 10

FED. R. CIV. P. 12(b)(6).......................................................................................................4

# I.

# INTRODUCTION

These claims were brought to ensure equitable distribution of estate assets to Debtors'
unsuspecting creditors who were left without recovery due in no small part to the massive amounts
Ford Motor Credit Company, LLC ("FMCC") received through fraudulent and preferential
transfers.  FMCC disingenuously suggests that it is perverse and impermissible that Debtors could
recover amounts from FMCC due to Debtors' own misconduct.  This both misapprehends the
Bankruptcy Code and fundamentally mischaracterizes the claims asserted.  The claims are brought
pursuant to well-known provisions of the Bankruptcy Code for the benefit of creditors—as borne
out by the plan of reorganization, which vests these claims in the Creditors' Trust overseen by the
Creditors' Trustee, Dennis Faulkner (as successor to Debtors, the "Trustee").[1]

FMCC's protestations that Debtors were engaged in a massive fraud is not a defense to the
claims; to the contrary, fraud by the transferor is part of proving a fraudulent transfer claim.  Nor
is FMCC's suggestion that it was—on some level—a victim of this fraud a defense to a claim
under 11 U.S.C. § 548(a)(1).  Instead, FMCC must prove it received the transfers at issue in "good
faith," 11 U.S.C. § 548(c), which requires FMCC to prove that it received the transfers without
inquiry notice of Debtors' fraud.  Not only is good faith not susceptible to determination on a
motion to dismiss, but the allegations of the Original Complaint [Dkt. 1] ("Complaint")
demonstrate that FMCC lacks a credible good faith defense.

FMCC also inaccurately portrays the effect these claims would have.  While FMCC does
not have a secured interest in Debtors' commingled bank accounts, the Trustee's avoidance claims

---

[1] As the Creditors' Trust now has ownership of these claims, this brief is submitted on behalf of the Trustee as
successor to the Debtors.  Because of the pendency of this motion to dismiss, the Trustee has not yet submitted a
motion for leave to amend the Original Complaint to reflect this change in ownership, but the Trustee intends to submit
such a motion when procedurally feasible.

do not deprive FMCC of a claim to estate assets. They merely require FMCC to take its rightful place alongside other creditors to receive distributions in accordance with the dictates of the Bankruptcy Code, including 11 U.S.C. § 548(a)(1) and the standards for equitable subordination. Doing so will right the wrong of FMCC recovering hundreds of millions while other creditors with no notice of Debtors' fraud were left unpaid or, worse, extended additional credit.

FMCC's motion to dismiss is one in name only because FMCC disregards the standards for a motion to dismiss. FMCC rarely cites the Complaint at all and instead uses documents extrinsic to the Complaint to lodge factual challenges. The Trustee has concurrently filed a motion to strike documents outside of the Complaint.[2] The Complaint's allegations—which must be taken as true—show that the Trustee has properly stated claims for fraudulent transfer, preferential transfer, and other claims under Chapter 5 of the Bankruptcy Code.

## II.
## FACTUAL BACKGROUND

Reagor-Dykes owned and operated six auto dealerships that were part of a larger group of affiliated dealerships and entities commonly known as RDAG. Complaint ¶¶ 4, 21.[3] Debtors' businesses operated at a loss due to an out-of-control cost structure, including excessive compensation packages. *Id*. ¶¶ 4, 24-25, 27. Debtors' Chief Financial Officer, Shane Smith, devised a scheme to obtain the needed cash flow to continue enriching himself and others by securing fraudulent loans and through check kiting. *Id*. ¶¶ 4, 27, 32.

FMCC provided wholesale floorplan financing to Reagor-Dykes secured by vehicle inventory, as well as furniture, fixtures, and equipment. *Id*. ¶ 22. As part of the Debtors' scheme, Reagor-Dykes routinely sold FMCC-floored vehicles and failed to timely remit the proceeds to

---

[2] *See* Creditors' Trustee Dennis Faulkner's (as successor to Debtor Plaintiffs) Brief in Support of Motion to Strike.
[3] Capitalized terms not defined herein have the same meaning attributed to them in the Complaint.

FMCC (known as selling vehicles "out of trust"). *Id.* ¶¶ 22, 28. Reagor-Dykes instead used the proceeds to pay off excessive business expenses and other obligations. *Id.* ¶ 28. Reagor-Dykes also engaged in "fake flooring," in which it requested advances for vehicles that had been sold months or years earlier. *Id.* ¶ 29. Reagor-Dykes also "double floored" (and even "triple floored") vehicles by receiving loans with FMCC and other lenders covering the same collateral. *Id.* ¶ 30.

In each type of fraudulent loan, Reagor-Dykes would no longer have the floored collateral (if it ever existed) or any proceeds available to repay FMCC's loan. *Id.* ¶ 31. FMCC was entitled to conduct quarterly "surprise" audits of Reagor-Dykes' financials and inventory, which would have revealed a large amount of missing collateral. *Id.* ¶¶ 23, 33. Reagor-Dykes received advance notice of the dates of the "surprise" audits and falsified sales paperwork to make it seem as though the missing vehicles had been sold recently so that repayments to FMCC were not yet due (known as "sold not due"). *Id.* ¶¶ 33-36. The enormous amounts of sold not due reported during each audit were—in FMCC's own words—a "significant red flag" that "indicated to [FMCC] that [Debtors] … were falsifying their sales dates …." *Id.* ¶¶ 35-36.[4] FMCC knew or should have known of Reagor-Dykes' fraud years prior to the bankruptcy due to these obvious anomalies in the quarterly audits, yet FMCC ignored the clear warning signs and continued to accept payments without questioning the source of the funds. *Id.* ¶¶ 2, 5, 26, 34-39, 41-43, 48-50.

The "sold not due" amounts soon became due, and Reagor-Dykes was required to make massive payoffs to FMCC in the week following each audit. *Id.* ¶¶ 34-36, 43. Reagor-Dykes was only able to make the large payoffs to FMCC by engaging in even more fraudulent loans and through check kiting. *Id.* ¶¶ 4, 43-46. The check kiting scheme was "extensive," with an entire team at RDAG devoted to kiting checks. *Id.* ¶¶ 44-45, 47. "The Debtors created a vicious cycle

---

[4] Referencing Ford Motor Credit Company LLC's Motion to Appoint Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) and (b) [Docket No. 47] at 5.

in which new funds acquired through fraudulent practices were required to pay off the previous loans and replenish overdrawn accounts." *Id*. ¶ 4; *see also id*. ¶ 31.  This Ponzi or Ponzi-like scheme was bound to fail, as Debtors lacked sufficient legitimate cash flow to repay their ever-increasing debts. *Id*. ¶¶ 4, 31-32.  Debtors made payments to FMCC knowing that other creditors would inevitably be left unpaid. *Id*. ¶¶ 4, 32.

