IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| IN RE: | |
| Reagor-Dykes Motors, LP, et al. | Case No. 18-50214-rlj-11 |
| Debtors, | Jointly Administered |
| Dennis Faulkner, Creditors' Trustee, | |
| *Plaintiff* | Adversary No. 20-05005-rlj |
| vs. | |
| Ford Motor Credit Company, LLC, | |
| *Defendant* | |

## CREDITORS' TRUSTEE DENNIS FAULKNER'S
## BRIEF IN SUPPORT OF RESPONSE TO MOTION TO SEAL AND CROSS
## MOTION TO COMPEL RE-REVIEW AND DE-DESIGNATION

Creditors' Trustee Dennis Faulkner (the "Trustee") submits this brief in support of his response to motion to seal and cross motion to compel re-review and de-designation.

Respectfully Submitted,

**BRACEWELL LLP**

By: */s/ Bryan S. Dumesnil*
    Bryan S. Dumesnil
    State Bar No. 00793650
    bryan.dumesnil@bracewell.com
    Bradley J. Benoit
    State Bar No. 24012275
    brad.benoit@bracewell.com
    Diane M. Lancaster
    State Bar No. 24046966
    diane.lancaster@bracewell.com
    711 Louisiana, Suite 2300
    Houston, Texas  77002
    (713) 223-2300 – Telephone
    (800) 404-3970 – Facsimile

**STRICKLIN LAW FIRM, P.C.**

By: */s/ Samuel M. Stricklin*
    Samuel M. Stricklin
    State Bar No. 19397050
    sam.stricklin@stricklaw.pro
    2435 N. Central Expy
    Suite 1200, Palisade, Bldg. II
    Richardson, TX 75080
    (972) 238-8687 – Telephone

**COUNSEL TO PLAINTIFF DENNIS FAULKNER, CREDITORS' TRUSTEE**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................3

      A.    The Protective Order...................................................................................3

      B.    Ford's Improper Designation Of Its Production ........................................4

      C.    The Parties' Dispute Over Ford's Designations .......................................5

III.    ARGUMENT AND AUTHORITIES IN RESPONSE TO MOTION TO SEAL...............7

      A.    The Trustee Fully Complied With The Procedures In The Protective Order..........7

      B.    Public Access To Bankruptcy Courts And Their Records Are Favored ................8

      C.    Ford Has Not Met Its Heavy Burden To Seal The Challenged Documents ...........9

      D.    The Disputed Documents Are Not Confidential And Cannot Be Sealed .............11

IV.     CROSS MOTION TO COMPEL FORD TO RE-DESIGNATE OR DE-DESIGNATE ...................................................................................................20

      A.    Ford Has Abused Its Privilege To Designate Documents "Confidential" Or "Highly Confidential"...............................................................................20

      B.    Ford Should Be Compelled To Re-Designate Or De-Designate ..........................23

      C.    The Trustee Is Entitled To Attorneys' Fees ........................................................24

V.      PRAYER..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acuity Brands Lighting, Inc. v. Bickley*,
  2015 WL 12976102 (E.D. Ky. Sept. 4, 2015) .......................................................21

*Binh Hoa Le v. Exeter Fin. Corp.*,
  990 F.3d 410 (5th Cir. 2021) ...................................................................................9

*In re C2R Global Mfg., Inc.*,
  2020 WL 7265867 (E.D. Wis. Dec. 10, 2020) ............................................9, 10, 11

*Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*,
  263 F.3d 1304 (11th Cir. 2001) ...............................................................................9

*In re Food Mgmt. Grp., LLC*,
  359 B.R. 543 (Bankr. S.D.N.Y. 2007)....................................................8, 9, 10, 12

*In re Gitto Global Corp.*,
  422 F.3d 1 (1st Cir. 2005)...................................................................................9, 10

*Hall v. Hartzell Engine Techs., LLC*,
  Case No. 3:17-cv-01340, 2020 WL 5545121 (M.D. Tenn. Sept. 15, 2020).....................23, 24

*Healthtrio, LLC v. Aetna, Inc.*,
  2014 WL 6886923 (D. Colo. Dec. 5, 2014)...........................................................21

*In re Motors Liquidation Co.*,
  561 B.R. 36 (Bankr. S.D.N.Y. 2016)..........................................................8, 9, 10

*In re One Jet, Inc.*,
  2021 WL 2769224 (W.D. Pa. July 1, 2021) ............................................................8

*In re Overmyer*,
  24 B.R. 437 (Bankr. S.D.N.Y. 1982).....................................................................12

*PPD Enters., LLC v. Stryker Corp.*,
  2017 WL 3262469 (S.D. Tex. June 27, 2017)..................................................20, 21

*Procaps S.A. v. Pantheon Inc.*,
  2015 WL 4430955 (S.D. Fla. July 20, 2015)..........................................................24

*Specialty Auto Parts USA, Inc. v. Holley Performance Prods., Inc.*,
  2020 WL 1914817 (W.D. Ky. Apr. 4, 2020)..........................................................21

*THK Am., Inc. v. NSK Co. Ltd.,*
    157 F.R.D. 637 (N.D. Ill. 1993)......................................................................................20, 22

*In re ULLICO Inc. Litig.,*
    237 F.R.D. 314 (D.D.C. 2006).............................................................................20, 21, 23, 24

**Statutes**

11 U.S.C. § 107................................................................................................................8, 9, 10, 16

11 U.S.C. § 1104....................................................................................................................................12

**Rules**

Fed. R. Bankr. P. 7037 ........................................................................................................................24

Fed. R. Bankr. P. 9037 ........................................................................................................................16

Fed. R. Civ. P. 26 ................................................................................................................................21

Fed. R. Civ. P. 37 ....................................................................................................................20, 21, 24

Fed. R. Civ. P. 56(d) ..........................................................................................................................13

## I.    INTRODUCTION

1.    For more than three years, Defendant Ford Motor Credit Company ("Ford") has repeatedly alleged in pleadings before this Court, and in other courts, that Ford did not discover the Debtors' fraud until late June 2018, only weeks before the bankruptcy filings on August 1, 2018. Ford has cast itself as an unknowing, innocent victim, and its claims of ignorance and victimhood have been repeated by the press.  Ford made these same claims in seeking and obtaining relief from the stay in the bankruptcy cases, judgments against the Debtors' former owners, and restitution orders in numerous criminal proceedings against the Debtors' former employees.  But Ford's claims have been false.   Ford had ***actual knowledge*** that the Debtors were submitting false sales information long before the supposed discovery of the fraud.

2.    Not only do Ford's internal documents prove that it knew about the fraud, but these same documents also prove that Ford stuck its head in the sand while happily accepting millions in payments from the Debtors and profiting from the Debtors' record sales of Ford vehicles.  An email from a Ford employee aptly illustrates Ford's conscious disregard of the plight of innocent creditors, including consumers, who lacked the crucial information that Ford possessed:[1]

---

[1] Email from W. Delaney to S. Carter (Jan. 18, 2018), attached as Ex. A.



