

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 3, 2022**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP,[1] | § | Case No.:  18-50214-RLJ-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |
| ――――――――――――――― | § | ――――――――――――――― |
| | § | |
| DENNIS FAULKNER, Creditors' Trustee | § | |
| of the Creditors Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 20-05005 |
| | § | |
| FORD MOTOR CREDIT COMPANY, | § | |
| LLC, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

---

[1] The following chapter 11 cases are jointly administered in Case No. 18-50214: Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (Case No. 18-50321), Reagor-Dykes III LLC (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323), Reagor Auto Mall, Ltd. (Case No. 18-50324), and Reagor Auto Mall I LLC (Case No. 18-50325).

Ford Motor Credit Company, LLC ("Ford Credit"), the defendant, moves for summary judgment on the fraudulent transfer and preferential transfer claims of the plaintiff, Dennis Faulkner, Trustee of the Reagor-Dykes Auto Group Creditors Liquidating Trust ("Trustee").[2] As explained below, the Court concludes that Trustee's use of the Ponzi-Scheme Presumption is improper and grants summary judgment on that point; the Court denies summary judgment on all other points raised by Ford Credit.

## BACKGROUND

This adversary proceeding arises under the bankruptcies of the Reagor-Dykes auto dealerships ("Reagor-Dykes").[3] Reagor-Dykes is a group of affiliated entities that were in the business of selling new and used motor vehicles. Reagor Dykes was owned by Bart Reagor and Rick Dykes. Prior to August 1, 2018, Ford Credit provided floorplan financing to Reagor-Dykes to finance the purchase of new and used vehicle inventory. To secure the financing, Ford Credit obtained security interests in all of Reagor-Dykes' assets, including its vehicle inventory, proceeds from sales of vehicle inventory, furniture, trade fixtures, equipment, accounts, general intangibles, and contract rights. On advances made under the floorplan, Reagor-Dykes was required to repay Ford Credit on the earlier of (a) seven business days after the date that Reagor-Dykes sold a vehicle, or (b) 24 hours after the dealership received funding of a customer loan or customer payment on a vehicle sale.

Reagor-Dykes was a top-performing dealership in terms of gross sales of Ford vehicles with a revenue stream reaching into the hundreds of millions of dollars. Most of its income came

---

[2] The Court has jurisdiction of this matter under 28 U.S.C. § 1334(b); this dispute is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H).

[3] The Reagor-Dykes auto group consisted of all the entities listed in note 1. Only the following six entities made transfers to Ford Credit that are the subject of this proceeding: Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Plainview, LP, and Reagor-Dykes Floydada, LP. "Reagor-Dykes" hereinafter refers to these six entities.

from the sale of vehicles that it obtained through the floorplan financing, but it also earned income by servicing customer vehicles, selling parts, and collecting accounts receivable.  Despite enormous gross revenues, Reagor-Dykes was unprofitable and substantially undercapitalized due in large part to excessive partner draws, employee compensation, and overhead.  For the two years before it filed bankruptcy, Reagor-Dykes lacked sufficient liquidity from its business operations to continue to service its obligations.

To cover Reagor-Dykes' constant cash-flow shortfall, Reagor-Dykes' Chief Financial Officer, Shane Smith, orchestrated sundry fraudulent acts to raise the funds needed to keep Reagor-Dykes operating.  Such frauds took several forms:

- Reagor-Dykes routinely and intentionally failed to make timely payoffs to Ford Credit, known as selling vehicles "out of trust."  During Ford Credit floorplan audits, Reagor-Dykes employees would falsify sales dates in vehicle paperwork in an attempt to hide out-of-trust sales, which resulted in large payoffs due to Ford Credit following each audit.  Reagor-Dykes would also falsely represent that a large number of missing vehicles were out on two-day test drives during audits.

- Reagor-Dykes requested floorplan advances for vehicles that had already been sold months or years earlier, a practice known as "fake flooring."

- Reagor-Dykes received floorplan loans from Ford Credit and other lenders on the same collateral, a practice known as "double flooring."

- Reagor Dykes engaged in a "check-kiting" scheme involving at least nineteen accounts located at several banks.

  "Check-kiting" is a systematic scheme to defraud, whereby nonsufficient checks are traded or cross deposited between two or more checking accounts in order to artificially inflate the bank account balances. This is accomplished by using the float time in the bank system. Once bank accounts are artificially inflated, checks

that would normally be returned for nonsufficient funds are, in fact, paid or honored by the issuing banks. There are no actual good or services provided in exchange for a kited check, nor is there a legitimate or well-documented loan between the two account holders. The purpose of the check-kiting is to falsely inflate the balances in two or more checking accounts in order to allow payroll checks, vendor checks, and other legitimate debits to clear. In this way, rather than negotiable instruments, checks are misused as a form of unauthorized credit.

ECF No. 259-6, Def's. Ex. D-4 at App. 1026.[4]

Under its floorplan financing agreements, Ford Credit conducted quarterly inventory audits of Reagor-Dykes through a third-party, Alliance Inspection Management, LLC. Ford Credit also had the right to conduct periodic surprise audits of Reagor-Dykes' inventory. In June 2018, Ford Credit determined that approximately 150 vehicles allegedly sold by Reagor-Dykes had reported sales dates that did not match sales and/or registration dates with the Texas Department of Motor Vehicles and other sources. In response, Ford Credit ordered an emergency audit at the Reagor-Dykes' dealerships, which occurred on July 26 and July 27, 2018.

The emergency audit revealed that Reagor-Dykes had falsely reported sales dates for certain vehicles and could not produce more than $40 million of collateralized inventory for inspection. Ford Credit demanded immediate payment of that amount, but Reagor-Dykes was unable to pay. On July 30, 2018, Ford Credit suspended floorplan financing and sued Reagor-Dykes and its principals, seeking to sequester all collateral remaining at the dealerships and to recover more than $116 million of debt due under its financing. Reagor-Dykes filed for Chapter 11 protection on August 1, 2018.

Starting in February 2018, the Federal Bureau of Investigation began covertly investigating Reagor-Dykes, following an anonymous tip that it was engaged in fraud. The FBI investigation ultimately led to multiple federal fraud and fraud-related charges against at least

---

[4] "ECF No." hereinafter refers to the numbered docket entries in this adversary proceeding, No. 20-05005, unless otherwise stated.

fifteen Reagor-Dykes employees, including Shane Smith, all of whom have pleaded guilty.
These individuals stipulated that they knowingly, and with intent to defraud, obtained financing
from Ford Credit by means of materially false representations or pretenses and engaged in an
extensive check-kiting scheme to conceal the fraud.  Most of these individuals are serving
federal prison time and have been ordered to pay more than $40 million in restitution to Ford
Credit.

After Reagor-Dykes filed bankruptcy, Ford Credit pursued Reagor Dykes and its
guarantors in this Court and the District Court to recover amounts owed to it and related
damages.  Ford Credit has made substantial recovery but remains Reagor-Dykes' largest
unsecured creditor with a claim in the bankruptcy case for $48 million.  In November 2021,
Trustee estimated that the remaining unsecured and administrative claims in Reagor-Dykes'
case, excluding Ford Credit's, totaled approximately $70 million.  *See In re Reagor-Dykes
Motors*, No. 18-50214-rlj-11, ECF No. 2295.  The claims objection process is still ongoing;
Trustee has, since November 2021, successfully objected to numerous claims.