The fraudulent scheme was ultimately exposed in June 2018 by an FMCC employee that stumbled upon information regarding Reagor-Dykes while investigating possible fraud at an unrelated dealership. *Id*. ¶¶ 51.  The FMCC team that audited Reagor-Dykes never requested an inquiry into Reagor-Dykes despite years of red flags; the employee's discovery was by accident. *Id*. ¶¶ 51, 53.  Reagor-Dykes' falsification of sales dates was quickly confirmed by FMCC with publicly-available sources, and FMCC conducted a real surprise audit of Reagor-Dykes on July 26-27, 2018. *Id*. ¶¶ 51-54.  That audit revealed $41,000,000 worth of vehicles that were missing for which Reagor-Dykes did not have the funds to repay FMCC. *Id*. ¶¶ 54-55.  FMCC terminated funding on July 30, 2018, and Reagor-Dykes filed for bankruptcy on August 1, 2018. *Id*. ¶ 56.

### III.
### ARGUMENT AND AUTHORITIES

#### A.    Pleading Standard

A motion to dismiss under Rule 12(b)(6) is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).  In reviewing a Rule 12(b)(6) motion, the Court must construe facts in the light most favorable to the plaintiff. *Id*.  The complaint must contain sufficient factual allegations, taken as true, that state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

To the extent Rule 9(b) applies to the fraudulent transfer claim—an issue the Fifth Circuit has not resolved—Rule 9(b) would require pleading "the who, what, when, where, and why [of] the fraudulent conduct." *In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *8 (Bankr. N.D. Tex. Aug. 24, 2020) (quoting *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019)). Fraudulent intent may be pled generally. FED. R. CIV. P. 9(b).

**B.     The Trustee Has Adequately Pled Fraudulent Transfer Claims**

1.     <u>Commingled Funds In Debtors' Deposit Account Are Presumptively Debtors' Property</u>

A fraudulent transfer claim must involve property of the debtor. *See Begier v. IRS*, 496 U.S. 53, 58 (1990). The Complaint alleges that the fraudulent transfers originated from the Debtors' commingled accounts that contained funds belonging to Debtors from numerous sources. Complaint ¶¶ 80-82. At all relevant times, FMCC lacked a perfected security interest in Debtors' deposit accounts from which the funds were transferred because FMCC did not control these accounts. *Id.* FMCC has also failed to trace any alleged proceeds of its collateral. *Id.*

"[M]oney in [a] commingled bank account[] under debtor's control … presumptively constitutes property of the debtor's estate." *In re Southmark Corp.*, 49 F.3d 1111, 1117 n.15 (5th Cir. 1995) (quoting *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1988) (quotations omitted)). In determining whether funds in a commingled bank account are "property of the debtor," the Fifth Circuit has stated that "control is decisive." *In re Am. Hous. Found.*, 785 F.3d 143, 159 (5th Cir. 2015) (quoting *In re IFS Fin. Corp.*, 669 F.3d 255, 263 (5th Cir. 2012)). This is true "*whether or not [Debtor] actually owns [the funds]*" because when the debtor controls the account, "the funds are available for payment to creditors in general" and the debtor chooses which creditors receive the funds. *In re Southmark Corp.*, 49 F.3d at 1117 n.17 (emphasis in original) (internal quotation marks omitted). Control over a commingled account is therefore

"central to assessing whether [these funds] are to form part of the bankruptcy estate" because the debtor's unfettered discretion over these funds provides it an opportunity to diminish resources "from which the debtor's creditors could have sought payment." *In re IFS Fin. Corp.*, 669 F.3d at 263-64 (quoting *In re Southmark*, 49 F.3d at 1117).

Texas law requires a control agreement for a creditor to perfect its security interest in the funds contained in a deposit account. *See* TEX. BUS. & COM. CODE ANN. §§ 9.104(a)(2), 9.312(b)(1), 9.314(a); *see also In re Am. Hous. Found.*, 785 F.3d at 158 (whether assets constitute property of a debtor's estate "is a question of state law"). FMCC never obtained a tri-party control agreement. Complaint ¶ 82. Accordingly, the money in the Debtors' commingled deposit accounts was presumptively property of Debtors' estates. *See In re Southmark Corp.*, 49 F.3d at 1116-17; *see also Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1358 (5th Cir. 1986).

FMCC has done nothing to rebut this presumption. When funds are commingled in a deposit account the debtor controls, the creditors or trust beneficiaries bear the burden to trace the res to prove that the property is not part of the debtor's estate. *Georgia Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 969 (5th Cir. 1983);[5] *see In re Philip Servs. Corp.*, 359 B.R. 616, 628 (Bankr. S.D. Tex. 2006) (courts "universally agree" that if a trust recipient wants to recover its allegedly secured property from a commingled account that it did not control, "the trust beneficiary *must* be able to trace the funds") (emphasis added). If no such tracing is performed, the property held in a debtor's commingled deposit account presumptively belongs to the debtor's estate. *In re*

---

[5] Other courts outside of the Fifth Circuit follow this same principle. *See In re Strategic Techs., Inc.*, 142 F. App'x 562, 566 (3d Cir. 2005) ("When funds are commingled, and a trust recipient claims a right in those funds, 'a claimant must make two showing: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled.") (citations omitted); *In re Hedged-Inv. Assoc., Inc.*, 48 F.3d 470 , 474 (10th Cir. 1995) ("When property of the estate is alleged to be held in trust, the burden rests upon the claimant to establish the original trust relationship.") (citations omitted).

*Southmark Corp.*, 49 F.3d at 1117 n.15; *see In re Rocco Co., Inc.*, 2014 WL 7404566, at *5 (D.N.J. Dec. 29, 2014) (holding that as a result of commingling, alleged trust property presumably became property of the debtor's estate). FMCC has made no attempt to trace the property at issue, and any attempt to do so would be a fact-intensive inquiry. The property in Debtors' commingled accounts is presumptively estate property.

The cases FMCC relies on do not change this result. *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 483-84 (5th Cir. 1986), involved an out-of-trust car dealer who took proceeds from the sale of vehicles and flew to Las Vegas in an ill-fated effort to turn his fortunes around by gambling. There was apparently no dispute about the source of the funds being "the proceeds from the sales of individual vehicles." *Id.* at 482. The case does not even mention the possibility the funds were commingled or what the rule would have been had the funds been commingled. In fact, the opinion does not even use the word "commingled."

Likewise, FMCC devotes nearly a full page to *Richardson v. Huntington National Bank* (*In re CyberCo Holdings, Inc.*), 382 B.R. 118 (Bankr. W.D. Mich. 2008). The case in fact bolsters the Trustee's case. What FMCC leaves out of its description of the case is that Huntington was actually Huntington National Bank, and the transfers the trustee sought to avoid were the sweep of deposit accounts that the bank held. *Id.* at 134. As the court correctly held: "Although the law does limit the granting of security interests in deposit accounts to only those that the creditor controls, Huntington was clearly in control of the CyberCo accounts from which the deposits were swept because they were all maintained at Huntington." *Id.*[6]

---

[6] The other cases FMCC cites are similarly distinguishable. *Melamed v. Lake Cty. Nat'l Bank*, 727 F.2d 1399 (6th Cir. 1984) was decided under the now-repealed Bankruptcy Act, and the case does not involve or even mention commingling. "Terminal [the debtor] deposited [the $30,000 construction deposit] and the Bank applied the money to Terminal's pre-existing indebtedness." *Id.* at 1401. The $30,000 construction deposit was deemed an account receivable over which the bank had a valid, perfected security interest. *Id.* at 1402. Similarly, *Ehlich for Hoffmans Trade Grp. LLC v. Comm. Factors of Atlanta*, 567 B.R. 684 (N.D.N.Y. 2017) does not address lien rights after commingling funds.