Thu 1/18/2018 4:39 PM

Delaney, William (F.)

**RE: Reagor Audits**

To ☐ Carter, Scott (S.A.)

Please do not cc me on the Reagor audit items, because I do not want to know.



The Trustee represents the interests of these true victims of the Debtors' fraud.

3.        Ford put the issue of what it knew and when it knew it at the forefront of this case by pleading good faith as an affirmative defense to the Trustee's fraudulent transfer claims. Ford cannot continue to declare publicly its ignorance of the Debtors' fraudulent activities while keeping the truth—that Ford knew about the fraud—hidden through improper confidentiality designations. This is a gross violation of this Court's Confidentiality and Protective Order (the "Protective Order"). Dkt. 134.

4.        Now that Ford's knowledge of the fraud has come to light through discovery, Ford

is doubling down on its effort to conceal the truth from the public by filing a motion to seal the very records that prove its knowledge.  This Court should not condone Ford's attempted cover-up.  The burden to seal records is high and requires at a minimum that Ford prove the documents contain critical commercial information or trade secrets.  The documents in dispute contain nothing of the sort.  They do not warrant this "extraordinary" remedy, and the Court should deny Ford's motion to seal.

5.      The Trustee also cross moves to compel Ford to re-review or de-designate its production.  The rules require parties to act in good faith when designating items as confidential. Ford's designation of more than 97.9% of its production as "Confidential" or "Highly Confidential" is *prima facie* evidence of its bad faith.  Courts in similar circumstances have held that the non-designating party is relieved from the customary provisions in a protective order that require objecting to designations on a document-by-document basis because this procedure would unfairly shift the burden on the receiving party to conduct the type of good faith review required by the producing party.  Instead, the producing party must "try again" and re-review its production or the court can order that the production be de-designated in its entirety.  Courts have also ordered the offending party to pay the other side's attorneys' fees for having to seek relief from improper confidentiality designations.  The Trustee asks the Court to award the Trustee the reasonable and necessary attorneys' fees incurred in responding to the motion to seal and prosecuting this cross motion.

## II.     BACKGROUND

### A.     The Protective Order

6.      The Protective Order allows a producing party to designate discovery material as "Confidential" if the material contains "confidential, commercially sensitive, private personal information and/or proprietary information."  Protective Order at 2, ¶¶ 1, 6.  The Protective Order

requires protected information to be labeled "Subject to Protective Order," "Confidential," or "Highly Confidential." *Id*. at ¶ 6. The Protective Order does not define "Highly Confidential," but restricts who may view "Highly Confidential" documents. *Id*. at ¶ 8.

7. One part of the Protective Order, paragraph 4, prescribes a procedure to object to a confidentiality designation. *Id*. at ¶ 4. The challenging party must identify, in writing, the challenged documents "with specificity," including Bates-numbers and the specific grounds for the objection to each designation. *Id*. If the parties cannot agree, the receiving party may apply to the Court for a hearing to challenge the designations. *Id*. The producing party then has the burden to establish that the nature of the document justifies the designation. *Id*.

8. A separate part of the Protective Order, paragraph 15, addresses the filing of "Confidential" documents under seal. *Id*. at ¶ 15. If a party believes that a "Confidential" document should not be sealed, it must identify to the other side, in writing, the documents that it wishes to file. *Id*. The parties must then meet and confer to resolve the dispute. *Id*. In case of disagreement, the party wishing to file the protected documents must provide the producing party with ten days' notice. *Id*. The producing party must then file a motion to seal "with any necessary briefing and supporting evidence to justify the sealing." *Id*. And, the "producing party shall have the burden of justifying that the materials must be submitted under seal." *Id*.

## B. Ford's Improper Designation Of Its Production

9. Ford initially produced 139 public filings to the Trustee, including Ford's own briefing in other cases. Ford first produced internal documents on July 2, 2021, and Ford designated 12,259 of the 12,311 documents—or roughly 99.6% of the documents—"Confidential" or "Highly Confidential." Ford later withdrew its "Confidential" designations for 11 documents, bringing the percentage to 99.5%. On August 30, 2018, after the Trustee indicated that the percentage of documents labeled "Confidential" was excessive, Ford produced an additional 1,865 documents

and designated 94.2% of them "Confidential" or "Highly Confidential." In total, Ford designated

97.9% of its production—which includes public filings—"Confidential" or "Highly Confidential."

Ford's designations constitute *prima facie* evidence of bad faith.

10.     In contrast, the Trustee has produced 58,641 documents, and has designated only

5,283 documents—roughly 9%— as "Confidential."[2] The vast majority of these designations were

intended to protect individual consumers' private information.

## C.      The Parties' Dispute Over Ford's Designations

11.     On August 11, 2021, the Trustee sent a letter to Ford objecting to the confidentiality

designation for a subset of the challenged documents.[3] Ford's response on August 16, 2021 claimed

that "*it was not clear from your August 11, 2021 correspondence which specific confidentiality*

*designations the Creditors' Trustee finds objectionable, and Ford Credit will not guess.  Ford*

*Credit is amenable to further discussions regarding specific documents, but otherwise stands by its*

*existing designations.*"  Ex. B at 2, ¶ 6 (emphasis added).  Ford's claim that it did not know which

confidentiality designations the Trustee found objectionable was disingenuous to the point of

absurdity—the Trustee's August 11, 2021 letter specifically identified the documents by Bates

label.

12.     To make it crystal clear which specific documents the Trustee thought were

improperly designated, the Trustee sent another letter to Ford on August 20, 2021.  Ex. C.  This

letter included the Bates labels of the documents previously identified in the August 11 letter, as

well as other documents with objectionable designations.  *Id.*  Importantly, the letter notified Ford

---

[2] The Trustee designated only 7% of the documents produced as confidential at the time of some of the earlier correspondence (3,903 out of 56,802 documents).  The Trustee has recently made additional productions of documents received from third parties that has increased the percentage to 9%.

[3] The August 11, 2021 letter provides details of the contents of the challenged documents and is therefore not attached to this filing.

that the Trustee (1) was challenging the designations under paragraph 4 of the Protective Order; (2) did not believe the documents merited sealing under this Court's rules; and (3) intended to use the documents in filings before this Court in accordance with the procedures in paragraph 15 of the Protective Order. *Id*. at 3.[4]

13.     On August 26, 2021, the Trustee objected to Ford's blanket designation of 99.6% of its production as "Confidential" or "Highly Confidential."  Ex. E.  In this email, the Trustee notified Ford that this constituted *prima facie* evidence of Ford's bad faith designation, that the document-by-document review process in paragraph 4 of the Protective Order was not applicable under the circumstances, and that the parties needed to meet and confer to discuss whether Ford would promptly revisit its designations and make only appropriate designations. *Id*.  Absent Ford doing so, the Trustee made it clear he would seek relief from the Court. *Id*.