On June 10, 2020, Reagor-Dykes, then as debtor-in-possession, filed this adversary
proceeding to recover allegedly fraudulent and preferential transfers by Reagor-Dykes to Ford
Credit.[5]  Trustee, appointed under Reagor-Dykes' confirmed chapter 11 plan, now owns the
claims that are the subject of this adversary proceeding and thus stands in Reagor-Dykes' shoes.
ECF No. 102.  Trustee seeks to recover through his fraudulent-transfer claim $315,429,217.16,
which amount accounts for all of Reagor-Dykes' transfers, almost 3,000, made to Ford Credit
during the two years before Reagor-Dykes filed bankruptcy.  For the preference claim, he aims
to recover $44,509,155.22, which constitutes transfers Reagor-Dykes made to Ford Credit during

---

[5] The Complaint also raises causes of action for equitable subordination, surcharge, turnover, determination of lien, and claim objection.

the ninety days before Reagor-Dykes filed bankruptcy. Ford Credit now moves for summary

judgment on Trustee's fraudulent and preferential transfer claims.

## DISCUSSION

### I.      Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a).[6] "A fact issue is material if its resolution could affect the outcome of the

action." *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). The movant bears the initial

burden of identifying portions of the pleadings and discovery that demonstrate the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the

movant does meet its burden, the nonmovant must go beyond the pleadings and designate

specific facts showing that a genuine issue of material fact exists for trial." *Roberson v. Game*

*Stop, Inc.*, 395 F. Supp. 2d 463, 468 (N. D. Tex. 2005), *aff'd*, 152 F. App'x 356 (5th Cir. 2005).

"[T]he court must review all of the evidence in the record, but make no credibility

determinations or weigh any evidence." *Peel & Co.*, 238 F.3d at 394. The facts and inferences

to be drawn from the evidence must be viewed in the light most favorable to the nonmoving

party. *Id*.

### II.     Ponzi-Scheme Presumption

Trustee brings his fraudulent-transfer claim under § 548(a)(1)(A), which provides that a

"trustee may avoid any transfer … that was made … within 2 years before the date of the filing

of the petition, if the debtor voluntarily or involuntarily … made such transfer … with actual

intent to hinder, delay, or defraud any [creditor]."[7] A plaintiff must provide evidence that the

---

[6] Applicable to bankruptcy proceedings under Rule 7056 of the Federal Rules of Bankruptcy Procedure.
[7] "Section" or "§" hereinafter refers to the Bankruptcy Code, 11 U.S.C., unless otherwise stated.

debtor made each transfer with intent to hinder, delay, or defraud creditors.  *Furr v. TD Bank, N.A. (In re Rollaguard Sec., LLC)*, 591 B.R. 895, 918 (Bankr. S.D. Fla. 2018).

Trustee says he can avoid this burden—to prove intent for every transfer—through the "Ponzi-Scheme Presumption," which provides an exception to the statute's requirement.  "In this circuit, proving that [the transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."  *Sec. & Exch. Comm'n. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).  Trustee argues that the Ponzi-Scheme Presumption applies to his fraudulent-transfer claim because Reagor-Dykes operated as a "Ponzi-like" fraudulent enterprise.  Fraudulent intent can therefore be presumed, he says, for all transfers made by Reagor-Dykes during the transfer period, which relieves him of the need to prove that each transfer was made with fraudulent intent.  Ford Credit disagrees, arguing that, under Fifth Circuit precedent, the Ponzi-Scheme Presumption may not be extended to this case and that summary judgment should therefore be granted in Ford Credit's favor.  The Court agrees with Ford Credit.

### A.  Definition of Ponzi Scheme

The Fifth Circuit has defined a Ponzi scheme as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."  *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)).  A Ponzi scheme is, "as a matter of law, insolvent from its inception."  *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).  "[T]hat investor funds were used to issue 'returns' to other investors" is a "*sine qua non*" of a Ponzi scheme.  *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012).

Reagor-Dykes did not operate as a Ponzi scheme.  It did engage in extensive fraudulent activity, such as fake flooring, double flooring, selling vehicles out of trust, and check kiting.

But it did not operate as an investment scheme whereby money from later investors was used to pay new investors. Reagor-Dykes was a legitimate business with enormous gross revenues from actual sales and services. It accessed capital through traditional financing that created debtor-creditor relationships. There is no evidence that Reagor-Dykes was insolvent from its inception.

Trustee admits that Reagor-Dykes did not operate as a classic Ponzi scheme but contends it engaged in "Ponzi-like" frauds. And he argues that the Fifth Circuit has extended the Ponzi-Scheme Presumption beyond classic Ponzi schemes. The Court disagrees.

### B. Fifth Circuit Caselaw

#### 1. Early Cases

In most of the cases that the Fifth Circuit has applied the Ponzi-Scheme Presumption, the court expressly found that the transferor operated a classic Ponzi scheme. *See Warfield*, 436 F.3d at 558–559; *Janvey v. Alguire*, 647 F.3d at 597–98; *Janvey v. Brown*, 767 F.3d 430, 439 (5th Cir. 2014); *Res. Dev. Int'l*, 487 F.3d at 301; *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007). In *Janvey v. Alguire* and *Quilling*, the Fifth Circuit narrowly defined a Ponzi scheme as that term is classically understood and found the transferors met that definition, affording the plaintiffs the Ponzi-Scheme Presumption. *Janvey v. Alguire*, 647 F.3d at 597; *Quilling*, 247 Fed. App'x at 586. An express reliance on an understanding of a classic Ponzi scheme in these cases raises the logical implication that an enterprise must meet the definition of a classic Ponzi scheme for the Ponzi-Scheme Presumption to apply.

#### 2. *American Cancer Society v. Cook*

The Fifth Circuit has refused to extend the Ponzi-Scheme Presumption where a plaintiff failed to prove that the transferor operated as a classic Ponzi scheme. In *Cook*, a collection of entities sold securities in oil-and-gas drilling programs to investors. 675 F.3d 524, 526 (5th Cir.

2012). The entities funneled a considerable portion of investor funds to executives and subsidiaries in violation of federal securities law. *Id*. at 526–27. A receiver was appointed over the entities' assets, and the receiver sued the American Cancer Society to recover fraudulent transfers. *Id*. at 527. The district court concluded that "because defendants were operating a 'Ponzi-like scheme,' their transfers to [American Cancer Society] were presumptively made with fraudulent intent." *Id*.

The Fifth Circuit reversed the district court's holding. The court held "[t]he Receiver's attempt to liken the scheme in question to a 'Ponzi-like fraud,' and therefore reduce her burden to proving 'presumed intent to defraud,' fails for lack of evidence. Not all securities frauds are Ponzi schemes." *Id*. at 526. The court held the receiver failed to prove that the entities used investor funds to issue returns to other investors, "a *sine qua non* of any Ponzi scheme," or that the entities ever made an investor payout. *Id*. at 528. The court contrasted this lack of evidence with *Janvey v. Alguire*, where the court found "'clear, numerical support for the creative reverse engineering undertaken' by the Ponzi scheme." *Id*. (quoting *Janvey v. Alguire*, 647 F.3d at 597). The court found that the entities "may well have operated as a fraudulent or at least badly mismanaged drilling investment program" but that the plaintiff failed to prove the entities' fraud was a "traditional Ponzi scheme … based on the manufacturing of 'returns' to investors from other investors' contributions." *Id*.

Trustee makes much of the fact that the court refused to extend the Ponzi scheme for lack of evidence. But it was the receiver's lack of evidence *that the entities operated as a classic Ponzi scheme* that was fatal, not her failure to provide evidence that the entities operated a fraudulent enterprise. *Cook* thus stands for the proposition that a plaintiff must prove that the transferor operated as a classic Ponzi scheme for the Ponzi-Scheme Presumption to apply.