2.   Recovery Of The Fraudulent Transfers Would Benefit The Estate

Section 550 of the Bankruptcy Code allows recovery of fraudulent transfers "*for the benefit of the estate*." 11 U.S.C. § 550. Courts have consistently held that "benefit of the estate" should be interpreted broadly. *See, e.g., In re ASARCO LLC,* 513 B.R. 499, 506-07 (S.D. Tex. 2012) (citing *In re Tronox Inc.,* 464 B.R. 606, 614 (S.D.N.Y. 2012)).

"[Section] 550 sets a minimum floor for recovery in an avoidance action—at least some benefit to the estate—but does not impose any ceiling on the maximum benefits that can be obtained once that floor has been met." *In re Tronox, Inc.*, 464 B.R. at 618. Ignoring that unsecured creditors and administrative expenses have not been paid in full, FMCC argues that a recovery would be an impermissible windfall to Debtors. Given that a recovery will inure to the benefit of claimants who have not been paid in full, FMCC's standing argument is baseless.

Moreover, the Fifth Circuit has rejected the argument that a trustee lacks standing to pursue avoidance actions even when the unsecured creditors have been satisfied in full. *In re Mirant Corp.*, 675 F.3d 530, 534 (5th Cir. 2012) ("Once a trustee's avoidance rights are triggered at the time of filing, they persist until avoidance will no longer benefit the estate under § 550."); *see also Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 823-24 (8th Cir. 2004) (finding that the trustee had standing to pursue an avoidance action for administrative expenses even though the unsecured creditors had settled); *In re Acequia, Inc.*, 34 F.3d 800, 811 (9th Cir. 1994) (disagreeing with the argument that allowing a trustee to "recover more than it paid out to unsecured creditors would necessarily benefit the debtor" and not the estate). "Central to this decision is the assessment that the bankruptcy estate is not synonymous with the concept of a pool of assets to be gathered for the sole benefit of unsecured creditors." *Mirant Corp.*, 675 F.3d at 534.[7]

---

[7] The cases FMCC cites are inapposite. In *Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp*, the court limited recovery under section 550 because a certain class of creditors were barred from recovery by numerous

FMCC also ignores that it can bring a claim for amounts the Trustee recovers under section 502(h). "Following avoidance and recovery of the transfer, the Bankruptcy Code protects the transferee through section 502(h) by returning the transferee to the status it would have had if it had never received the now-avoided transfer." *In re Falcons Inc.,* 2008 WL 363045, at *6 (E.D. Mo. Feb. 8, 2008); *see also* 11 U.S.C. § 502(h); *In re Tronox,* 464 B.R. at 611 n.8. "This ensures that all similar creditors … are treated equally, which is a paramount goal of the Bankruptcy Code." *In re Falcons Inc.,* 2008 WL 363045, at *6. It would be inappropriate to cap damages at the motion to dismiss phase before the parties have even conducted discovery. *See In re Tronox,* 464 B.R. at 618 ("[T]he calculation of damages in this case will be based on the facts proved at trial, … and it is premature to speculate as to the effect of § 502(h) or other damages provisions in this case.").

### 3. The Trustee's Fraudulent Transfer Claims Meet Rule 9(b)'s Pleading Standard

The Fifth Circuit has not ruled on whether Rule 9(b) applies to fraudulent conveyance claims. *In re Life Partners,* 926 F.3d at 118 ("[W]e need not weigh in on this vexing question."). The Fifth Circuit found in *In re Life Partners Holdings, Inc.* that actual fraudulent transfer claims were adequately pled under Rule 8 or Rule 9(b) where the complaint included "details of the allegedly fraudulent transfers—including the transferor, transferees, amounts, and time period— and … contain[ed] pages of allegations detailing the underlying fraudulent scheme." *In re Life Partners,* 926 F.3d at 119; *see also In re Juliet Homes, LP,* 2011 WL 6817928, at *13 (Bankr. S.D.

---

state laws. 500 B.R. 464, 477, 481-83 (W.D. Tex. 2013). In *Wellman v. Wellman,* 933 F.2d 215, 218 (4th Cir. 1991), the debtor-in-possession executed non-recourse promissory notes with creditors specifically in an attempt to create a claim so that the debtor would obtain a massive recovery. 933 F.2d at 219. Furthermore, the holding in *Wellman* is inapplicable to the Fifth Circuit because the Fourth Circuit interprets "benefit of the estate" narrowly. *See In re Mirant Corp.,* 675 F.3d at 533-34; *see also In re Tex. Rangers Baseball Partners,* 498 B.R. 679, 706-09 (N.D. Tex. 2013). Finally, *Dunes Hotel Assoc. v. Hyatt Corp.* is another case from within the Fourth Circuit that relies on *Wellman.* 245 B.R. 492 (D. S.C. 2000). In this case, the court stated (1) that there were no non-insider creditors, and (2) the only entities that would benefit would be the debtor and its equity holder. *Dunes Hotel Assoc.,* 245 B.R. at 510-11.

Tex. Dec. 28, 2011) (Rule 9(b) was met where the complaint "identifie[d] the transferor, recipient, amount, and date of transfers … [and] provide[d] sufficient context as to the overall scheme.").

This Court recently applied the Rule 9(b) pleading standard to a claim under section 548(a)(1)(A). *In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *8 (Bankr. N.D. Tex. Aug. 24, 2020). This Court noted, however, that a "lesser" pleading standard may apply to claims under section 548(a)(1)(A) in this case because Debtors are operated by a court-appointed restructuring officer with only a handful of original employees left to sort through Debtors' complex fraudulent schemes. *Id.* at *10. Regardless of the standard applied, the Trustee has adequately pled a claim.

> a.    The Trustee Has Adequately Pled The "Who, What, When, Where and Why" Of The Fraudulent Transfers

Exhibit 1 to the Complaint lists the transferor entity, transferee (FMCC), date, and amount of each transfer. *See* Exhibit 1 [Docket No. 1-2]. As noted in Exhibit 1, the net settlement amounts reflect the "cash paid out" to FMCC on each particular day "as reflected in the bank statements provided to each RDAG entity by their respective financial institutions." *Id.* at 14-15. Although multiple transactions between RDAG and FMCC may underlie each cash transfer,[8] the Trustee has not aggregated multiple transfers over large spans of time—these are the daily cash transfers between Reagor-Dykes and FMCC as shown in Debtors' bank statements.