14.     On August 30, 2021, the parties met and conferred by phone to discuss a number of matters.  One express purpose of the meeting was to discuss Ford's confidentiality designations. Despite this, Ford was not prepared to discuss the designation issues raised in the Trustee's letters (August 11, 20) and email (August 26).  As a result, the parties agreed that the ten day notice period contemplated by paragraph 15 of the Protective Order started running as of August 30, 2021.  The Trustee confirmed this agreement by email on the same date.  Ex. F.  To avoid any misunderstanding, the Trustee spelled out the import of this agreement in the email to Ford: "[T]his means that, absent Ford filing a motion to seal within 10 days, the Trustee is permitted to publicly file the records identified in the August 20 letter." *Id*.

15.     On September 7, 2021, Ford advised that it had reconsidered eleven of the 61 documents and withdrew the designation of confidentiality as to those eleven documents.  Ex. G.

---

[4] On the same day, the Trustee provided a similar written notice to Ford's third-party auditor, Alliance Inspection Management ("AiM").  Ex. D at 2.

Though Ford had previously refused to discuss any of the challenged designations during the August 30, 2021 meet and confer call, Ford said it was willing to "meet and confer on the remaining 50 documents." *Id*. Ford indicated that it was opposed to any motion seeking to compel Ford to re-visit or de-designate its production. *Id*. Ford also accused the Trustee of not following the procedures specified in the Protective Order and indicated that it would file a motion to seal to prevent the Trustee from publicly filing the documents. *Id*.

16. The Trustee responded that same day to advise Ford that he was not obligated to conduct another meet and confer because Ford had refused to do so during the August 30, 2021 meet and confer call. Ex. H. The Trustee reiterated that, considering Ford's bad faith designations:

> [T]he procedures contemplated in the Protective Order [are] untenable and impose[] an unfair burden and needless delay on the Trustee before he can file virtually anything with the Court. Under the circumstances, the Trustee is permitted to seek relief from the contemplated document-by-document process of objecting to designations and instead seek immediate relief, including requiring de-designation, requiring reclassification, and other appropriate relief. The Trustee intends to do just that.

*Id*. at 3. On September 9, 2021, nearly two months after the Trustee first objected to the designation of certain documents, Ford filed its motion to seal and to compel compliance with confidentiality order [Dkt. 159] ("Motion to Seal").

### III. ARGUMENT AND AUTHORITIES IN RESPONSE TO MOTION TO SEAL

#### A. The Trustee Fully Complied With The Procedures In The Protective Order

17. Prior to filing its motion, Ford never asked the Trustee why he invoked the provisions of paragraph 15 of the Protective Order. Had Ford done so, it would have learned that the Trustee had a specific purpose in mind: the Trustee intends to use some or all the challenged documents as evidence in support of upcoming motions for summary judgment, as well as during trial. The Trustee does not believe these documents qualify for filing under seal, and he is squarely

within his rights to invoke paragraph 15 of the Protective Order. That process takes time, and there is nothing improper about bringing the issue to the Court's attention now rather than days before a filing or on the eve of trial.

18.     Ford's invocation of *Dondi* and request for an order requiring the Trustee to challenge Ford's designations pursuant to paragraph 4 of the Protective Order are nothing more than litigation tactics designed to distract from Ford's own bad faith in designating 97.9% of its documents as "Confidential" or "Highly Confidential." The Trustee did not "manufacture" a dispute to harass Ford. *Dondi*'s admonition against groundless claims of "bad faith" cannot be reasonably read to preclude a litigant from asserting bad faith as supported by the facts and well-established case law. The Trustee has every right to seek a remedy for *Ford's* non-compliance with the Protective Order.

**B.     Public Access To Bankruptcy Courts And Their Records Are Favored**

19.     Motions to seal judicial records in bankruptcy cases are disfavored and should be granted only when necessary to prevent harm. *In re Motors Liquidation Co.*, 561 B.R. 36, 38 (Bankr. S.D.N.Y. 2016). The "policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could arise." *Id.* at 41–42 (internal quotations omitted). Unless records contain "trade secret[s] or confidential research, development or commercial information," "scandalous or defamatory" information, or personal identifying information, all filings in a bankruptcy case must remain open to the public. *See* 11 U.S.C. § 107; *see also In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 554 (Bankr. S.D.N.Y. 2007). This requirement extends to papers filed in related adversary proceedings. *In re One Jet, Inc.*, 2021 WL 2769224, at *2 (W.D. Pa. July 1, 2021). And in cases where a document contains sealable information, "[r]edacting portions of a document . . . is preferable to wholesale sealing." *In re Motors Liquidation Co.*, 561

B.R. at 42.

20.     Ford misses the mark on the standard for a motion to seal by conflating the "good cause" standard for entry of a protective order and the much more stringent standard for entry of a sealing order.  *See* Motion to Seal at 15–16.  Ford's motion is also devoid of any reference to 11 U.S.C. § 107.  Section 107 supplants common law sealing standards applicable to non-bankruptcy cases and restricts a bankruptcy court's discretion so that records can only be sealed if they contain information falling into a narrow set of categories.  *In re Gitto Global Corp.*, 422 F.3d 1, 7–8 (1st Cir. 2005); *In re Food Mgmt. Grp., LLC*, 359 B.R. at 554.  Ford's references to the good cause standard or a court's "balancing of interests" when sealing documents for non-dispositive motions is based upon inapplicable common law.  Even under common law standards, the "good cause" standard is improper because the Trustee intends to use the disputed documents in dispositive motions and at trial.  *See Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 420 (5th Cir. 2021) ("[A]t the *adjudicative* stage, when materials enter the court record, the standard for shielding records from public view is far more arduous."); *see also Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312 (11th Cir. 2001) ("[M]aterial filed in connection with pretrial motions that require judicial resolution on the merits is subject to the common-law right [of access].").  The public—including the unsecured creditors and consumers that remain unpaid—has a legitimate interest in the outcome of this case.  Ford's lack of good faith should not be adjudicated behind closed doors.