9

### 3.  *Templeton v. O'Cheskey*

*Templeton v. O'Cheskey* also cautions the Court to refrain from extending the Ponzi-Scheme Presumption to debtors engaged in other frauds.  *(In re Am. Hous. Found.)*, 785 F.3d 143 (5th Cir. 2015).  The debtor in *Templeton* developed low-income housing projects through funding from private investors who could receive a reduction in their tax liability and who were promised large returns on their investments.  *Id*. at 146.  The debtor failed to use considerable investor funds for their intended purposes and instead used them to benefit executives and fund the debtor's corporate subsidiaries' obligations.  *Id*. at 148.  The debtor eventually was unable to obtain sufficient cash from investors to fund all its obligations and was forced into bankruptcy. *Id.*

The trustee, O'Cheskey, brought a preferential-transfer action against Templeton, a transferee, under § 547.  *Id*. at 150.  The trustee objected to Templeton's ordinary-course-of-business defense by asserting the "Ponzi-Scheme Exception," which holds that, because a Ponzi scheme is not a legitimate business, no transfers made under a Ponzi scheme can be in the ordinary course of business.  *Id.* at 160–61.  The court held that because the debtor was not operating a classic Ponzi scheme, the Ponzi-Scheme Exception did not apply:

> The theory underlying the Ponzi exception to the ordinary course of business defense is that "Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2)." … Expanding this exception—as no other court, apparently, has done—to cover legitimate businesses in which there were some fraudulent or Ponzi-like transactions is inconsistent with this theory.

*Id.* at 161 (quoting *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214, 217 (9th Cir. 1987)).  While this case dealt with the Ponzi-Scheme *Exception* rather than the Presumption, it cautions the Court to refrain from extending the Ponzi-Scheme Presumption beyond the parameters explicitly laid out by the Fifth Circuit.

Trustee argues these cases do not dispositively limit the Ponzi-Scheme Presumption to classic Ponzi schemes and that, in two cases, the Fifth Circuit has extended the presumption to Ponzi-like frauds: *Jacobs v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 119 (5th Cir. 2019), and *Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 265 (5th Cir. 2012).

### 4. *In re Life Partners Holdings, Inc.*

The debtors in *In re Life Partners Holdings* sold shares of life insurance policies to investors. 926 F.3d at 112. The debtors sold the policies at an inflated price based on grossly flawed life-expectancy estimates. *Id*. at 112–13. While investor funds were used to purchase the shares of insurance policies, the debtors also used investor funds to make distributions to recruiters and executives. *Id*. at 113–14. Because of these distributions, the debtors were insolvent for much of their existence prior to bankruptcy, they were unable to cover their liabilities to investors, and they continued to recruit new investors to pay the liabilities of the old investors. *Id.* at 114. Eventually, the debtors failed to retain enough capital to continue maintaining their policies and filed for bankruptcy. *Id*.

The creditors' trust over the debtors' bankruptcy brought a fraudulent transfer action against certain transferees. *Id*. at 119. The transferees filed a motion to dismiss, arguing that the trustee failed to allege which particular debtor made each transfer. *Id*. The court held the complaint was sufficiently pleaded because "in cases involving a Ponzi or Ponzi-like scheme, a plaintiff 'may establish fraudulent intent by showing that the ... enterprise operated as a Ponzi scheme' without proving which of the entities involved in the scheme was the transferor." *Id*. (quoting *Janvey v. Alguire*, 846 F. Supp. 2d 662, 672 (N.D. Tex. 2011)). The court continued, "And it can hardly be argued that the third amended complaint fails to allege an actual intent to

defraud on the part of the [debtor entities]—the complaint is replete with allegations to this effect, including facts corresponding directly to the 'badges of fraud.'" *Id.*

Contrary to Trustee's assertion, this case did not extend the Ponzi-Scheme Presumption to Ponzi-like frauds. Although the court used the phrase "Ponzi-like scheme," it still stated that for the presumption to apply, the plaintiff must show the "enterprise operated as a *Ponzi scheme*." *Id.* (emphasis added) (quoting *Janvey v. Alguire*, 846 F. Supp. 2d at 672). Furthermore, the court never held that the Ponzi-Scheme Presumption properly applied to the debtor—whether the Ponzi-Scheme Presumption was properly pleaded was never raised by the defendant. Rather, the court merely held that because the debtor operated as a Ponzi or Ponzi-like scheme, the trustee did not have to prove from which particular transferor each transfer was made. *Id.* And when the court addressed whether the creditors' trust properly pleaded fraudulent intent, the court did not rely on whether the trustee properly pleaded the existence of a Ponzi (or Ponzi-like) scheme; rather, the court held that the creditors' trust pleaded fraudulent intent because the complaint was replete with facts revealing the existence of *the badges of fraud*. And finally, even if the opinion could be construed to apply the Ponzi-Scheme Presumption, the debtor operated like a classic Ponzi scheme. The debtor did have legitimate investments underlying the enterprise, but it was insolvent for most of its existence, and it relied on the influx of funds from new investors to cover its liabilities to prior investors. *Id.* at 113–14.

*Life Partners* stands for the proposition that a plaintiff need not plead which transferor made a particular transfer under a fraudulent-transfer claim when the transferors operated a Ponzi scheme. It did not extend the Ponzi-Scheme Presumption to other fraudulent enterprises.

### 5. *In re IFS Financial Corp.*

Finally, Trustee relies on *Stettner v. Smith (In re IFS Financial Corp.)*, 669 F.3d 255 (5th Cir. 2012). The debtors in *IFS* were a group of businesses "offering insurance, mortgage, and banking services" that began as a legitimate business but eventually devolved into a fraudulent, Ponzi-like scheme. *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 427 (Bankr. S.D. Tex. 2009).[8] Due to poor management, the debtors eventually realized they had no hope of honoring their commitments. *Id*. at 428. "IFS orchestrated a series of fraudulent inter-company loans to distort its balance sheets and solicited new investments to pay-off old investments. By 1998, IFS's transfers were made solely to keep the fraudulent scheme going." *Id*. The debtors filed bankruptcy, and the creditors' trust brought actual fraudulent transfer actions against certain transferees. *Id*.

The bankruptcy court held that the trustee adequately proved fraudulent intent because he proved the transfers were made under a fraudulent scheme. *Id*. at 439. The bankruptcy court said it made no finding as to whether the debtor operated as a Ponzi scheme: "The Fifth Circuit's reasoning applies whether the organization neatly fits within a judicially constructed definition of Ponzi scheme or was a fraudulent scheme that had some, but perhaps not all, attributes of the traditional Ponzi scheme." *Id*. at 439 n.15. "When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with actual intent to defraud." *Id*. The district court upheld the bankruptcy court's determination but relied on a badges-of-fraud analysis rather than the Ponzi-Scheme Presumption to hold the trustee proved

---

[8] *Aff'd*, No. H-09-CV-3059, 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255 (5th Cir. 2012).

fraudulent intent. *Smith v. Suarez (In re IFS Fin. Corp.)*, No. H-09-CV-3059, 2010 WL 11652027, at *8–9 (S.D. Tex. Sept. 11, 2010).[9]

The Fifth Circuit affirmed the district court's affirmance of the bankruptcy court. *IFS*, 669 F.3d at 265. Like the district court, the Fifth Circuit relied on a badges-of-fraud analysis to find fraudulent intent. *Id*. But the Fifth Circuit also echoed the bankruptcy court, stating, "[e]vidence that a company operated as a fraudulent enterprise at the time of the transfer, moreover, *may be* sufficient to establish actual intent." *Id*. (emphasis added). After concluding the trustee had made a sufficient showing of fraudulent intent through the badges of fraud, the Fifth Circuit added, "[f]urther, evidence that IFS operated as a fraudulent enterprise at the time of the transfers *supports* this finding of fraudulent intent." *Id*. (emphasis added).