FMCC cites no authority for the proposition that the Trustee is required to segregate each cash transfer into payments made on account of floorplan loan payoffs, interest, or trade-in lien payoffs.[9] No such pleading burden exists. *See Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 50 (1st Cir. 2020) ("Rule 9(b) does not demand a blow-by-blow account; as long as a plaintiff has adequately pleaded the who, what, where, and when of the alleged fraudulent conduct, the rule

---

[8] *See* Exhibit 1 [Docket No. 1-2] at 14-15.
[9] Motion to Dismiss at 15.

does not obligate her to allege every conceivable detail incident to the fraud.").  As shown below (*infra* Part III(B)(3)(b)), each type of payment was made with intent to hinder, delay or defraud creditors, and therefore partitioning of each cash transfer is unnecessary for FMCC to understand the claims against it.  *Id*. at 51 (the primary purpose of Rule 9 is "to place the defendants on notice and enable them to prepare meaningful responses").[10]

> ### b.  The Complaint Adequately Pleads Actual Fraudulent Intent

This Court is well-versed in Debtors' fraud and previously found actual fraudulent intent was adequately pleaded with regard to Debtors' check kiting transactions.  *In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *2-3.  The Complaint alleges that "Debtors were engaged in a Ponzi or Ponzi-like scheme by which they artificially propped up their failing businesses with funds from fraudulent loans and check kiting."  Complaint ¶ 4.  Debtors were "[w]ithout sufficient legitimate cash flow to repay their debts … and made payments to FMCC with an intent to hinder, delay, or defraud their creditors, who would be left without recovery when Debtors' business inevitably failed."  Complaint ¶ 4.  As this Court previously noted, "when a Ponzi scheme has been sufficiently pleaded, the intent-to-defraud element does not need to be pleaded."  *In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *9; *see also Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014) (TUFTA claim); *In re Provident Royalties, LLC*, 517 B.R. 687, 694-95 (Bankr. N.D. Tex. 2014) (§ 548(a)(1)(A) claim).[11]

The Fifth Circuit has described a Ponzi scheme as follows:

---

[10] It is also worth noting that FMCC has in its own files information regarding all the transactions underlying each specified transfer between RDAG and FMCC.

[11] FMCC claims that the presumption of fraudulent intent in a Ponzi scheme has "been rejected in recent state court opinions in the analogous context of state law fraudulent transfer," citing *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016).  Motion to Dismiss at 14-15 n.14.  Far from rejecting the Ponzi-scheme presumption, the Texas Supreme Court stated that the Fifth Circuit has adopted the presumption, and that the Court "express[ed] no opinion regarding the validity of the Fifth Circuit's conclusive Ponzi-scheme presumptions" because the issue was beyond the scope of the certified question.  *Id*. at 567 n.27.  The Trustee's claim under section 548 is a federal claim subject to federal standards as established by the Fifth Circuit.

> A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.

*Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (citations omitted). Although some Ponzi schemes have little to no legitimate business transactions, a Ponzi scheme can also operate to artificially prop up a business that is operating at a loss. *See, e.g, In re Life Partners*, 926 F.3d at 112-14; *SEC v. Helms*, 2015 WL 1040443, at *4, 8 (W.D. Tex. Mar. 10, 2015); *Wing v. Layton*, 957 F. Supp. 2d 1307, 1310 (D. Utah 2013); *Sender v. Simon*, 84 F.3d 1299, 1301-1302 (10th Cir. 1996); *In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 510-11 (Bankr. S.D.N.Y. 2002); *see also In re LLS Am. LLC*, 2013 WL 3305393, at *6 (Bank. E.D. Wash. July 1, 2013) ("It is not disputed that the debtor operated a legitimate business, i.e., the payday loan business .... [T]he debtor's operations did not generate sufficient profits or cash flow to repay lenders [and] the source of payments made to lenders were the receipts from later lenders ....").

The debtor's fraudulent intent in a Ponzi or Ponzi-like scheme stems from the inevitability of the scheme's demise. "A Ponzi scheme cannot work forever .... The perpetrator must know that the scheme will eventually collapse .... [A] debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." *In re Ramirez Rodriguez*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997) (quoting *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (D. Utah 1987)); *see also Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011), *abrogated on other grounds*, *In re BLMIS*, 513 B.R. 437, 453 (S.D.N.Y. 2014). Even outside of the context of a true Ponzi scheme, courts have found fraudulent intent where the debtor knew creditors would ultimately be left unpaid as a result of the transfer. *See In re KZK Livestock, Inc.*, 190 B.R. 626, 630 (Bankr. C.D. Ill. 1996) ("The check kiting, like a Ponzi scheme, comes to a point of no return

where the check kiter would not be able to pay them all.  At that point, every transfer might be
made with an intent to defraud creditors."); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278,
386-88 (S.D. Tex. 2008) (finding fraudulent intent because the controlling shareholder knew that
the transfer would leave the cash flow insolvent ASARCO in a "hole" with even less ability to pay
overdue obligations to other creditors); *see also In re Reagor-Dykes Motors, LP*, 2020 WL
4939180, at *9-10 (a check kiting scheme may be afforded the presumption of fraudulent intent
where the check kiter is not financially able to promptly cover overdrafts).

        The Trustee has adequately pled that Debtors were engaged in a Ponzi or Ponzi-like
scheme.  The Complaint alleges that Reagor-Dykes was in the business of selling new and used
vehicles but that it "did not turn a profit" and was "in a constant cash-flow shortfall."  Complaint
¶¶ 24, 27; *see also id*. ¶ 4.  The Trustee has further alleged that "Reagor-Dykes was under-
capitalized," in part, because it "overpaid individuals with salaries and bonuses far exceeding
industry standards."  *Id*. ¶¶ 24-25.  "Reagor-Dykes could never sell enough cars to make up the
working capital deficit due to its out-of-control cost structure."  *Id*. ¶ 24.

        FMCC does not dispute that Debtors engaged in massive fraud involving fraudulent loans
and check kiting to make payoffs to FMCC.  *Id*. ¶ 4, 43-46.[12]  Debtors required a constant flow of
new money from fraudulent practices to repay their debts—the hallmark of a Ponzi scheme.  *Id*. at
¶¶ 4, 27, 31, 46.  The Complaint alleges that Reagor-Dykes sold FMCC-floored vehicles out of
trust to use the proceeds to "pay off its excessive business expenses and other obligations."  *Id*. at
¶ 28.  Debtors also engaged in substantial fake flooring and double/triple flooring to obtain funds
to repay FMCC.  *Id*. ¶¶ 29-30, 44, 46.  The Complaint provides specific examples of payouts to
FMCC that were made with proceeds from fraudulently-induced loans: funds from fake flooring

---

[12] Motion to Dismiss at 2 ("The essential facts demonstrating that Debtors themselves perpetrated a massive fraud
are undisputed."); *see also id.* at 4 ("And, by kiting checks, Debtors were able to make payoffs due after those audits.").

accounted for 62% of RD Imports' payoffs to FMCC after the December 21, 2016 audit, and funds

from double flooring accounted for 42% of RD Floydada's payoffs to FMCC after the June 26,

2018 audit.  *Id*. ¶ 46.  The out of trust sales, fake floors and double floors only drove the Debtors

deeper into a hole they could never crawl out of, as there was no collateral or proceeds of collateral

available to repay FMCC and no profits to make up the shortfall.  *Id*. ¶¶ 4, 24-25, 27, 31-32.