## C.     Ford Has Not Met Its Heavy Burden To Seal The Challenged Documents

21.     A party moving to seal bankruptcy records has the burden of proving that the records contain sealable information using evidence, "not argument or conclusory statements."  *In re C2R Global Mfg., Inc.*, 2020 WL 7265867, at *1 (E.D. Wis. Dec. 10, 2020); *see also In re Motors Liquidation Co.*, 561 B.R. at 42.  Because of the statutory presumption of public access to

bankruptcy records, a party must provide "compelling" reasons to justify sealing. *In re Gitto Global Grp.*, 422 F.3d at 6; *see also In re Motors Liquidation Co.*, 561 B.R. at 42 (sealing requires "an extraordinary circumstance or compelling need") (internal citations omitted).  To satisfy this burden, the party must describe each document with particularity and explain why the information specific to each document, if disclosed, would put it at a competitive disadvantage. *In re C2R Global Mfg., Inc.* 2020 WL 7265867, at *7–8 (internal citations omitted); *In re Motors Liquidation Co.*, 561 B.R. at 44.  A moving party's unsupported claims that it would suffer general harm or embarrassment are inadequate to seal bankruptcy records. *See In re C2R Global Mfg., Inc.*, 2020 WL 7265867, at *1; *In re Food Mgmt. Grp., LLC*, 359 B.R. at 554 ("Section 107(b) is not intended to save the debtor or creditors from embarrassment.").

22.     To qualify as "commercial information" under section 107, the document must contain information that is "so critical to the operations of the entity . . . that its disclosure would unfairly benefit the entity's competitors." *In re Motors Liquidation Co.*, 561 B.R. at 44 (internal citations omitted); *see also In re C2R Global Mfg., Inc.*, 2020 WL 7265867, at *5 (information to be sealed must constitute "a trade secret or something comparable whose economic value depends on its secrecy") (internal citations omitted).[5]  In *In re C2R Global Manufacturing*, a bankruptcy court refused to seal certain emails because the party failed to link its claims of harm to the contents of the emails. 2020 WL 7265867, at *6–7.  The moving party argued that publicly disclosing emails that allegedly contained secret product development information and historical information about the party's business strategies would give competitors an "unearned competitive advantage"

---

[5] Ford has not alleged that the documents contain "scandalous or defamatory information" under section 107. However, the fact that the disputed documents prove Ford's lack of good faith are not a basis to seal the documents because "scandalous or defamatory" material under section 107 must be untrue or introduced for an improper purpose. *In re Gitto Global Grp.*, 422 F.3d at 16-17; *In re Food Mgmt. Grp., LLC*, 359 B.R. at 557-60.  Ford cannot claim its own communications are irrelevant to Ford's affirmative defense of good faith.

because they could use the information to offer similar products to customers "without the need to invest the time and money in developing their own sales and pricing strategies." *Id.* The court rejected these arguments because the moving party failed to provide "additional factual and legal support that describe[d], in detail, how each segment of the information to be sealed" constituted a trade secret or confidential commercial information. *Id*. at *6 ("This explanation does not identify which particular statements within these emails [the party] believes reveal secret information about product development, and it is not the Court's burden to comb through the materials in an effort to find that information.").

23.     This Court should reject the same unsupported and conclusory allegations in Ford's Motion to Seal. Ford mostly relies on tautological reasoning: access to the proposed documents would place Ford at a competitive disadvantage because Ford's competitors would have access to the documents. *See* Motion to Seal at 17. Ford attempts to build on this reasoning with the declaration of Scott Carter, which (1) generally describes the competitive nature of the floor plan lending industry and (2) claims in a conclusory fashion that the challenged emails contain Ford's policies and procedures for audits and risk management. Dkt. 159-1. Like the moving party in *C2R Global Manufacturing*, Ford claims that its competitors would be able to tailor their rates, policies, and procedures to undercut Ford's credit offerings to customers if the emails were disclosed. *Id*. But Ford fails to explain the critical nature of the content of each specific email or connect that content to Ford's claims of potential competitive harm. Ford's conclusory allegations are not enough to carry Ford's heavy burden to seal the documents.

### D.     The Disputed Documents Are Not Confidential And Cannot Be Sealed

24.     Ford offered to submit the disputed documents *in camera* for the Court's review, and the Trustee agrees that the Court should not rule on the Motion to Seal in a vacuum. The Court's review of the disputed documents will confirm that they do not contain "critical"

commercial information that could provide an unfair advantage to Ford's competitors; they are instead Ford's communications discussing its actual and constructive knowledge of the Debtors' fraud. To the extent the communications touch on Ford's audits or risk management practices, they only include general information that is comparable to other information Ford has already made publicly available or designated as "not confidential." Information that has been publicly released cannot reasonably be considered confidential commercial information. *See In re Overmyer*, 24 B.R. 437, 442 (Bankr. S.D.N.Y. 1982) (finding that matters part of the public record can "hardly" be characterized as confidential); *In re Food Mgmt. Grp., LLC*, 359 B.R. at 565 (denying motion to seal information derived from public documents).

(i) ***Ford's Communications And Analyses Regarding Debtors' Falsified Sales Dates***

25. Ford has publicized details of its purported "discovery" of the Debtors' fraud in June 2018 in order to portray itself as an unsuspecting victim.[6] In public filings, Ford has described its internal process of comparing sales and registration data from the Texas DMV and other sources to the sales dates the Debtors reported during audits to determine that the Debtors provided falsified sales dates.[7] James Conlan—the Ford employee who performed the analysis in June 2018—

---

[6] *See, e.g.*, Ford's Brief in Support of Motion to Dismiss Debtors' Complaint [Dkt. 16] ("Motion to Dismiss") at 11 (labeling itself as the "primary victim" of Debtors' "massive fraud" and stating that "[i]n late June 2018, Ford Credit discovered a massive floorplan financing fraud committed ***by the Debtors against Ford Credit***").

[7] Motion to Dismiss at 12 ("In June 2018, as a result of vehicle inventory audits, and an analysis of sales and registration data, Ford Credit discovered that Debtors were committing floorplan financing fraud. … That analysis revealed that Debtors falsely reported sales data and, by doing so, delayed making required payment to Ford Credit."); Ford's Motion to Appoint Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) and (b), No. 18-50214-rlj11 [Dkt. 47] ("Motion to Appoint Trustee") at 5 ("Ford obtained sales and registration data from the Texas DMV to compare the sales dates reported by the Debtors with the official sales dates identified by the Texas DMV."); Declaration of Paul Boudreau In Support of Motion to Appoint Trustee and Motion for Relief from Automatic Stay, No. 18-50214-rlj11 [Dkt. 48] ("Boudreau Decl.") at ¶ 17 ("Ford Credit undertook an initial analysis of the audit results and sales and registration data from the Texas DMV and other publicly available sources."); Declaration of James Conlan, *Ford Motor Credit Co. LLC v. Reagor*, 5:18-cv-00186-C [Dkt. 1-48] ("Conlan Decl.") ("In my role with Ford Credit, I was asked to undertake an analysis of the most recent vehicle inventory audit of Reagor-Dykes Dealerships, and to compare the sales information reported to the auditors by the Reagor-Dykes Dealerships to registration and sales data available from the Texas DMV and other publicly-available sources.").

explained Ford's process in greater detail during his publicly-available deposition:[8]

> I used a different set of data that we have to identify this dealer…. It's called the RDR, registration data report…. It shows dealers that have floor plan vehicles that could be sold according to public sources…. The initial report just would tell us how many vehicles and what the VINs were…. The total was 150 vehicles on all their locations…. [ ] 147 of those had different sold and registration information than what was provided on that prior June audit.