While the bankruptcy court found it acceptable to extend the Ponzi-Scheme Presumption without a close analysis of whether the fraudulent enterprise operated as a classic Ponzi scheme, the Fifth Circuit's opinion cannot be interpreted to extend the Ponzi-Scheme Presumption beyond classic Ponzi schemes. The Fifth Circuit makes no mention of a presumption. Instead, the court said evidence of a fraudulent enterprise "*may be* sufficient to establish actual intent," and the existence of a fraudulent enterprise "*supports*" the court's finding of fraudulent intent which was based on *the badges of fraud*. The court treated the existence of a fraudulent scheme as another badge of fraud that helps indicate the existence of fraudulent intent, but *not* as a presumption that conclusively establishes fraudulent intent.

### C. Conclusions of the Court

The core requirement of § 548(a)(1)(A) is that the trustee prove that the debtor made each transfer with the actual intent to hinder, delay, or defraud creditors. Proving subjective intent is

---

[9] *Aff'd sub nom. Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 265 (5th Cir. 2012)

always difficult; admissions of ill will are rare.  Trustee therefore seeks to avoid the statutory requirement by invoking the Ponzi-Scheme Presumption.  To further complicate the issue, Trustee seeks to set aside thousands of transfers—the payments Reagor-Dykes made to Ford Credit in the two years prior to the bankruptcy filings.

Reagor-Dykes operated multiple car dealerships throughout west Texas and the metroplex; as is common in the industry, Reagor-Dykes' inventory was financed by large floorplan loans—Ford Credit's being the largest by far.  Reagor-Dykes generated large sales and huge revenues.  It was never a Ponzi scheme.  While Ponzi schemes have been defined in different ways, they are, at bottom, investment scams.  A Ponzi scheme is not a legitimate business, and investment deals are different from debtor-creditor relations.

Every Fifth Circuit case discussed above concerns investment schemes.  The Circuit has not addressed the application of the Ponzi-Scheme Presumption in a case where the transfers are payments made under a traditional debtor-creditor relationship.  The payments here were required under a legitimate floorplan loan.  They were not Ponzi-scheme payments made to lure other new investors.  Further, in *Templeton*, the court held that a "Ponzi-like" (rather than a classic or pure Ponzi) scheme was not enough to create an exception to the ordinary-course-of-business defense.  *Templeton*, 785 F.3d at 161.  Reagor-Dykes, despite its many acts of fraud, was not a wholly illegitimate business; it is a business that failed from its profligate ways.

The Fifth Circuit has narrowly defined Ponzi schemes and has limited application of the Ponzi-Scheme Presumption to true Ponzi schemes.  *Janvey v. Alguire*, 647 F.3d at 597–98; *Quilling*, 247 F. App'x at 586.  In *Cook*, the Fifth Circuit declined to apply the Ponzi-Scheme Presumption where there was evidence that the transferor operated as a fraudulent enterprise but

not as a classic Ponzi scheme. 675 F.3d at 526. Trustee's proposed "Ponzi-like Presumption" is not supported by Fifth Circuit precedent.[10]

Even if the Court were to conclude that the circuit left room for the expansion of the Ponzi-Scheme Presumption, this is not the proper case to do so. Extending the Ponzi-Scheme Presumption here, where the transferor was a real business paying off legitimate obligations, would expand the presumption beyond where any court in the Fifth Circuit has taken it and would undermine the rationale underlying the presumption. Bypassing proof of the required subjective intent—the core element of a fraudulent transfer action based on actual fraud—would be a radical departure from the statute. For these reasons, the Court concludes that Trustee cannot rely on the Ponzi-Scheme Presumption to relieve himself of the burden to prove fraudulent intent.

## III.    Badges of Fraud

Trustee argues that even if he cannot rely on the Ponzi-Scheme Presumption, he still has evidence showing the existence of several "badges of fraud" that support his fraudulent-transfer claim. When analyzing facts under a fraudulent-transfer claim, "[s]ince direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent." *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) (alteration in original) (quoting *Roland v. United States*, 838 F.2d 1400, 1402–03 5th Cir. 1988)). The "badges of fraud" are categories of circumstantial evidence that aid the fact-finder in assessing the

---

[10] The Court recognizes that the existence of legitimate business activity does not prohibit the extension of the Ponzi-Scheme Presumption in all circumstances. Indeed, Ponzi schemes often involve some legitimate investment activity to support the façade of profitability, and courts have extended the Ponzi-Scheme Presumption in such cases. *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 127 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011); *Segner v. Ruthven Oil & Gas, LLC (In re Provident Royalties, LLC)*, 517 B.R. 687, 692–95 (Bankr. N.D. Tex. 2014). Reagor-Dykes did not engage in legitimate activity to support its fraud; it committed fraud to support its dealerships.

transferor's fraudulent intent. *Id.* The Fifth Circuit has recognized the following badges of fraud:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Id.* (quoting *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)). In addition to these badges of fraud, the Fifth Circuit has stated that "evidence that [the transferor] operated as a fraudulent enterprise at the time of the transfers [may support a] finding of fraudulent intent." *IFS*, 669 F.3d at 265. "Not all, or even a majority, of the 'badges of fraud' must exist to find actual fraud." *Soza*, 542 F.3d at 1067.

Trustee has presented evidence that Reagor-Dykes was insolvent when it made the transfers. ECF No. 265-1, Def's. Mot. to Preclude Reilly, App'x at App. 11; ECF No. 259-6, Def's. Ex. D-4 at App. 1031. He has presented evidence of an illegal "course of conduct" after the onset of financial difficulties, as well as a "general chronology of events" that include acts of fraud. *Soza*, 542 F.3d at 1067; ECF No. 259-6, Def's. Ex. D-4 at App. 1023–35; ECF No. 288-1, Pl's Ex. A-1 at App 86–88; ECF No. 259-6, Def's. Ex. C at App. 952–58. Trustee has presented evidence that may support the badges of fraud and other theories recognized by the Fifth Circuit for a fraudulent-transfer action based on actual fraud.

While Trustee, by his complaint, relies on the Ponzi-Scheme Presumption, ECF No. 1, Pl's. Compl. ¶ 61, the complaint is also replete with the circumstantial indicators of fraud outlined above. *Id.* ¶¶ 24–25, 27–32, 44–47, 51–53. Ford Credit has been on notice of the facts underlying a badges-of-fraud theory of fraudulent intent since this case was filed. Trustee

pleaded those facts in his complaint and provided Ford Credit with relevant discovery.

Accordingly, the Court will grant Ford Credit's request for summary judgment foreclosing the

extension of the Ponzi-Scheme Presumption in this case but does not render such judgment on

Trustee's fraudulent-transfer claim.[11]

## IV.    Property of the Bankruptcy Estate

Ford Credit seeks summary judgment on Trustee's fraudulent transfer and preferential

transfer claims on the basis that the transfers did not come from property that would have

become estate property.  A trustee may only avoid transfers "of an interest of the debtor in

property."  §§ 547(b), 548(a).  The Supreme Court has interpreted this phrase to mean that a

trustee may only avoid transfers of "property that would have been part of the estate had it not

been transferred." *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990).  The bankruptcy estate is comprised

of "all legal or equitable interests of the debtor in property as of the commencement of the case."