The Complaint also provides details of Debtors' "extensive" check kiting scheme used to

make payoffs to FMCC.  *Id*. ¶¶ 44-47.  Check kiting is a form of a Ponzi scheme, as Reagor-Dykes

repaid the credit from one bank with credit from the next bank, which would be repaid from the

float time from a new check from another bank.  *Id*. at ¶ 44.  The Complaint properly pleads a

Ponzi scheme by alleging that the cash flow insolvent Debtors paid FMCC, "in substantial part,

with funds from new fraudulent loans and check kiting." *Id*. at ¶ 43.[13]

Even if the Court finds that Debtors were not engaged in a classic Ponzi scheme, the

Complaint nonetheless properly pleads Debtors' actual fraudulent intent.  "Under Supreme Court

and Fifth Circuit precedent, the existence of a pervasive fraudulent scheme is sufficient to find

fraudulent intent with respect to transfers made in furtherance of that scheme."  *In re IFS Fin.*

*Corp.*, 417 B.R. 419, 428 (Bankr. S.D. Tex. 2009) (Isgur, J.), *aff'd*, 669 F.3d 255 (5th Cir. 2012).

As Judge Isgur wrote:

> The Fifth Circuit and other circuits have repeatedly held that the existence of a
> fraudulent scheme itself is sufficient to find that a transfer made in furtherance of
> that scheme was made with fraudulent intent. … The Fifth Circuit's reasoning
> applies whether the organization neatly fits within a judicially constructed

---

[13] FMCC inaccurately asserts that "[t]his Court has already recognized that Debtors' scheme, even to the extent
it involved check kiting, was not actually a Ponzi scheme."  Motion to Dismiss at 14 n.14.  The Court stated that
"check kiting is a form of Ponzi scheme" but that an automatic presumption of fraudulent intent does not necessarily
apply to check kiting schemes where the debtor "remains financially able to promptly cover overdrafts."  *In re Reagor-*
*Dykes Motors, LP*, 2020 WL 4939180, at *9-10 (internal citations omitted).  Nonetheless, the Court found that
"fraudulent intent is adequately pleaded" because the complaint alleged that the check kiting enabled Debtors to pay-
down the floorplan loans and hide that inventory had been sold out of trust.  *Id*. at 20.  The Court also noted that the
volume of transactions in relation to the actual revenues from operations further supported an inference of fraudulent
intent.  *Id*.  The Complaint contains similar allegations.  Complaint ¶¶ 44-47.

definition of Ponzi scheme or was a fraudulent scheme that had some, but perhaps not all, attributes of the traditional Ponzi scheme. When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with actual intent to defraud.

*Id*. at 439; *see also id.* at 439 n.15.

The Complaint states that "Reagor-Dykes made payments to FMCC knowing that other creditors and consumers would be harmed when its scheme inevitably collapsed." Complaint ¶ 43. "Reagor-Dykes' failure was inevitable, as the growing deficit it created with each fraudulent transaction was impossible to overcome without any legitimate profits." *Id.* ¶ 32. The Trustee further alleges that Reagor-Dykes needed to make timely payoffs to FMCC to perpetuate Debtors' fraudulent scheme to pay above-market compensation packages. *Id.* ¶ 5, 32. The Complaint does not allege an intent to prefer one creditor over another,[14] but instead alleges Debtors' knowledge that their fraudulent schemes to prefer *themselves* over their creditors would eventually come to an end and leave creditors unpaid. *Id.* ¶¶ 2, 4, 32.

4.    FMCC Has Not Proven Its Affirmative Defense Under 11 U.S.C. § 548(c)

FMCC claims that it would be "inequitable" for the Debtors to avoid the challenged transfers because FMCC allegedly provided value in exchange for the transfers. Motion to Dismiss at 13-14. But FMCC ignores the other requirement of a section 548(c) affirmative defense: good faith. 11 U.S.C. § 548(c); *see also In re Am. Hous. Found.*, 2011 WL 4625349, at *23 (Bankr. N.D. Tex. Sept. 30, 2011) (Jones, R.) ("The test is conjunctive: Horton must prove both good faith and that … he gave value …."). A determination regarding good faith is inappropriate at the motion to dismiss stage, as FMCC must plead and prove its affirmative defense. *See In re Dreier LLP*, 452 B.R. 391, 425-26 (Bankr. S.D.N.Y. 2011) ("Determining the Defendants' good faith is

---

[14] Motion to Dismiss at 14.

an indisputably factual inquiry to be undertaken by the Court after the close of discovery and need not be resolved at the motion to dismiss stage.").

FMCC's contention that providing value is an "absolute defense" to an actual fraudulent transfer claim under § 548(a)(1)(A) misstates the law. FMCC only cites cases regarding constructive fraudulent transfer—claims for which a lack of "reasonably equivalent value" is an element of the claim.[15] Motion to Dismiss at 13 (citing *In re Fairchild Aircraft Corp.*, 6 F.3d 1119 (5th Cir. 1993) (analyzing the reasonably equivalent value standard); *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) (analyzing alleged constructively fraudulent transfers under New York law)).[16] Indeed, every transfer in a Ponzi scheme is avoidable as an actual fraudulent transfer absent the transferee's good faith, regardless of whether the transfer is repayment of an antecedent debt or earned interest. *See Picard*, 462 B.R. at 454; *In re Dreier LLP*, 452 B.R. 425-27; *see also In re M & L Bus. Mach. Co.*, 198 B.R. 800, 810 n.4 (D. Colo. 1996) (rejecting defense under section 548(c) due to transferee's lack of good faith, even though repayment of principal investment in a Ponzi scheme constituted a repayment of debt).

The good faith test under section 548(c) questions whether the transferee had inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. *See In re Am. Housing Found.*, 785 F.3d at 164. Inquiry notice is an objective standard, examining what a reasonably prudent person should have known instead of what the transferee subjectively

---

[15] FMCC is wrong to suggest that 11 U.S.C. § 1107(a) would authorize the Court to alter the unambiguous language of 11 U.S.C. § 548(c) requiring good faith as an element of the defense. Motion to Dismiss at 14 n.13.

[16] Constructive fraudulent transfer claims under New York's version of the Uniform Fraudulent Conveyance Act require the plaintiff to allege a lack of equivalent value and a lack of good faith of the transferee. *In re Sharp Int'l Corp.*, 403 F.3d at 54; *compare* 11 U.S.C. § 548(a)(1)(B). Courts have routinely rejected applying the cited language in *In re Sharp Int'l Corp.* in the context of actual fraudulent transfer claims. *See, e.g.*, *Picard*, 462 B.R. at 453 ("Whether, in these circumstances, defendants can avail themselves of the affirmative defense of taking for value and in good faith under section 548(c) is in no way controlled by *Sharp*."); *see also In re Manhattan Inv. Fund Ltd.*, 310 B.R. at 508 (distinguishing *Sharp*'s holdings regarding actual fraudulent transfer claims because the New York statute requires a showing of fraudulent intent by both the transferee and transferor, while section 548(a)(1)(A) only requires fraudulent intent by the transferor).

knew related to the fraudulent transaction. *See In re Am. Hous. Found.*, 2011 WL 4625349, at

*23; *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) (the "transferees' knowing participation

is irrelevant under the statute"); *In re Dreier LLP*, 452 B.R. at 425-27.  Once the transferee has

been put on inquiry notice, the transferee must show it conducted a "diligent investigation" into

the potentially fraudulent activity.  *See In re Am. Housing Found.*, 785 F.3d at 164; *see also Janvey*

*v. GMAG, L.L.C.,* 592 S.W.3d 125, 131-32 (Tex. 2019) (creditor on inquiry notice does not act in

good faith under TUFTA without a diligent investigation, even if an investigation would have been

futile).