Two of the documents Ford moves to seal—FMCC0008311 and FMCC0023607—are internal communications containing information regarding James Conlan's June 2018 analysis that is similar to the information that is already publicly available or not marked confidential. FMCC0023607 is a report that was heavily referenced in Conlan's deposition.[9]

26.     Other documents Ford asks the Court to seal relate to identical analyses Ford performed in **2016, 2017, and 2018** that compared information from the Debtors' inventory audits to information from the Texas DMV and the registration data report (FMCC0022870, FMCC0014962,     FMCC0023011,     FMCC0023014,     FMCC0023065,     FMCC0023170, FMCC0023154).  These documents refute Ford's public denials of any knowledge of the Debtors' out-of-trust sales or falsification of sale dates during the transfer period.[10]  Ford withdrew its confidentiality designation for one document related to its earlier analyses of reported sales dates, but refused to de-designate other similar documents.  The document Ford de-designated shows that, on March 23, 2018, Ford performed the same type of sales date analysis that James Conlan performed in June 2018.  Ford compared sale date and registration data from the RDR report and

---

[8] Appendix to Defendant's Brief in Support of Rule 56(d) Motion to Defer Consideration of Plaintiff's Motion for Summary Judgment and to Take Discovery, Case No. 5:18-cv-00186-C [Dkt. 34], attached as Ex. I at 63–64 (Deposition of James Conlan dated Aug. 15, 2018 ("Conlan Depo."), at 13:21-14:2-3, 16:22-17:19).

[9] Ex. I at 67 (Conlan Depo. at 30:30:1-32:16) (quoting the document as stating that "[t]he audit indicates extremely high ratio of sold and not due versus paid to the business center at 3,037 times.").

[10] *See* Ford's First Amended Answer to Adversary Complaint and Demand for Jury Trial [Dkt. 84] ("Amended Answer") at 7 (stating that Ford admits the "Reagor-Dykes dealerships at times failed to make payoffs to Ford Credit within 7 days after a floorplanned vehicle was sold, but denies that it was aware of this at the time relevant to the transfers at issue"); *id.* at 10 (stating that Ford admits the "Reagor-Dykes dealerships at times falsified sales data reported to Ford Credit, but denies that it was aware of this at the time relevant to the transfers at issue").

Texas DMV ("Registration Date for RDR Report" and "Sale Date According to TX DMV" columns) to the sales dates provided by the Debtors during the March 20, 2018 audit ("Sale Date" column).[11] Ford discovered that the registration dates according to the RDR report were ***at least a month earlier*** than the sales dates the Debtors reported during the audit for ***all*** twelve vehicles that appeared on the RDR report.[12] Ford cannot release information regarding its internal process of discovering falsified sales dates in June 2018 to support its public narrative but hide Ford's earlier knowledge through applications of the same process by claiming the process is "Confidential."

27. Similarly, Ford de-designated several documents related to a different internal report that identified out-of-trust sales and inaccurate sales dates, but now asks the Court to seal documents containing identical information. On September 15, 2017, a Ford employee forwarded a "Virtual Audit Report" that was triggered for one of the Debtors and asked that Ford's auditor collect sales information for the vehicles on the report during the upcoming audit.[13] The Virtual Audit Report shows the date a vehicle may have left the dealership and the number of possible "float" days (the length of time the dealership had failed to remit the proceeds of the sales), in this case ranging from 9 to 45 days, with an average of 20 days.[14] Another de-designated document shows that the Debtors reported sales dates ***weeks later*** than the sales dates from the Virtual Audit Report in most cases.[15] Ford presents no justification for sealing other documents related to Virtual Audit Reports (FMCC0009785 and FMCC0009787) that contain comparable information.

---

[11] Email from T. Dion to W. Delaney and attachment (Mar. 23, 2018), attached as Ex. J at 3–23.
[12] Ex. J at 3–23. Conlan testified that the RDR report does not catch all out-of-trust sales—150 vehicles triggered the RDR report in June 2018, but Ford identified 1470 missing units during the July emergency audit. Ex. I at 68 (Conlan Depo. at 33:17-35:13).
[13] Email from W. Delaney to J. Sims (Sept. 15, 2017), attached as Ex. K at 2.
[14] Virtual Audit Report (Sept. 15, 2017), attached as Ex. L at 3–7.
[15] Email from W. Delaney and J. Sims (Sept. 25, 2017) and attachment, attached as Ex. M at 5-6.

(ii)    **Ford's Communications Discussing Red Flags During Debtors' Inventory Audits**

28.    Ford has publicly disclosed or labeled "not confidential" many aspects of its auditing procedures and how it applied those procedures to the Debtors.  Among other things, public documents reveal that (1) Ford expects dealerships to maintain a violation rate of less than 2%;[16] (2) Ford expects 5% of a dealership's inventory to be "Sold Not Due,"[17] (3) Ford believed that the Debtors' reporting 25% of inventory Sold Not Due during the June 2018 audit indicated that the Debtors were falsifying sales dates;[18] (4) Ford conducts inventory audits as little as twice a year and as often as monthly;[19] (5) the Debtors' audits were conducted quarterly;[20] and (6) Ford allowed the Debtors seven processing days to pay off the floorplan loan after a vehicle was sold.[21]

29.    Ford has no valid basis to keep the 105 audit summary reports that AiM produced (AIM0000001 - AIM00000105) secret.  Ford routinely shared audit summary reports and auditor comments with the Debtors after audits,[22] and audit summaries are publicly available in Ford's case against the Debtors' former principals.[23]  The audit summary reports contain highly-relevant information regarding obvious red flags indicating the Debtors' out-of-trust sales and falsified sales

---

[16] Amended Answer at 9.

[17] "Sold Not Due" vehicles are vehicles that were sold within the allowed processing days (seven business days under Ford's agreement with the Debtors) and for which payments to Ford are not yet due.

[18] Motion to Appoint Trustee at 5.  Ford's apparent response to this indication of falsified sales dates was to simply continue with quarterly audits.  Ex. I at 83 (Deposition of Rene Leal dated Aug. 15, 2018 ("Leal Depo.") at 17:5-19:6).

[19] Motion to Appoint Trustee at 5.

[20] Ex. I at 17 (Deposition of Gary Byrd dated Aug. 15, 2018 ("Byrd Depo") at 32:22-25).

[21] Boudreau Decl. at ¶ 22.