§ 541(a)(1).  Except where the Bankruptcy Code provides otherwise, substantive property rights

of the debtor are determined by state law.  *Chiasson v. Bingler (In re Oxford Mgmt., Inc.)*, 4 F.3d

1329, 1334 (5th Cir. 1993).

Ford Credit held a first-priority security interest in Reagor-Dykes' furniture, fixtures,

equipment, accounts receivable, and vehicle inventory, as well as the proceeds of vehicle sales.

*See In re Reagor-Dykes Motors*, No. 18-50214, ECF No. 46, 890.  Under Ford Credit's security

agreements with Reagor-Dykes, Reagor-Dykes was required to hold all proceeds of vehicle sales

in trust for Ford Credit.  ECF No. 259, Def's. Exs. A-7–A-12 at App. 37–54.  From these

agreements, Ford Credit concludes that Reagor-Dykes' transfers to Ford Credit consisted of trust

funds or collateral that were not estate property and thus not subject to avoidance.

---

[11] The Court recognizes that, as is the case here, establishing fraudulent intent for a vast number of transfers may be problematic.

## A. Trust Funds

Funds held in trust for another are not property of the bankruptcy estate. *Begier*, 496 U.S. at 59. When funds that would otherwise be property of the estate are alleged to be held in trust, the claimant bears the burden of establishing the existence of the trust. *Oxford Mgmt.*, 4 F.3d at 1335. Ford Credit argues that the transfers consisted of trust funds because its security agreements required Reagor-Dykes to hold in trust the funds it would use for loan payments. But an agreement to hold funds in trust, standing alone, is insufficient to establish the existence of a trust. *Evans Fur Co. of Hous. v. Chase Manhattan Bank, N.A. (In re Sakowitz, Inc.)*, 949 F.2d 178, 184 (5th Cir. 1991).

Trustee, on the other hand, has provided evidence that Reagor-Dykes paid Ford Credit from general operating accounts that consisted of proceeds of Ford-Credit collateral that were commingled with other funds. ECF No. 288-1, Pl's. Ex. A-1 at App. 48–56. "[W]here the recipient of the funds can by agreement use them as his own and commingle them with his own monies, a debtor-creditor relationship exists, not a trust." *Oxford Mgmt.*, 4 F.3d at 1335 (quoting 4 COLLIER ON BANKRUPTCY § 541.13, at 541–76 to –78 (15th ed. 1993)). Indeed, "money in commingled bank accounts under debtor's control 'presumptively constitutes property of the debtor's estate.'" *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 n.15 (5th Cir. 1995) (quoting *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1998)).

Although Reagor-Dykes may have been required under its security agreements to avoid commingling, "control is decisive" in determining whether funds are property of the bankruptcy estate. *IFS*, 669 F.3d at 263–64. Ford Credit cannot merely assert that Reagor-Dykes was required to hold funds in trust to meet its burden to prove the existence of a trust; it must also rebut Reagor-Dykes' evidence of commingling to meet its burden. Ford Credit has not

conclusively proven that commingling did not occur, nor has it provided evidence to prove the existence of a trust besides the requirements of its security agreements.  A genuine dispute of material fact exists on whether the transfers consisted of trust funds.

### B.  Security Interest

Ford Credit also argues that Reagor-Dykes transferred proceeds encumbered by Ford Credit's security interests and the proceeds thus would not have become property of the bankruptcy estate.  The Fifth Circuit has held that because fully encumbered assets cannot be used to pay the debtor's general creditors, they are not property of the bankruptcy estate for avoidance purposes and are unavoidable as preferential or fraudulent transfers.  *Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 461 (5th Cir. 2006); *see also Sherman v. OTA Franchise Corp. (In re Essential Fin. Educ., Inc.)*, 629 B.R. 401, 423–26 (Bankr. N.D. Tex. 2021).  Ford Credit is correct that transferred funds that are encumbered by its senior security interest are not recoverable as fraudulent transfers.

Ford Credit contends that Reagor-Dykes' payments were made with proceeds of its collateral.  "[A] security interest attaches to any identifiable proceeds of collateral."  TEX. BUS. & COM. CODE ANN. § 9.315(a)(2).  But as stated above, Trustee has presented evidence that the funds used to pay Ford Credit came from commingled accounts.  ECF No. 288-1, Pl's. Ex. A-1 at App. 48–56.  And a security interest attaches to the proceeds of commingled collateral only "to the extent that the secured party identifies the proceeds by a method of tracing."  TEX. BUS. & COM. CODE ANN. § 9.315(b)(2).

"[T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment."  *Southmark*, 49 F.3d at 1117.  By showing the transfers came from

commingled general operating accounts over which Reagor-Dykes had complete control, Trustee has shown that the funds came from property of the estate from which other "creditors could have sought payment." *Id*. Thus, just as Ford Credit had the burden of tracing trust funds, it also bears the burden of tracing the proceeds of its collateral to prove it retained a security interest in the proceeds. *See also In re Essential Fin. Educ.*, 629 B.R. at 423–24 (placing burden on transferee to prove it had perfected security interest over transferred funds). Ford Credit has made no attempt at tracing.

There thus remains a genuine dispute of material fact as to whether the transfers to Ford Credit consisted of encumbered collateral. Because of this dispute of fact, and because there exists a fact dispute as to whether the transfers consisted of trust funds, Ford Credit is denied summary judgment on the basis that the transfers it received would not have been property of the estate but for the transfers.

## V.     Good-Faith Defense

Ford Credit argues that because Trustee has admitted that Reagor-Dykes defrauded Ford Credit, Trustee is foreclosed from challenging Ford Credit's good-faith affirmative defense to his fraudulent-transfer claim. A transfer is not voidable as fraudulent under § 548 if the transferee received the transfer "for value and in good faith." § 548(c). A transferee does not receive a transfer in good faith when (1) the transferee was "on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose," and (2) if put on inquiry notice, the transferee failed to engage in a "diligent investigation." *Templeton*, 785 F.3d at 164 (quoting *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 F. App'x 516, 520 (5th Cir. 2013)).

A party has a claim for common-law fraud only if the party justifiably relied on the fraudster's misrepresentations. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546

S.W.3d 648, 654–55 (Tex. 2018). For a party to justifiably rely on another's representations, the "party must exercise ordinary care for the protection of his own interests, … [and] 'a person may not justifiably rely on a misrepresentation if there are red flags indicating such reliance is unwarranted.'" *Id.* at 654–55 (quoting *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). Ford Credit argues that because Trustee conceded by his complaint that Ford Credit was defrauded, he effectively admits that Ford Credit "justifiably relied" on Reagor-Dykes—that is, Ford Credit did not know of, and had no reason to suspect, Reagor-Dykes' misconduct. Accordingly, Ford Credit argues that Trustee has admitted that Ford Credit was not put on "inquiry notice" and was not required to engage in a "diligent investigation," thus conceding Ford Credit's good-faith defense. *Templeton*, 785 F.3d at 164.