     *Grede v. Bank of New York Mellon Corp.* (*In re Sentinel Mgmt. Grp., Inc.*), 809 F.3d 958

(7th Cir. 2016) (Posner, J.), provides an analogous example of inquiry notice.  In *Sentinel,* the

debtor (Sentinel) wrongfully placed securities purchased for its customers into an account pledged

to BNY Mellon.  *Id*. at 960-61.  BNY Mellon received periodic financial statements from Sentinel

which showed over $300 million in assets in the collateral account even though Sentinel had no

more than $3 million in capital.  *Id*. at 962.  At Sentinel's bankruptcy filing, BNY Mellon was

owed $312 million, fully secured by securities that Sentinel had wrongfully placed into the

collateral account.  *Id*. at 961.

     The Seventh Circuit sustained a finding that Sentinel acted with actual fraud under

section 548(a)(1).  *Id.* at 966.  More importantly, it concluded that BNY Mellon was on inquiry

notice and should have investigated the source of the collateral.  *Id*. at 962-64.  BNY Mellon's lien

was avoided as a fraudulent transfer, and $312 million became available to pay unsecured

creditors.  *Id.* at 964.  The holding in *Sentinel*, among other implications, eviscerates FMCC's

argument that it has an "absolute defense" either based on having provided value or having a

security interest—both of which were true of BNY Mellon.

Although the Trustee need not plead a lack of good faith, the well-pleaded facts in the Complaint preclude FMCC's reliance on section 548(c).  FMCC knew or should have known of Debtors' fraud long before the bankruptcy filings.[17]  Complaint ¶¶ 1, 5, 32.  The Complaint cites deposition testimony of FMCC employees involved in Reagor-Dykes audits confirming that FMCC knew about double flooring and out of trust sales long before the bankruptcy.  *Id.* ¶ 39. The Complaint states that FMCC's quarterly audits revealed obvious anomalies in Reagor-Dykes' sales numbers, which were consistently several times larger in the months in which an audit occurred.  *Id.* ¶ 34.  The majority of those sales suspiciously occurred in the seven days prior to each audit, resulting in an implausible number of "sold not due" being reported  *Id.* ¶¶ 35-36.  The Complaint provides examples of several audits where the average sold not due for all of Reagor-Dykes was around 25%, with individual dealerships reporting sold not due amounts as high as 30%, 34%, and even 45% of inventory.  *Id.* ¶ 36.  The Trustee cites FMCC's own filings in the bankruptcy in which FMCC stated that it expects about 5% of inventory to be sold not due, indicating Reagor-Dykes' reported sold not due of 25% resulted from falsified sales dates.  *Id.* ¶¶ 35-36.  In addition, the Complaint states FMCC knew or should have known that Reagor-Dykes was falsifying paperwork with advance notice of the "surprise" audits, as there was consistently an aberrational spike in sales shortly before the auditors arrived.  *Id.* ¶¶ 33, 38, 43.

FMCC also audited Reagor-Dykes' monthly financial statements, which showed the huge increase in sales the week before the audit accounted for most of the sales reported that month.  *Id.* ¶ 37.  Any reasonably prudent person would question the veracity of a dealership selling a quarter of its inventory in one week, and then selling virtually nothing the other three weeks of the month.

---

[17] FMCC improperly seeks to use extraneous documents to contest the well-pleaded facts in the Complaint regarding FMCC's inquiry knowledge of Reagor-Dykes' fraudulent activities.  The Trustee has filed a motion to strike documents outside of the Complaint to the extent they are being used to prove the truth.  In any event, FMCC's actual knowledge is not required under the good faith test.  *See In re Am. Hous. Found.*, 2011 WL 4625349, at *23.

Reagor-Dykes also reported an abnormally large percentage of violations to FMCC. *Id.* ¶ 42. These are out of trust sales that were actually disclosed to FMCC during an audit. *Id.*

The Complaint avers that, despite all of the obvious red flags and irregularities, FMCC failed to launch a diligent investigation. *Id.* ¶¶ 41, 53. FMCC did not verify the sales dates of reportedly sold not due inventory with readily-available resources. *Id.* ¶ 36. FMCC has an entire department dedicated to detecting fraud with data-analytics tools, yet the audit team never initiated a review of Reagor-Dykes. *Id.* ¶¶ 51, 53. FMCC's willingness to disregard the obvious was evident in the last quarterly audit in June 2018, in which RD Floydada reported that it had sold virtually the entire inventory on its lot in the preceding week. *Id.* ¶ 48. Nonetheless, FMCC passed the audit with flying colors. *Id.* ¶ 48. The Complaint cites deposition testimony of an FMCC employee who stated that he discussed this red flag with other team members but that they decided not to launch any further inquiry. *Id.* ¶ 50.

The Complaint alleges that FMCC also should have suspected the source of the large payoffs. FMCC was aware that Reagor-Dykes grossly overpaid its employees. *Id.* ¶ 25. FMCC allowed Reagor-Dykes to deviate from protocol by not reporting its working capital. *Id.* ¶ 26. FMCC knew or suspected that Reagor-Dykes was involved in double flooring and out of trust sales, which left no collateral or proceeds to pay FMCC. *Id.* ¶¶ 31, 39. Nonetheless, FMCC turned a blind eye to it all as it accepted massive catch-up payments. *Id.* ¶¶ 2, 5, 26, 36, 43. Tellingly, FMCC demanded to see Reagor-Dykes' bank balances during the first real surprise audit in July 2018. *Id.* ¶ 55. FMCC clearly suspected the money to pay off out of trust sales would not be in the accounts when Reagor-Dykes was not provided advance notice to inflate its balances. FMCC's lack of good faith precludes any defense under section 548(c).

### C.    The Complaint Alleges An Equitable Subordination Claim

The Fifth Circuit has held that a trustee has standing to bring an equitable subordination claim. *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 358 n.2 (5th Cir. 1997); *see also In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *11 (stating that "[t]he majority, though few in number, of courts have found that a chapter 11 debtor-in-possession has standing to bring an equitable subordination claim[]" and collecting cases).  FMCC's suggestion that the Trustee lacks standing is contrary to this precedent.

The Fifth Circuit has established a three-prong test for equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the conduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) the invocation of equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code.  *In re Fabricators, Inc.*, 926 F.2d 1458, 1464-65 (5th Cir. 1991).  "Equitable subordination is a fact-intensive cause of action that is not normally determined on a motion to dismiss."  *In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *12; *see also In re BH S & B Holdings LLC*, 420 B.R. 112, 156 (S.D.N.Y. 2009).  The Complaint repeatedly alleges that FMCC had knowledge that other creditors could be harmed by Debtors' fraud, providing numerous examples.  *See* Complaint ¶¶ 2, 5, 24-26, 30, 33-43.