[22] Ex. I at 43–44 (Deposition of Gwen Schmucker dated Aug. 15, 2018, ("Schmucker Depo.") at 14:10-19) ("The only other [communication with Shane Smith] is the audit summary report that I sent to him at – after each wholesale audit."), 17:17-24 (testifying that the audit summaries were also sent to Reagor-Dykes' owners); Email from M. Dorsey to S. Smith (Dec. 22, 2016), attached as Ex. N at 2, 5, 8, 11, 15, 18 (Ford forwarding Shane Smith detailed Audit Summary Reports from December 2016 that contain auditor comments regarding the "large number of test drives"); Email from M. Dorsey to B. Reagor, R. Dykes, and S. Smith (Mar. 29, 2017), attached as Ex. O (forwarding audit summaries from March 2017 audit); Email from G. Schmucker to B. Reagor, R. Dykes, and S. Smith (Jan. 26, 2018), attached as Ex. P at 3 (forwarding auditor comments from the January 2018 audit regarding multiple vehicles that were floored *after* they were reported as sold and that the dealership was refusing access to records showing when vehicle sales were funded).

[23] Ex. I at 36–39 (Byrd Depo. at Exhibit B).

dates, including a high number of violations, Sold Not Due vehicles, and purported "test drives."

30.     Ford states that the Audit Summary Reports contain the identity of dealership customers and their personal banking information.  Motion to Seal at 14; Carter Dec. at ¶¶ 32-33. The Audit Summary Reports include customer names and financing sources (either "cash" or the name of a financing company), but do not include customer birthdates, account numbers, or other identifying information that would warrant redaction under section 107.  11 U.S.C. § 107(c)(1) ("The bankruptcy court, for cause, may protect an individual … to the extent the court finds that the disclosure of such information would create undue risk of identity theft or other unlawful injury"); *see also* Fed. R. Bankr. P. 9037 (parties may partially redact filings containing social security numbers or taxpayer-identification numbers, birth dates, the names *of minors*, or financial *account numbers*).  The customer's name and financing source are relevant to Ford's good faith defense because Ford knew or should have known that the Debtors routinely falsified this information.  For example, Ford's analysis verifying falsified sales dates the Debtors reported during the March 2018 audit also included analysis of the "Buyer According to Audit."[24]  Ford's analysis shows that 100% of the vehicles with false sales dates were reportedly sold to a Reagor-Dykes sister store,[25] but Ford's review of the Texas DMV information for these vehicles (FMCC0023154, a document Ford wishes to seal) reveals the real customer names.

31.     Documents Ford labels as "responses to specific audit conditions"[26] should not be filed under seal, as these communications reveal Ford's identification and discussion of the red flags the Trustee outlined in the Complaint (AIM00000554, AIM00000616, AIM00002119, AIM00002159,    AIM00002573,    FMCC0008698,    FMCC0008848,    FMCC0008855,

---

[24] Ex. J.
[25] *Id.*
[26] Motion to Seal at 11.

FMCC0008872,       FMCC0008875,       FMCC0009109,       FMCC0009153,       FMCC0009201,

FMCC0009208,       FMCC0009263,       FMCC0009273,       FMCC0009277,       FMCC0009299,

FMCC0009354,       FMCC0009424,       FMCC0009600,       FMCC0009609,       FMCC0009616,

FMCC0009640,       FMCC0009756,       FMCC0011566,       FMCC0012183,       FMCC0014875,

FMCC0015498, FMCC0018034).    Ford either never claimed confidentiality or withdrew its

confidentiality designations for other similar documents describing audits:

- Ford's auditors reported an "excessive" number of test drives during the July 21, 2016 and December 20, 2016 audits.[27]  Test drives were "made up as [the auditors] waited once the dealer could not locate the unit" during the July 2016 audit;[28] but the Debtors had the test drive paperwork ready and dated all the same date in December 2016.[29]

- Ford noted the large amount of Sold Not Due vehicles during the January 2016 audit: "[T]here [are] a lot of Sold Not Due's that they will have to follow for (as much as 25% at some locations).  That's a large amount for an audit obviously.…"[30]

- Ford's auditors reported that the Debtors provided inaccurate sales dates for vehicles sold at auction.[31]

- Ford's auditors reported that the Debtors did not want to provide the auditors with DealerTrack or Route One contract funding status reports[32] that would allow the auditors to verify independently the date the Debtors received funds from a buyer's financing source.

---

[27] Email from G. Byrd to M. Dorsey and S. Carter (July 21, 2016), attached as Ex. Q at 2; Email from T. Porter to S. Carter (Dec. 20, 2016), attached as Ex. R at 2; Email from M. Dorsey to S. Carter (Dec. 20, 2016), attached as Ex. S at 2 ("We had a similar amount last time and the question came up, 'were these created last minute?'").  Ford also sent the Debtors the Audit Summary Reports from the March 17, 2017 audit, which shows that **Ford's auditors confirmed that vehicles listed as test drives were actually sold**.  Ex. O at 5 ("Auditor identified test drives that were reported as sold units-NBC [Ford's Nashville Business Center] was notified.").  *Compare* Amended Answer at 9 ("Ford Credit avers that it lacks knowledge sufficient to form a belief regarding whether Reagor-Dykes falsified test drives and otherwise denies the allegations in the Complaint alleging that Ford's auditors flagged the large number of purported test drives.").

[28] Ex. Q at 2.

[29] Ex. R at 2.

[30] Email from S. Carter to M. Dorsey, P. Stephenson, and G. Byrd (Jan. 22, 2016), attached as Ex. T at 2.  Ford has denied any allegations related to its notice of the high number of Sold Not Due vehicles.  Amended Answer at 8.

[31] Ex. Q at 2.

[32] Ex. Q at 2; Email from S. Smith to M. Dorsey and S. Miller (May 6, 2016), attached as Ex. U at 2 (Shane Smith told a Ford employee to "make sure you get in touch with the audit company and let them know we will NOT be showing them DealerTrack or RouteOne again."); *see also* Ex. P at 3 (during the January 2018 audit, Ford's auditors reported that the Debtors "refused access to records … [and] closed the door when verifying funding and would only give the auditor a small amount of funded information on contracts").

- Ford discussed Shane Smith's repeated requests that Ford change "surprise" audit dates to accommodate his schedule: "[T]his has come up with the last 4 audits. None of them have been convenient. Do we need to ask them the exact date they want us to come next time?"[33]

- Ford observed that the Debtors drew down $500,000 from their revolving line of credit to assist with payoffs during the July 2016 audit.[34]

The few documents Ford labeled "not confidential" are just the tip of the iceberg; hundreds of other communications Ford wishes to keep hidden provide clear proof of Ford's actual and inquiry knowledge of the Debtors' fraud. Ford's communications regarding anomalies during the Debtors' audits do not disclose any proprietary processes, and it is unlikely that Ford's competitors will attempt to duplicate what Ford did here—knowingly allowing fraudulent activity.