Trustee's perceived concessions in the complaint cannot be read to admit that Ford Credit has a claim for common-law fraud or that Ford Credit "justifiably relied" on Reagor-Dykes' representations. The complaint alleges that Reagor-Dykes committed numerous frauds in connection with the floorplan financing that were then complimented by its extensive kiting scheme. ECF No. 1, Compl. ¶¶ 27–32. But these allegations of fraud are broad and generic with no reference to the elements of common law fraud, especially justifiable reliance. Indeed, immediately after outlining Reagor-Dykes' fraudulent activities, Trustee explains in his complaint that Ford Credit was put on inquiry notice of Reagor-Dykes' fraudulent conduct. *Id*. ¶¶ 33–43. The complaint can thus be read to admit only that Reagor-Dykes engaged in gross misconduct; it does not admit that Ford Credit has a viable common-law claim for fraud or that it received transfers in good faith. Ford Credit is denied summary judgment on this basis for its good-faith defense.

## VI.     Preference Claim

### A.  Chapter 7 Liquidation Analysis – § 547(b)(5)

Ford Credit seeks summary judgment on Trustee's preference claim, arguing that Trustee

has failed to provide evidence supporting an essential element of that claim—that the transfers

enabled Ford Credit to receive more than it would have received under a hypothetical chapter 7

liquidation.  *See* § 547(b)(5).  Trustee bears the burden of proof for his preference claim.

§ 547(g).

When an undersecured creditor, such as Ford Credit, recovers *its collateral* as payment, it

will not recover more than it would in a chapter 7 liquidation.  Such collateral would still have

been available to the creditor in a chapter 7 case.  *Krafsur v. Scurlock Permian Corp. (In re El

Paso Refinery, L P)*, 171 F.3d 249, 254 (5th Cir. 1999).  Likewise, an undersecured creditor does

not receive a greater recovery than it would in a chapter 7 liquidation when it applies a payment

to the secured portion of a debt.  *Id*.  In *El Paso Refinery*, the creditor effectively released a

portion of its collateral from its security interest and thus reduced its secured claim and freed-up

a corresponding amount of collateral.  *Id*.  Accordingly, "[t]o determine whether an undersecured

creditor received a greater percentage recovery on its debt than it would have under chapter 7 the

following two issues must first be resolved: (1) to what claim the payment is applied and (2)

from what source the payment comes."  *Id*.

Ford Credit does not address at this stage whether Reagor-Dykes' payments were

"applied" to its debt to reduce its collateral.[12]  It does, however, argue that Trustee has failed to

---

[12] Ford Credit raises the "application" aspect of the *El Paso Refinery* analysis for the first time in a footnote in its reply. "Courts generally will not consider arguments raised for the first time in a reply brief" because "[d]oing so would deprive the non-movant of a meaningful opportunity to respond." *White v. City of Red Oak, Tex.*, No. 3:13-CV-4477-P, 2014 WL 11460871, at *1 (N.D. Tex. July 31, 2014) (internal quotations omitted). The Court therefore will not consider Ford Credit's contention concerning the "application" aspect of the *El Paso Refinery* analysis.

prove that the preference payments were not "sourced" from Ford Credit's collateral. Like he did to show that the payments were property of the estate, Trustee points out that the transferred funds originated from commingled bank accounts. Unlike the property of the estate analysis, however, it is *Trustee*, not Ford Credit, that bears the burden of tracing proceeds of collateral to prove the preference payments *were not* sourced from Ford Credit's collateral. *Garner v. Knoll, Inc. (In re Tusa-Expo Holdings, Inc.)*, 811 F.3d 786, 799 (5th Cir. 2016) ("[W]e hold that it was the Trustee's burden to establish that the funds in the operating account were not the proceeds of Tusa Office's accounts receivable and that she failed to do so.").

Trustee has failed to conduct a tracing analysis, and Ford Credit argues this failure entitles it to summary judgment. Although Trustee bears the burden to either trace Ford Credit's proceeds or prove tracing is impossible, his evidence of commingling shows that at least *some* of the payments were sourced from funds besides Ford Credit's collateral. There thus remains a fact dispute as to what extent the preference payments were sourced from Ford Credit's collateral, and Trustee's failure at this stage to trace, or prove tracing is impossible, does not entitle Ford Credit to summary judgment.

The *El Paso Refinery* analysis is only a threshold inquiry, however, and after meeting that threshold, Trustee still must prove Ford Credit received more than it would have in a chapter 7 liquidation. But there is a presumption that "an undersecured creditor who receives payments is obtaining more than it would receive in a Chapter 7 liquidation to the extent that the payments reduced the unsecured deficiency." *Rand Energy Co. v. Strata Directional Tech., Inc. (In re Rand Energy Co.)*, 259 B.R. 274, 278 (Bankr. N.D. Tex. 2001). Because Ford Credit has not contested that the payments were applied to the unsecured portion of the debt, and because Trustee has presented evidence that some of the transfers to Ford Credit consisted of

unencumbered collateral, it can be presumed that Ford Credit received more than it would have received in a hypothetical chapter 7 liquidation.

### B.   "Contemporaneous Exchange" Defense – § 547(c)(1)

Ford Credit argues it is entitled to summary judgment on Trustee's preference claim because the transfers were "contemporaneous exchange[s] for new value." § 547(c)(1).  Even if the elements of § 547(b) are met, a transfer may not be avoided if it meets the elements of the contemporaneous-exchange-for-new-value exception to preferential transfers.  *Id*.  Under this exception, a trustee may not avoid a transfer that was: "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact [was] a substantially contemporaneous exchange." *Id*.  "The purpose of the contemporaneous exchange for new value defense is to encourage creditors to continue to deal with financially-distressed debtors, as long as their transactions involve true exchanges of equally-valued consideration."  *Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.)*, 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005).

Section 547(c)(1) is an affirmative defense on which the defendant bears the burden of proof.  *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, No. 99-11401, 2000 WL 1741550, at *3 (5th Cir. Nov. 7, 2000).  To succeed on a § 547(c)(1) defense, a defendant must prove (1) intent, (2) contemporaneousness, and (3) new value.  *Id*.

Under Ford Credit's floorplan financing agreement, Ford Credit extended loans to Reagor-Dykes to purchase vehicles for customer sales.  ECF No. 259, Def's. Ex. A at App. 3.  Once Reagor-Dykes sold a vehicle, it had seven days to remit payment from the sale to Ford Credit.  ECF No. 288-1, Pl's Ex. A-1 at 82–83.  This evidence indicates that the parties did not

intend for a contemporaneous exchange; rather, Ford Credit expected a delay between funding its loan to Reagor-Dykes and receipt of payment after sale of a vehicle.

Further, the exchanges were not contemporaneous in practice. Reagor-Dykes would rarely, if ever, remit payment upon credit from Ford Credit. Indeed, Reagor-Dykes would commonly sell vehicles "out of trust," failing to remit payment to Ford Credit until well past the 7-day window allowed under the financing agreements. ECF No. 288-1, Pl's. Ex. A-4 at App. 0441. Ford Credit and Reagor-Dykes had a typical lender-borrower relationship with gaps between loan funding and repayment. Reagor-Dykes' payments were not substantially contemporaneous.

Ford Credit contends that Reagor-Dykes made payments to it in order to contemporaneously borrow additional funds from Ford Credit on a daily basis. But while repayment may have been necessary for additional funding, Reagor-Dykes' payments were on account of the antecedent debts from the floorplan. Payments may have made further extensions of credit available, but they are irrelevant to the contemporaneous-exchange analysis.