### D.    The Trustee Has Adequately Pled A Surcharge Claim

To recover surcharge expenses, the Complaint must allege that (1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses.  *In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015).  The benefit to the secured creditor should be direct but need not be exclusive; the expenses can also be incurred to realize

value for the estate. *Id*. at 694-99 (allowing recovery of expenses to preserve collateral—including utilities, ad valorem taxes, and insurance—during sale process that was ultimately unsuccessful).[18]

The expenses the Trustee seeks are directly related to FMCC's collateral. From August 1, 2018 until January 17, 2019, the stay was in place while Debtors sought a transaction that could salvage the going concern value of the dealerships, including FMCC's collateral. Case No. 18-50214-rlj-11, Dkts. 1, 230, 296, 319, 389, 865. For those five and a half months, the Complaint seeks rent for property where the collateral vehicles were stored and the payment of *ad valorem* taxes (as specifically allowed in *Domistyle*). Exhibit 2 to the Complaint [Dkt. 1-3] ("Exhibit 2") (providing the number of vehicles remaining on lots each month). Other rows in Exhibit 2 during those months are marked "Paid," meaning they were paid by Debtors through cash collateral orders, and Debtors are not seeking to surcharge those amounts.[19] *Id*. After the stay was lifted (Case No. 18-50214-rlj-11, Dkt. 865), the number of rows with dollar amounts appropriately expands to reflect all of Debtors' expenses of maintaining FMCC's collateral pending repossession. Exhibit 2. After the Court lifted the stay on FMCC's vehicle collateral, the expenses Debtors paid were solely for the preservation of collateral.

### E.    The Trustee Has Adequately Pled A Turnover Claim

The cash collateral orders provided a carve-out for all fees to the Clerk of Court and the U.S. Trustee set forth in the interim budgets, as well as all fees, disbursements, costs and expenses that counsel for Debtors and the CRO incurred from the Petition Date (August 1, 2018) through

---

[18] The statement in *In re Grimland, Inc.*, 243 F.3d 228 (5th Cir. 2001) that the expenses may not "benefit the debtor or other creditors" was *dicta*. The Fifth Circuit in *In re Domistyle, Inc.* revisited the benefit to the creditor standard and found that no such restriction exists in the statutory language. 811 F.3d at 696 ("Where does *Delta Tower*'s 'primarily for the benefit of' language come from? Not the Bankruptcy Code …. Section 506(c) thus does not include an express requirement that the money be spent with any particular beneficiary in mind."). *In re Consol. Cotton Gin Co.*, decided by this Court before the Fifth Circuit's guidance in *Domistyle*, relied on the now-abandoned *dicta* in *In re Grimland, Inc.* 347 B.R. 572, 580 (Bankr. N.D. Tex. 2006).

[19] FMCC's assertion that Debtors are seeking to surcharge expenses that were already paid through cash collateral orders is inaccurate, as reflected in Exhibit 2.

the Interim Period covered by the Interim Budget (January 5, 2019). Complaint ¶ 71. FMCC has

failed to fund $1,604,443.83 of the carve-out. *Id*. ¶ 72. FMCC claims that the carve-out is limited

to amounts set out in the interim budgets, but this restriction applies only to the U.S. Trustee's fees

and costs of court. Complaint ¶ 71.

FMCC also inappropriately attempts to create a factual dispute by alleging—without

support—that "sufficient cash collateral was provided" to pay the budgeted amounts. Motion to

Dismiss at 20. Counsel and CRO fees are not limited to the budgeted amounts, and the Court must

take the Complaint's allegation that amounts remain "unfunded" as true. Further, FMCC's cited

"evidence" merely shows "projected" cash flow rather than actual cash received. Dkt. 476, Ex. B.

As the counsel and CRO fees for the appropriate time period have only recently been requested

(Dkts. 1995, 1996, 1999, 2000, 2007, 2008), the Trustee will amend its claim for carve-out

expenses, if necessary, after final approval by this Court.

**F.     The Trustee's Preference Claim Is Adequately Pled**

This Court recently explained that, although "Federal Rule of Civil Procedure 8(a) applies

to preference actions, [] what is required to meet the pleading standard of Rule 8(a) is unsettled."

*In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *5. Exhibit 3 of the Complaint links the

transfers to antecedent debt and identifies the transferee, transferor, date and amount of each

preferential transfer. *See* Complaint ¶ 74; *id.* at Exhibit 3. This satisfies Rule 8's requirements.

As previously explained, FMCC is incorrect that the funds held in Debtors' commingled

deposit accounts do not belong to Debtors. *See supra* Part III(B)(1). FMCC also again falsely

asserts that the burden rests with the Trustee to parse out transfers made subject to FMCC's secured

interests from the general pool of funds in Debtors' commingled deposit accounts. To the contrary,

it is FMCC's burden to establish the property that FMCC claims should be held in trust when

dealing with a commingled deposit account. *See Georgia Pac. Corp.*, 712 F.2d at 969 (5th Cir.

1983) ("When property of the estate is alleged to be held in trust, the burden rests upon the claimant to establish the original trust relationship.").[20]  *See supra* Part III(B)(1).  The Trustee met his pleading burden by alleging the accounts were commingled and not controlled by FMCC.

FMCC is also not "insulated as a matter of law" from a preferential transfer claim simply because of its security interest in some of Debtors' property.  Dkt. 16 at 21-22.  Although transfers to a secured creditor that can be traced to its own collateral are generally not preferential, payments that an *undersecured* creditor receives from commingled funds are not entitled to the same exclusion.  *See In re Furr's Supermarkets, Inc.*, 2007 WL 2827459, at *7 (B.A.P. 10th Cir. 2007) (citing *In re El Paso Refinery LP*, 171 F.3d 249, 253 (5th Cir. 1999)).[21]  The Trustee specifically alleges this to be the case.   Complaint ¶¶ 27-31.   Instead of being paid solely from its own collateral, FMCC received funds from commingled accounts containing Debtors' fraudulently-obtained proceeds, which were all presumptively property of Debtors.  *See id.* ¶ 46 ("Funds used from fake flooring accounted for approximately 62% of funds used to pay off FMCC."); *supra* Part III(B)(1).   After these funds were commingled with proceeds of Debtors' other fraud (including check kiting), payments to FMCC were no longer attributable to its alleged security.  *In re Furr's Supermarkets, Inc.*, 2007 WL 2827459, at *7.