### (iii) *Ford's Communications Regarding Debtors' July 2018 Audit*

32.     Ford also asks the Court to seal communications related to Ford's true surprise emergency audit in July 2018 (FMCC0006256, FMCC0015053, FMCC0015155, FMCC0015174, FMCC0023265, FMCC0023278, FMCC0023530, FMCC0023534, FMCC0023554, FMCC0023574, FMCC0023604). Ford publicized details concerning the results of this audit and the special procedures Ford applied to promote its victim storyline. Ford initiated an emergency audit after James Conlan presented a report of his findings regarding the Debtors' falsified sales dates during a July 23, 2018 meeting.[35] During the July 26-27, 2018 emergency audit, Ford determined all vehicles that were missing from the dealership, as it would with a normal audit, but also went a step further to verify the information the Debtors provided regarding missing vehicles using information from the Texas DMV and Fast Data (an online tool that uses public information to determine sales and registration dates for vehicles).[36] Through that process, Ford confirmed that

---

[33] Email from M. Dorsey to S. Carter (Mar. 16, 2017), attached as Ex. V at 2.
[34] Ex. Q at 2.
[35] Ex. I at 66, 75 (Conlan Depo. at 26:22-27:10 and errata sheet), 90 (Leal Depo. at 47:23-48:4).
[36] Ex. I at 65 (Conlan Depo. at 21:22-23:24), 84 (Leal Depo. at 22:1-12, 23:24:6).

the Debtors were "significantly" out of trust and had engaged in fake flooring and double flooring.[37]

33.     During the audit, Ford employee Gary Byrd confronted Shane Smith with evidence of falsified sales dates and fake floored vehicles, requested immediate payment for all missing vehicles, and required proof of the Debtors' ability to pay.[38]   After Ford confirmed the Debtors' could not make payoffs, Ford employees collected keys, Manufacturer Statements of Origin (MSOs), and titles.[39]   The documents Ford asks the Court to seal contain Ford's internal discussions regarding the same audit process and audit results Ford has already publicly disclosed, Ford's discussions with Shane Smith and others at the Debtors, and Ford's communications discussing the red flags noted during prior audits.  None of this information is confidential.

### (iv)    *Ford's Communications Regarding Debtors' Financial Condition*

34.     Finally, Ford asks the Court to seal Ford's communications regarding the Debtors' financial condition at various times relevant to the transfers (FMCC0009843, FMCC0010601, FMCC0012145).  These documents do not contain any proprietary credit risk analysis or risk rating procedures.  Similar information regarding Ford's review of the Debtors' financial information is already publicly available or designated as "not confidential."  Ford employees Rene Leal and Gary Byrd described aspects of Ford's credit review process in their publicly-available depositions.[40]  Similar non-confidential documents contain Ford's consideration of the Debtors' financial condition, including:

- Ford's discussion of inaccuracies in the Debtors' financial statements;[41]

---

[37] Ex. I at 65 (Conlan Depo. at 23:25-25:9), 84 (Leal Depo. at 24:7-17); Motion to Appoint Trustee at 7.
[38] Ex. I. at 12–13 (Byrd Depo. at 16:13-18:19), 85 (Leal Depo. at 25:8-7).  Gary Byrd also disclosed his conversations with Reagor-Dykes' owners during the emergency audit.  Ex. I at 13 (Byrd Depo. at 19:21-22:10).
[39] Ex. I at 13 (Byrd Depo. at 18:23-19:9), 46 (Schmucker Depo at 26:1-14).
[40] Ex. I at 17 (Byrd Depo. at 33:1-17, 34:2-35:21), 81 (Leal Depo. at 12:1-13:5).
[41] Dkt. 88-9 ("2010 Credit Review Summary") at 2; Letter from G. Byrd to B. Reagor and R. Dykes, attached as Ex. W at 3–4.

- Ford's discussion of the Debtors' poor cash position and liquidity issues;[42] and

- Ford's responses to the Debtors exceeding credit limits and requesting additional credit.[43]

The documents Ford asks the Court to seal contain comparable information that is highly-relevant to Ford's good faith defense.

35.     None of the documents Ford asks the Court to seal contain the type of critical commercial information Ford's competitors could use to obtain an unfair advantage.  Ford's discussions regarding the Debtors' fraud, insolvency, and improper business practices during the transfer period is certainly devastating to Ford's good faith defense.  It should also be highly embarrassing.  But these considerations do not permit the extraordinary remedy of sealing.

## IV.     CROSS MOTION TO COMPEL FORD TO RE-DESIGNATE OR DE-DESIGNATE

### A.     Ford Has Abused Its Privilege To Designate Documents "Confidential" Or "Highly Confidential"

36.     A producing party acts in bad faith when it designates nearly all of its discovery material confidential.  *In re ULLICO Inc. Litig.*, 237 F.R.D. 314, 317 (D.D.C. 2006).  Specifically, courts find bad faith when the party designates as confidential "obviously non-confidential, publicly accessible documents," "innocuous" customer records, and "vacuous" and "mundane" company emails.  *Id.* at 318; *THK Am., Inc. v. NSK Co. Ltd.*, 157 F.R.D. 637, 647 (N.D. Ill. 1993); *PPD Enters., LLC v. Stryker Corp.*, 2017 WL 3262469, at *1 (S.D. Tex. June 27, 2017).  The receiving party may challenge the bad faith designations wholesale and move for de-designation of non-confidential documents and sanctions.  *ULLICO Inc.*, 237 F.R.D. at 317–18.  The producing party, its attorney, or both must then pay the receiving party's reasonable expenses incurred in bringing the motion, if successful.  *See* Fed. R. Civ. P. 37(a)(5)(A); *ULLICO Inc.*, 237 F.R.D. at 316; *see*

---

[42] 2010 Credit Review Summary at 2-3; Ex. W at 3–4.
[43] Email from G. Byrd to M. Dorsey and S. Carter (Apr. 7, 2016), attached as Ex. X at 2–4.

*also Acuity Brands Lighting, Inc. v. Bickley*, 2015 WL 12976102, at *2 (E.D. Ky. Sept. 4, 2015) (explaining that Rule 37 covers a party's failure to obey a protective order's prohibition against indiscriminate designations).

37.     Ford's ability to designate documents for confidentiality is subject to a duty of good faith, which, as courts have found, is implicit in a protective order under Rule 26. *Acuity Brands*, 2015 WL 12976102, at *2; *Specialty Auto Parts USA, Inc. v. Holley Performance Prods., Inc.*, 2020 WL 1914817, at *9 (W.D. Ky. Apr. 4, 2020); *Healthtrio, LLC v. Aetna, Inc.*, 2014 WL 6886923, at *3 (D. Colo. Dec. 5, 2014). Ford also acknowledges the duty in its Motion. *See* Motion to Seal at 15. Ford violated its duty by indiscriminately designating 99.5% of its largest production of internal documents as "Confidential or "Highly Confidential," with all productions (including public filings) at 97.9%. This is *prima facie* evidence of bad faith. *See PPD Enters.*, 2017 WL 3264001, at *1; *see also ULLICO Inc.*, 237 F.R.D. at 317 (finding that designating 99% of documents "confidential" amounted to a violation of the good faith requirement).