Ford Credit contends that it extended $154,405,937.58 in credit to Reagor-Dykes that was "new value" for Reagor-Dykes' transfers. Even assuming that is true, Ford Credit has still failed to prove that the transfers were intended to be contemporaneous exchanges and that they were substantially contemporaneous in practice. Ford Credit has failed to meet its burden on its contemporaneous-exchange defense.

### C. "Ordinary Course of Business" Defense – § 547(c)(2)

Ford Credit argues that it is entitled to summary judgment on Trustee's preference claim because the transfers were made "in the ordinary course of business." § 547(c)(2). Even if all the elements of § 547(b) are met, a transfer may not be avoided if it meets the elements of the

"ordinary course of business" preferential-transfer exception. *Id.* Under this exception, a trustee

may not avoid a transfer:

> to the extent that such transfer was in payment of a debt incurred by the debtor in
> the ordinary course of business or financial affairs of the debtor and the transferee,
> and such transfer was--
>> (A) made in the ordinary course of business or financial affairs of the debtor
>> and the transferee; or
>> (B) made according to ordinary business terms.

*Id.* "The ordinary course of business defense provides a safe haven for a creditor who continues

to conduct normal business on normal terms." *Templeton*, 785 F.3d at 160 (quoting *Gulf City*

*Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 367 (5th

Cir. 2002)).

Section 547(c)(2) is an affirmative defense, and the defendant bears the burden of proof.

*Gulf City Seafoods*, 296 F.3d at 367. The defendant must show that the transfer meets either the

subjective test of § 547(c)(2)(A) or the objective test of § 547(c)(2)(B) of the "ordinary course of

business" exception. "[T]he objective test seeks to determine whether [the transfers] were

'ordinary in the industry.'" *Reed v. Walton (In re BFN Operations LLC)*, 607 B.R. 551, 561

(Bankr. N.D. Tex. 2018) (quoting *In re ACP Ameri-Tech Acquisition, LLC*, No. 09-90082, 2012

WL 481582, at *7 (Bankr. E.D. Tex. Feb. 14, 2012)). "The subjective test examines whether the

transfers were ordinary in light of 'each party's respective practices.'" *Faulkner v. Broadway*

*Festivals, Inc. (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2022 WL 120199, at *5

(Bankr. N.D. Tex. Jan. 12, 2022) (quoting *In re C.W. Mining Co.*, 798 F.3d 983, 989 (10th Cir.

2015)).

Ford Credit argues that the transfers were ordinary under the subjective test. Under the

subjective test, "courts consider whether the timing or amount of payments differed from past

practices, whether the creditor-transferee took advantage of the debtor's known deteriorating

financial condition or engaged in unusual collection efforts, and the length of time the parties were engaged in transactions." *Faulkner v. Lone Star Car Brokering, LLC (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2022 WL 468065, at *6 (Bankr. N.D. Tex. Feb. 15, 2022). Ford Credit argues that the transfers meet this test because Ford Credit pursued no unusual collection efforts, Reagor-Dykes frequently made payments in fluctuating amounts—with greater amounts typically paid in months with audits both before and during the transfer period—and because the total amount of the payments made during the preference period was consistent with the three-month rolling average for payments made in the year preceding the bankruptcy filing.

The evidence submitted by Ford Credit is not sufficient to hold that the transfers qualify for the ordinary-course exception under the subjective test. When analyzing transfers under the subjective test, a comparison of "a baseline transaction history between the debtor and the defendant spanning a length of time with a significant number of payments" to the allegedly preferential payments is important. *Broadway Festivals*, 2022 WL 120199, at *5. This comparison is especially significant where, like here, the parties have an extensive history with thousands of made payments. *See Plan Amin. Agent v. Coastal Indus. (In re Kevco, Inc.)*, No. 401-40783-BJH-11, 2005 WL 6443621, at *13 (Bankr. N.D. Tex. June 30, 2005). Ford Credit has presented no such analysis, save evidence that the total amount of payments during the preference period matched the year prior. With such an extensive history of transactions, this evidence is insufficient for summary judgment.

Ford Credit claims the transfers were also ordinary under the objective test because it is not uncommon for dealers to sell vehicles out of trust. But the Fifth Circuit has found that late loan repayments by debtors are inherently out of the ordinary. *Pritchard v. Ransom (In re Desktop Eng'g Sols. Inc.)*, 30 F.3d 1492 (5th Cir. 1994). And Trustee has pointed to evidence

(supplied by Ford Credit) that selling vehicles out of trust is *not* ordinary in the floorplan financing industry. ECF No. 261-1, Def's. App'x in Support of Mot. to Exclude William Ploog at App. 33. Ford Credit has failed to meet its burden under the objective test.

Trustee has made an adequate showing that the transfers enabled Ford Credit to receive more than it would have received in a hypothetical chapter 7 liquidation. And Ford Credit has failed to prove that it is entitled to the contemporaneous-exchange or ordinary-course-of-business defenses. For these reasons, the Court denies Ford Credit summary judgment on Trustee's preference claim.

## VII. Recovery Cap

While § 548 determines what transfers Trustee may *avoid*, § 550 determines what transfers Trustee may *recover* for the estate. Under § 550, Trustee may only recover transfers that are avoidable under § 548 "for the benefit of the estate." *See MC Asset Recovery, LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 534 (5th Cir. 2012) (Trustee has standing to pursue avoidance claims "to the extent that … successful avoidance of fraudulent transfers will benefit the bankruptcy estate."). The recovery of an avoidable transfer benefits the estate when the recovered property is used to pay claims of unsecured creditors but not when the recovery only benefits the debtor or when the estate could otherwise pay claims in full. 5 COLLIER ON BANKRUPTCY ¶ 550.02 (16th ed. 2022).

The $315 million that Trustee seeks to recover far exceeds the total amount of unsecured claims in this case (including Ford Credit's remaining unsecured claim), which total approximately $115 million, a number subject to change as the claims-objection process continues. *See In re Reagor-Dykes Motors*, No. 18-50214-rlj-11, ECF No. 2295. But Ford Credit admits that "general unsecured creditors will never be paid in full, even if the Trustee

could recover the full amount of the Transfers from Ford Credit." ECF No. 258, Def's. Br. at 44 n.122. That is because, for whatever amount Trustee might recover on his avoidance claims, Ford Credit will have an unsecured claim in the amount of that recovery. § 502(h). Ford Credit will then receive on that claim a pro rata recovery with all other unsecured creditors. While Ford Credit's ultimate payout from Reagor-Dykes will be reduced, the payout to other unsecured creditors will increase with every dollar recovered by Trustee. The following chart,[13] formulated by Trustee, illustrates this principle:

| Trustee's Recovery | Unsecured Claims Post-Recovery | Percent Distributed to Unsecured Creditors[14] | Transfers Retained by Ford Credit | Ford Credit's True Recovery[15] |
|---|---|---|---|---|
| $23 million | $123 million | 7% | $ 292,000,000.00 | 81% |
| $100 million | $200 million | 26% | $ 215,000,000.00 | 70% |
| $200 million | $300 million | 36% | $ 115,000,000.00 | 56% |
| $250 million | $350 million | 39% | $ 65,000,000.00 | 50% |
| $315 million | $415 million | 42% | $ 0 | 42% |

As every dollar recovered by Trustee will be used to increase the distribution to unsecured creditors, every dollar recovered benefits the estate.