---

[20] The case FMCC relies on for the contrary position should be afforded no weight.  *See In re Integra Healthcare Holdings, Ltd.*, 2012 WL 4434680, at *4-5 (Bankr. E.D. Tex. Sept. 24, 2012).  As FMCC's parenthetical notes, the *Integra* court specifically excluded various portions of plaintiff's alleged preferential transfers, but all for reasons completely unrelated to any burden being on the plaintiff to distinguish transfers of funds held in trust to those not held in trust.  *Id.*  Rather, portions of plaintiff's preferential claims were dismissed for obvious pleading defects (none of which are present here), such as plaintiff transferring funds to another debtor, and plaintiff transferring funds outside of the ninety day preferential transfer period.  *See id.*

[21] In contrast, the accounts in *In re Tusa-Expo Holdings, Inc.* were not shown to be commingled, and therefore the source of the collateral was identifiable.  811 F.3d 786, 797-98 (5th Cir. 2016); *see In re Tusa-Expo Holdings, Inc.*, 496 B.R. 388, 397-98 (Bankr. N.D. Tex. 2013), *aff'd*, 2015 WL 935141 (N.D. Tex. Mar. 4, 2015), *aff'd*, 811 F.3d 786 (5th Cir. 2016).  Similarly, the account *In re El Paso Refinery LP* only contained collateral proceeds.  171 F.3d at 252.

### G. The Trustee's Determination Of A Lien Claim Is Adequately Pled

FMCC's assertion that it had a "blanket security interest" in Debtors' assets again rests on the fictitious notion that "this Court has already determined that [FMCC] had a valid security interest in essentially all of the Dealerships' assets." Dkt. 16 at 23. This Court has made no such determination,[22] and the Complaint specifically alleges facts to the contrary. *See* Complaint ¶¶ 80-82. FMCC ignores that a control agreement is required under Texas law to perfect a security interest in a deposit account. *See supra* Part (III)(B)(1); Complaint ¶ 81. Additionally, FMCC retains the burden to prove it was paid from its own collateral when dealing with payments from commingled deposit accounts containing funds from other creditors and fraudulently-obtained funds. *See supra* Part III(F); Complaint ¶¶ 27-31, 46, 81.

FMCC's motion neither contests the Trustee's allegations that no control agreement existed nor rebuts the assertions that the majority of funds FMCC received were fraudulently-obtained funds lacking any relation to FMCC's security interests. *See* Dkt. 16 at 23-25. Consequently, the Trustee has adequately pled that FMCC lacked a valid lien on the cash.

### H. The Court Should Disallow FMCC's Claim

Section 502(d) requires the Court to disallow a claim of any entity from which property is "recoverable" under section 550 or that is a transferee of a transfer "avoidable" under sections 547 and 548 unless such entity or transferee has paid the amount or turned over such property. The "clear majority of cases" have held that only a *prima facie* showing of avoidability must be made; the right to turnover need not be adjudicated. *In re Margaux Tex. Ventures, Inc.*, 545 B.R. 506, 516-26 (Bankr. N.D. Tex. 2014) (collecting and discussing cases). "[I]t is common practice for bankruptcy trustees to object to claims under section 502(d) in the same adversary proceeding in

---

[22] *See* Creditors' Trustee Dennis Faulkner's (as successor to Debtor Plaintiffs) Brief in Support of Motion to Strike at Part III(A)(2).

which they sue for avoidance of an alleged preferential transfer." *Id*. at 524. *Margaux* discusses

at length the opinions that FMCC cites, finding that both *In re Davis*, 889 F.2d 658 (5th Cir. 1989),

and *In re IFS Fin. Corp.*, 2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008), were factually

distinguishable from circumstances such as those present in this case.[23]  The Complaint adequately

alleges claims under sections 547 and 548 that are recoverable under section 550, and therefore,

FMCC's claim should be disallowed until it has turned over the amounts owed.

## IV.
## CONCLUSION

The Trustee respectfully requests that the Court deny FMCC's motion to dismiss.

Date: 30 September 2020                       Respectfully submitted,

**BRACEWELL LLP**

By:*/s/ Bryan S. Dumesnil*
      Bryan S. Dumesnil
      State Bar No. 00793650
      bryan.dumesnil@bracewell.com
      Bradley J. Benoit
      State Bar No. 24012275
      brad.benoit@bracewell.com
      Diane M. Crabtree
      State Bar No. 24046966
      diane.crabtree@bracewell.com

---

[23] The Fifth Circuit in *In re* Davis faced a "unique situation" in which section 502(d) was used as a tool to sanction a creditor. *Id*. at 524-25.  In that case, the order confirming the plan contemplated no distributions to certain creditors until litigation against a creditor (the IRS) in another court had been resolved. *In re Davis*, 889 F.2d at 659-60.  While the litigation was pending, the trustee filed a turnover action against the IRS, but the proceeding was stayed until resolution of the litigation in the other court. *Id*. at 660.  Five days after the litigation was resolved, the district court (Hon. Lynn Hughes) used section 502(d) to disallow over $1 million of the IRS's claim as a penalty for "undue delay" in turning over the disputed funds. *Id*. at 660-61.

The Fifth Circuit reversed. *Id*. at 661-62 ("The touchstone of this appeal is the applicability of Section 502(d) *to this fact pattern*.  We find that Section 502(d) was not intended to have a punitive effect and consequently does not apply to this case.") (emphasis added); *see also In re Margaux Tex. Ventures, Inc.*, 545 B.R. at 522-25 ("[T]he Fifth Circuit was not presented … facts of the commonplace trustee practice" of asking for disallowance of a claim in the same adversary complaint that seeks avoidance.).

*In re IFS Fin. Corp.* involved section 502(d) being used defensively with no affirmative relief sought—the underlying fraudulent transfer claim had already been extinguished by a statute of repose. 2008 WL 4533713, at *2, *5.  The Court determined that *s*ince the statute of repose acted as a jurisdictional bar, the fraudulent transfer was not "avoidable," and section 502(d) therefore did not apply. *Id*.

711 Louisiana, Suite 2300
Houston, Texas  77002
(713) 223-2300 - Telephone
(800) 404-3970 – Facsimile

**STRICKLIN LAW FIRM, P.C.**

By:*/s/ Samuel M. Stricklin*
Samuel M. Stricklin
State Bar No. 19397050
sam.stricklin@stricklaw.pro
2435 N. Central Expy
Suite 1200, Palisade, Bldg. II
Richardson, TX 75080
(972) 238-8687 - Telephone

**COUNSEL TO CREDITORS' TRUSTEE
DENNIS FAULKNER, AS SUCCESSOR TO
DEBTORS**

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record pursuant to the Federal Rules of Civil Procedures via the Court's electronic filing service on September 30, 2020.

Kevin M. Sadler
State Bar No. 17512450
kevin.sadler@bakerbotts.com
**BAKER BOTTS LLP**
1001 Page Mill Road
Building One, Suite 200
Palo Alto, California 94304
(650) 739-7518 – Telephone
(650) 739-7618 – Facsimile

Michael S. Goldberg
State Bar No. 08075800
michael.goldberg@bakerbotts.com
**BAKER BOTTS LLP**
One Shell Plaza
910 Louisiana Street
Houston, TX 77002
(713) 229-1234 – Telephone
(713) 229-1522 – Facsimile

Craig A. Leslie
cleslie@phillipslytle.com
Jacob S. Sonner
jsonner@phillipslytle.com
**PHILLIPS LYTLE LLP**
One Canalside
125 Main Street
Buffalo, New York 14203
716-847-8400 – Telephone
716-852-6100 – Facsimile

*/s/ Diane M. Crabtree*
Diane M. Crabtree