### *(i)     Ford's "Confidential Designations" Are Evidence Of Bad Faith*

38.     As noted above, the Protective Order limits confidentiality designations to discovery material that contains "confidential, commercially sensitive, private personal, and/or proprietary information." Protective Order at ¶ 1. Interpreting similar protective orders, courts have held that publicly accessible documents and "every single company email" do not warrant the designation. *ULLICO Inc.*, 237 F.R.D. at 317–18; *PPD Enters.*, 2017 WL 3263469, at *1. Here, Ford designated "every single company email," including emails that do not contain proprietary or commercially sensitive information, but instead contain conversations between Ford employees discussing irregularities with the Debtors' audits and financial reporting. Further, Ford has labeled vehicle title and registration search results "Confidential," even though this information is

accessible using many public databases.[44]

39.    Most of the documents designated "Confidential" by Ford do not fall under any of the protected categories identified in the Protective Order.  Instead, they include:

- Search results from publicly available vehicle title and registration databases;

- Audit results shared with the Debtors;

- Emails discussing red flags Ford noticed during the Debtors' inventory audits, including falsified paperwork, excessive test drives, and other irregularities;

- Financial information regarding the Debtors; and

- Meeting confirmations and calendar invites.

### (ii)    *Ford's "Highly Confidential Designations" Are Evidence Of Bad Faith*

40.    Ford has also abused its ability to designate documents "Highly Confidential." The Protective Order does not define "Highly Confidential" documents, but limits who may view them. Protective Order at ¶ 8.  This designation is reserved for a more exclusive set of documents.  In *THK America, Inc. v. NSK Co. Ltd.*, the producing party designated the majority of its documents as "Attorney's Eyes Only"—a designation intended to be for a "very *limited* category" reserved for especially sensitive documents.  157 F.R.D. at 645.  The party used the exclusive label for "innocuous" customer information, publicly available information, and meaningless company emails.  *Id.* at 646–47.  The court therefore concluded that the party had acted in bad faith and prohibited the party from further using the designation.  *Id.* at 647.

41.    Here, Ford has unjustifiably designated certain documents "Highly Confidential." For example, "innocuous" financial information the Debtors sent to Ford is labeled "Highly

---

[44] *See generally Title Check – Look Before You Buy*, Texas Department of Motor Vehicles, https://www.txdmv.gov/motorists/buying-or-selling-a-vehicle/title-check-look-before-you-buy (last visited September 7, 2021).

Confidential."[45]  Ford has also designated documents discussing the Debtors' liquidity issues as "Highly Confidential."[46]  The Debtors are defunct and have been liquidated.  Their financial information, including creditworthiness, does not constitute commercially sensitive or proprietary information to Ford.  The Debtors' finances are now a matter of public record in the related bankruptcy proceeding.  There is no basis to designate this information as "Highly Confidential."

## B.  Ford Should Be Compelled To Re-Designate Or De-Designate

42.  The Trustee would suffer undue prejudice and delay if required to sift through more than 14,000 documents—97.9% of Ford's production—to determine whether each document contains confidential information.  *See ULLICO Inc.*, 237 F.R.D. at 317 (holding that receiving party did not have to follow objection procedure because of producing party's bad faith); *see also* Protective Order at ¶ 4 (procedure to object to confidentiality designations).  While the Protective Order instructs a receiving party to challenge confidentiality designations on a document-by-document basis, Ford had the initial burden of conducting a good faith review of its documents before designating them confidential.  *Hall v. Hartzell Engine Techs., LLC*, 2020 WL 5545121, at *2 (M.D. Tenn. Sept. 15, 2020).  Ford cannot now benefit from its bad faith by shifting the burden and cost of review to the Trustee.  *Id.*

43.  The district court in *ULLICO Inc.* concluded as much, holding that the receiving party was not required to adhere to the objection procedure in the protective order because of the producing party's bad faith.  237 F.R.D. at 317.  Similarly to Ford, the producing party had designated more than 99% of its documents confidential.  *Id.*  The court found that, if the receiving party were required to follow the objection procedure, the producing party would gain a "strategic advantage in the form of an unwarranted and unfair designation of 'confidential' for months."  *Id.*

---

[45] FMCC0010056; FMCC0010064.

[46] For example, FMCC0012145 is subject to the motion to seal.

Additionally, to require the receiving party to adhere to the objection procedure would encourage bad faith confidentiality designations. *Id.*

44.     Here, the Trustee likewise should be excused from the objection procedure in the Protective Order until such time that Ford re-designates its production in a way that complies with the Protective Order.   Otherwise, the Trustee would have to re-review more than 14,000 documents—nearly all of Ford's production—to determine which are appropriately labeled and explain the "specific grounds for [each] objection." *See* Protective Order at ¶ 4.  Ford's burden of good faith review would become the Trustee's.  *Cf. Hall*, 2020 WL 5545121, at \*2 (finding that producing party's indiscriminate designation would improperly shift the burden).  The Trustee asks the Court to compel Ford to either re-designate or de-designate its production.  *ULLICO Inc.*, 237 F.R.D. at 317–18.

## C.     The Trustee Is Entitled To Attorneys' Fees

45.     The Trustee seeks an award of the reasonable and necessary attorneys' fees incurred responding to the Motion to Seal and prosecuting this cross motion.  In cases where a party successfully challenges a producing party's bad faith designations wholesale, Federal Rule of Civil Procedure 37 requires the party, its attorney, or both, to pay for the receiving party's expenses incurred in bringing the motion.[47]  *ULLICO Inc.*, 237 F.R.D. at 316; *Procaps S.A. v. Pantheon Inc.*, 2015 WL 4430955, at \*6 (S.D. Fla. July 20, 2015).  Courts have found sanctions especially appropriate when, as Ford did here, a producing party designates, as "confidential," "obviously non-confidential, publicly-accessible documents," that "exceed the scope" of confidential categories outlined in a protective order.  *ULLICO Inc.*, 237 F.R.D. at 317–18.

---

[47] Rule 37 applies in adversary proceedings in bankruptcy.  Fed. R. Bankr. P. 7037.

## V.    PRAYER

46.    The Trustee asks the Court to order the following:

(a)    deny Ford's Motion to Seal;

(b)    compel Ford to re-designate documents in its production to comply with the Protective Order;

(c)    award the Trustee reasonable and necessary attorneys' fees; and

(d)    such other relief that the Court deems just and proper.


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record pursuant to the Federal Rules of Civil Procedures via the Court's electronic filing service on September 30, 2021.

/s/ *Bryan S. Dumesnil*
Bryan S. Dumesnil