Ford Credit argues that any recovery by Trustee must be capped at the amount of the remaining priority, administrative, and allowed unsecured claims, excluding Ford Credit's own claims. Otherwise, Ford Credit argues, the only benefit derived from the transfer will be to

---

[13] This chart makes the following assumptions for illustrative purposes. First, it assumes that there are $5 million in unpaid priority and administrative claims. Second, it assumes that there are $100 million in allowed, general unsecured claims, $50 million of which belong to Ford Credit. Third, it assumes that Trustee's professionals will be paid a 40% contingency fee in accordance with the compensation structure set forth in the Order Granting Application for Authority to Employ the Stricklin Law Firm as Special Litigation Counsel. No. 18-50214, ECF No. 1834 at 6. Fourth, it assumes that Trustee will be paid the agreed fee in accordance with 11 U.S.C. § 326(a). Fifth, it assumes an avoidance of $315 million in transfers. ECF No. 288, Pl.'s Br. at 44.

[14] This number is calculated by taking 57% of Trustee's recovery (the recovery after Trustee's fees and the attorneys' fees), subtracting the amount of unpaid priority and administrative claims, and then dividing that number by the amount of unsecured claims post-recovery.

[15] Ford Credit's true recovery includes money avoided but not recovered by Trustee, since this is money that the entire creditor body would be entitled to but for the cap that Ford Credit seeks to apply.

Trustee and his counsel, who will receive a 40–45% contingency fee on the recovery. There is no doubt that the disbursements to Trustee and his counsel will significantly diminish the amount Ford Credit receives from Reagor-Dykes by skimming such a large portion off Trustee's recovery—Ford Credit's distribution on its § 502(h) claim would be a fraction of whatever amount Trustee recovers from Ford Credit in this case. But there is also no doubt that any recovery, even with a hefty fee taken off the top, will benefit the estate because it will increase distributions to the unsecured creditors.

While this result may appear inequitable towards Ford Credit, it is the result contemplated by the Bankruptcy Code. The Code allows for recoveries on fraudulent-transfer claims that benefit the estate, and it allows the defendant to recoup some of its losses through a § 502(h) claim. Through that claim, the defendant will receive a pro rata distribution from the estate on equal footing with other unsecured creditors. While a plaintiff's fees may limit the ultimate recovery of unsecured creditors, no creditor, including Ford Credit, objected to Trustee's counsel's contingency fee agreement.

And while a cap may benefit Ford Credit, accepting Ford Credit's cap at the amount of claims in the case would negatively impact other creditors. Such a cap would *not* amount to a full recovery on their claims because a large portion of any fraudulent-transfer recovery would go to Ford Credit's § 502(h) claim and to Trustee and his counsel. This result contrasts with the facts of *Giuliano v. Schnabel* upon which Ford Credit relies. *(In re DSI Renal Holdings, LLC)*, No. 11-11722 (KBO), 2020 WL 550987, at *5 (Bankr. D. Del. Feb. 4, 2020). In that case, the court capped a plaintiff's recovery on a fraudulent-transfer claim to "the total amount necessary to satisfy all allowed creditor claims and expenses in the Debtors' bankruptcy cases." *Id*. at *9. But *DSI Renal Holdings* is readily distinguishable from the case at hand because there a recovery

on the fraudulent conveyance could *pay creditors in full*. *Id*. at \*7. Here, Ford Credit admits that no recovery will allow all creditors to be paid in full—every dollar recovered brings unsecured creditors closer to a full recovery but never to 100%.

In arguing that its proposed recovery cap should exclude a calculation of Ford Credit's existing unsecured claim and its § 502(h) claim, Ford Credit essentially argues it is entitled to a setoff for the full amount of those claims. But allowances for setoffs "do not apply to actions by the Trustee to recover fraudulent transfers: 'It would defeat the purpose of the Bankruptcy Act's provisions relating to fraudulent transfers to allow [creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor].'" *Bustamante v. Johnson (In re McConnell)*, 934 F.2d 662, 667 (5th Cir. 1991) (alterations in original) (quoting *Mack v. Newton*, 737 F.2d 1343, 1366 (5th Cir. 1984)). That is because "allowing the creditor to offset the amount of the transfer would merely continue the preference, thereby rendering the preference [and fraudulent conveyance statutes] useless because the preference would not become available for *pro rata* distribution to all creditors." 5 COLLIER ON BANKRUPTCY ¶ 553.03 (16th ed. 2022).

Ford Credit relies on *Page v. Rogers* for the contention that it is entitled to a setoff. 211 U.S. 575 (1909). In *Page*, the bankruptcy court ordered a creditor to pay-back a $61,000 preference to the bankruptcy estate. *Id*. at 577. Because of the preference, the creditor then had a claim against the estate, and the Supreme Court found "it is entirely practicable to avoid the circuitous proceeding of compelling the defendant to pay into the bankruptcy court the full amount of the preference which he has received, and then to resort to the same court to obtain part of it back by way of dividend." *Id*. at 581. The Court held that "the bankrupt [*sic*] court … may settle the amount of the dividend coming to [the creditor], and the final decree may direct

him to pay over the full amount of his preference, with interest less the amount of his dividend." *Id*.

While *Page* did allow for a setoff on a preference claim, the decision was rendered many decades before the enactment of the modern Bankruptcy Code. And since it was decided, "[s]ubsequent cases have applied *Page* narrowly, and have permitted a setoff by a preferred creditor only if 'the dividend can be quickly and easily determined, and the dividend is immediately payable.'" 5 COLLIER ON BANKRUPTCY ¶ 553.03 (16th ed. 2022) (quoting *Roeder v. Climax Molybdenum Co. (In re Old Electralloy Corp.)*, 164 B.R. 501, 506 (Bankr. W.D. Pa. 1994)). Trustee has not yet calculated the total amount of claims in the case, and it may be months or years before distributions from the estate are made to unsecured creditors. Ford Credit's § 502(h) claim therefore cannot be "quickly and easily determined" nor is it "immediately payable." *Id*. *Page* does not provide an exception here to the general rule that a defendant may not receive a setoff on a fraudulent transfer recovery.

Finally, Ford Credit argues that Trustee's recovery must be limited by netting the amounts that Ford Credit paid to new vehicle manufacturers for vehicles that Reagor-Dykes ordered and received into their inventory. The plain language of § 550, however, makes no mention of netting and says simply that "to the extent … a transfer is avoided, … the trustee may recover … the value of such property." The Fifth Circuit has found that in a Ponzi-scheme case "section 548(c) requires netting." *Williams v. Fed. Deposit Ins. Corp. (In re Positive Health Mgmt.)*, 769 F.3d 899, 909 (5th Cir. 2014). But because the Court concludes the Ponzi-Scheme Presumption does not apply here, there is no basis for netting recovery in this case.

In sum, Ford Credit is not entitled to a cap of any recovery obtained by Trustee. Any recovery will benefit the estate. For every dollar recovered by Trustee, distributions to

unsecured creditors increase.  The Court therefore denies summary judgment to Ford Credit to the extent it seeks to cap Trustee's recovery.

## VIII.   Conclusion

Trustee may not invoke the Ponzi-Scheme Presumption to satisfy the intent element of § 548(a)(1)(A).  Summary judgement is granted on this point.  There remain genuine disputes of material fact as to whether (1) the transfers would have been property of the bankruptcy estate had they not been made, (2) whether Ford Credit received the transfers in good faith, (3) whether Ford Credit received more through the transfers than it would have received in a hypothetical chapter 7 liquidation, and (4) whether the transfers were substantially contemporaneous or conducted in the ordinary course of business.  Ford Credit has not shown that Trustee's recovery, if any, should be capped.  On these issues, Ford Credit's motion for summary judgment is denied.

### End of Memorandum Opinion ###